IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RAPOWER-3, LLC, INTERNATIONAL AUTOMATED SYSTEMS, INC., LTB1, LLC, R. GREGORY SHEPARD, NELDON JOHNSON, and ROGER FREEBORN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER FREEZING ASSETS AND TO APPOINT A RECEIVER**<br><br>Civil No. 2:15-cv-00828 DN EJF<br><br>District Judge David Nuffer |

This order GRANTS the United States' second motion to freeze Defendants' assets and appoint a receiver, [ECF Doc. No. 414](ECF Doc. No. 414), filed June 22, 2018.

On November 23, 2015, the United States filed its complaint against Defendants, seeking to enjoin Defendants from organizing, promoting, and selling the "solar energy scheme" that they have been promoting since on or before 2010.[1] The United States also seeks disgorgement of Defendants' ill-gotten gains from the promotion of their abusive tax scheme.[2]

The United States previously moved for an order freezing the assets of Defendants Neldon Johnson, RaPower-3, and IAS's assets and for an order appointing a receiver on

---

[1] [ECF Doc. No. 2](ECF Doc. No. 2) and [ECF Doc. No. 35](ECF Doc. No. 35) ¶ 1(a).

[2] [ECF Doc. No. 2](ECF Doc. No. 2) and [ECF Doc. No. 35](ECF Doc. No. 35) ¶ 1(a).

November 17, 2017.[3] On March 2, 2018, the United States' motion was denied without prejudice in part because the United States relied upon the facts set forth in its motion for partial summary judgment including the "disputed material facts as to Defendants' knowledge at the time they made certain statements."[4] The Motion for Partial Summary Judgement was also denied in that same order.[5] Trial is now completed. The Court made extensive findings on the record at the end of trial;[6] intends to enter detailed Findings of Fact and Conclusions of Law including a disgorgement order; and has already entered an interim injunction based on summary findings[7] and a preservation order.[8] On the basis of the evidence adduced at trial, as laid out below, the United States' motion is granted.

I.    Statement of Facts ...................................................................................................... 3

II.   The injunctive relief requested by the United States – in the form of an asset freeze and appointment of a receiver – is necessary or appropriate to enforce the Internal Revenue Laws.. 13

    A.    The United States has succeeded on the merits. ................................................... 15

    B.    The United States will suffer irreparable injury if an order granting the asset freeze and appointing a receiver is not issued. ............................................................... 16

    C.    The balance of harm to the United States in not issuing the injunctive relief outweighs the harm to be caused to Defendants by issuing the requested relief. .............. 18

    D.    An injunction will benefit, not disserve, the public interest. ................................ 19

    E.    A receiver is necessary or appropriate to effect the asset freeze. ......................... 20

III.  Order ........................................................................................................................ 26

---

[3] ECF Doc. No. 252. The United States did not include Shepard in its original motion to freeze defendants' assets.

[4] ECF Doc. No. 318, at 4.

[5] *Id.*

[6] ECF Doc. No. 409, filed June 21, 2018.

[7] Initial Order and Injunction After Trial, ECF Doc. No. 413, filed June 22, 2018.

[8] ECF Doc. No. 419, filed June 27, 2018.

## I.    Statement of Facts

1.  Neldon Johnson is and has been the manager, and a direct and indirect owner of, RaPower-3, LLC, International Automated Systems, Inc. and LTB1, LLC (among other entities). He is the sole decision-maker for each entity.[9]

2.  Johnson claims to have invented certain solar energy technology that involves solar thermal lenses placed in arrays on towers.[10]

3.  In or around 2006 through 2008, Johnson directed IAS to erect, at most, 19 towers on "the R&D Site" near Delta, Utah, in Millard County.[11]

4.  Johnson also directed that IAS install solar lenses in those towers.[12]

5.  To make money from this purported solar energy technology, Johnson decided to sell a component of the purported technology: the solar lenses.[13]

6.  Johnson recognized that his strength was not in sales, so he directed that IAS use independent sales representatives to sell lenses.[14]

---

[9] ECF Doc. No. 22 ¶ 12; Pl. Ex. 579, Deposition Designations for Neldon Johnson, vol. 1 ("Johnson Dep., vol. 1"), 36:1-39:12, 46:3-47:3; 52:20-57:1; 74:1-14; 77:4-87:12.

[10] Johnson Dep., vol. 1, 87:16-91:1; 134:19-135:2; 139:23-144:19; Pl. Ex. 504; Pl. Ex. 509, Video 12_4_38-5_15; Pl. Ex. 509, Video 12_4_00-4-23.

[11] Pl. Ex. 581, Deposition Designations for International Automated Systems, Inc. ("IAS Dep."), 162:1-165:9; 171:10-173:20; Pl. Ex. 532 at 6; Pl. Ex. 531.

[12] IAS Dep. 62:15-64:1.

[13] Pl. Ex. 682, Deposition Designations for RaPower-3, LLC ("RaPower-3 Dep."), Dep. 36:4-39:8.

[14] IAS Dep. 145:21-146:9; Pl. Ex. 463; RaPower-3 Dep. 140:9-143:4; Pl. Ex. 504.

7.  Johnson drafted some promotional materials to describe the arrangement, "IAUS Solar Unit Purchase Overview" and IAS "Solar Equipment Purchase."[15]

8.  Johnson showed IAS salespeople these descriptive materials about the structure of the transaction, the purported technology, and the federal tax benefits that Johnson said a customer could lawfully claim when he bought a lens from IAS.[16]

9.  He told IAS's initial salespeople what he understood the tax laws to mean.[17]

10.  R. Gregory Shepard has been an IAS shareholder since the mid-1990s.[18] He became one of IAS's initial salespeople in or around September 2005, and began selling solar lenses.[19]

11.  Shepard's information about Johnson's purported solar energy technology came from Johnson or members of Johnson's family, and Shepard's own observations on his site visits over the years.[20]

12.  Johnson told Shepard that a depreciation deduction and the solar energy tax credit are related to the sale of lenses.[21]

---

[15] IAS Dep. 162:1-165:9; 171:10-173:20; Pl. Exs. 531 and 532.

[16] IAS Dep. 162:1-165:9; 171:10-173:20; Pl. Exs. 531 and 532.

[17] Johnson Dep. vol. 1, 240:18-241:10; 247:11-248:12; RaPower-3 Dep. 117:22-119:11; Pl. Ex. 473.

[18] Pl. Ex. 685, Deposition Designations for R. Gregory Shepard ("Shepard Dep."), 43:19-46:1.

[19] Shepard Dep. 70:14-71:22; Pl. Ex. 463.

[20] Johnson Dep., vol. 1, 209:11-210:3, 211:16-215:23; Shepard Dep. 36:6-40:23, 46:2-57:5, 183:14-187:13; Pl. Ex. 8A; RaPower-3 Dep. 155:4-166:18; Pl. Ex. 267.

[21] Johnson Dep., vol. 1, 279:19-22; IAS Dep. 162:1-165:9; 194:6-20; Pl. Ex. 531.

13. Johnson created, owns, and controls at least three entities that sell or have sold solar lenses: SOLCO I,[22] XSun Energy,[23] and RaPower-3, LLC.[24] SOLCO I and XSun Energy are not defendants in this action.

14. Johnson created RaPower-3 in 2010. He is it manager and the sole decision-maker for the company.[25]

15. Once formed, RaPower-3, rather than IAS, sold solar lenses to individuals.[26]

16. RaPower-3's only business activity is selling solar lenses through a multi-level marketing (otherwise known as "network marketing") approach to increase sales.[27]

17. Selling lenses through RaPower-3 gave Johnson "much needed revenue" to continue his operations.[28]

18. Johnson directed RaPower-3 to create a site online (https://rapower3.net) where a customer can access and sign a contract to buy lenses and sign other transaction documents that Johnson provides (described below).[29]

---

[22] Johnson Dep., vol. 1, 82:8-83:6; LTB1 Dep. 78:22-79:5; 79:12-80:9; IAS Dep. 38:10-40:6, 45:4-17.

[23] *See generally* Pl. Ex. 355; IAS Dep. 47:2-19; Johnson Dep., vol. 1 79:8-81:7.

[24] RaPower-3 Dep. 32:16-33:14, 44:4-14, 45:9-10.

[25] RaPower-3 Dep. 32:16-33:14.

[26] RaPower-3 Dep. 32:16-33:14; IAS Dep. 23:22-25:22; Pl. Ex. 462; Pl. Exs. 8A, 25, 91-95, 119, 121, 174, 181, 346, 462, 464, 473, 511, 512, 531-533, 555, 587, 613-615, 637-639, 760, 762; Rowbotham Testimony, Trial Tr. 910:24-927:7; Williams Testimony, Trial Tr. 982:3-983:23; 985:4-990:12; 991:6-994:15; Olsen Testimony, Trial Tr. 1060:11-25; 1070:11-1074:7; 1078:20-1081:23; Jameson Testimony, Trial Tr. 1221:15-22; 1224:13-1225:25; 1226:6-1228:10; 1237:8-16.

[27] RaPower-3 Dep. 32:16-33:14; 36:4-39:8.

[28] Pl. Ex. 8A at 9; Pl. Ex. 749.

[29] RaPower-3 Dep. 39:9-41:2; Pl. Ex. 511; Pl. Ex. 673, Deposition Designations for LTB1, LLC ("LTB1 Dep."), 39:6-25; Pl. Ex. 61.

19.  Among other things, Shepard created the website www.rapower3.com[30] and moderates an online discussion board called "IAUS & RaPower[-]3 Forum."[31]

20.  Shepard gets paid for his work with RaPower-3 through his company, Shepard Global.[32]

21.  On the RaPower-3 website, Shepard describes the solar energy technology (including the solar lenses) and the transactions underpinning the solar energy scheme, promotes sales, and provides links to the website with the transaction documents.[33] Shepard also uses the IAUS and RaPower-3 Forum and emails to communicate with RaPower-3 members and prospective members.[34]

22.  Shepard also organizes groups of people to visit the R&D Site, the site where component parts of the purported solar technology system are manufactured (the "Manufacturing Facility"), and the site on a large field with a few semi-constructed component parts (the "Construction Site").[35]

---

[30] Shepard Dep. 25:22-26:8; Pl. Ex. 459; Pl. Exs. 1, 5, 19, 20-21, 24-25, 34, 352, 419, 674, 676, 678-80, 714-724, 796.

[31] Shepard Dep. 286:5-24.

[32] Jameson Testimony, Trial Tr. 1294:15-1301:3; M. Shepard Testimony, Trial Tr. 1412:18-1415:16.

[33] Pl. Ex. 688, Deposition Designations of Roger Freeborn ("Freeborn Dep."), 23:2-24:14; Pl. Ex. 490; Pl. Ex 689, Deposition Designations for Peter Gregg ("Gregg Dep."), 56:20-57:13.

[34] Shepard Dep. 286:5-289:13; Pl. Ex. 481.

[35] *E.g.*, Pl. Exs. 21, 419 at 1; Johnson Dep., vol. 1, 87:23-89:10; Pl. Ex. 509, Video 12_4_00-4_23.

23.  Shepard directs customers to use tax return preparers who are part of the solar energy scheme, like John Howell in Wichita Falls, Texas; Kenneth Alexander in Florida; and Richard Jameson in St. George, Utah.[36]

24.  From 2009 through 2016, RaPower-3 had received at least $25,874,066 from its role in the solar energy scheme.[37]

25.  From 2008 through 2016, IAS has received at least $5,438,089 from its role in the solar energy scheme.[38]

26.  From 2011 through 2016, XSun Energy has received at least $1,126,888 from its role in the solar energy scheme.[39]

27.  From 2010 through 2016, SOLCO I has received at least $3,434,992 from its role in the solar energy scheme.[40]

28.  From 2005 through February 28, 2018, all lens-selling entities have received at least $32,796,196.

29.  Testimony at trial showed that the total sales price of lenses which appears to have been paid is at least $50,025,480.[41]

---

[36] Pl. Exs. 242-245; Pl. Ex. 597; Gregg Dep. 121:14-25; Pl. Ex. 606; Pl. Ex. 334.

[37] Pl. Ex. 735; Reinken Testimony, Trial Tr. 863:18-866:18; 866:19-868:24; *see also*, Pl. Exs. 742B, 749.

[38] Pl. Ex. 738; Pl. Ex. 852, at 59; Buck Testimony, Trial Tr. 257:7-258:20; 271:9-272:12; 293:1-294:11; 312:5-15; Pl. Ex. 371; Pl. Ex. 507, at 20, 35; Johnson Testimony, Trial Tr. 1812:4-12.

[39] Pl Ex 741; Johnson Dep., vol. 1, 79:8-81:7; 82:8-10; IAS Dep. 47:2-19; Pl. Exs. 208, 355, 356, 510, 743, at 11.

[40] Pl. Ex. 739; Reinken Testimony, Trial Tr. 863:18-866:18; 870:3-871:7; Johnson Dep., vol. 1, 82:8-85:2; IAS Dep. 38:10-40:6; 45:4-21; LTB1 Dep. 78:22-79:5; 79:12-80:9;81:12-21; Pl. Exs. 38, 325, 495, 545. Reinken Testimony, Trial Tr. 863:18-866:18; 871:10-872:14.

[41] Exhibit 749.

30.  From 2008 through 2016, Shepard received $702,001 from his role in the solar energy scheme.[42]

31.  While selling the solar lenses, Defendants told customers they could buy "lenses" and claim tax benefits.[43]

32.  While they sold solar lenses and organized efforts to sell solar lenses, Defendants told their customers that if they bought a solar lens and signed the transaction documents Defendants provide, their customers were in the "trade or business" of "leasing" solar lenses.[44]

33.  According to Defendants, because their customers are in the trade or business of leasing solar lenses, their customers are allowed to claim on their federal income tax returns a business tax deduction for depreciation on the solar lenses and a solar energy tax credit.[45]

---

[42] Pl. Exs. 411, 445; G. Shepard Testimony, Trial Tr. 1596:5-1598:21; Jameson Testimony, Trial Tr. 1296:19-1301:3.

[43] Oveson Testimony, Trial Tr. 377:21-378:3; Rowbotham Testimony, Trial Tr. 928:14-929:10; 957:17-19; Williams Testimony; Trial Tr. 1022:4-14; 1099:16-1102:15; Olsen Testimony, Trial Tr. 1089:21-1090:15; RaPower-3 Dep., 155:4-166:18; Shepard Dep. 250:13-251:13; Aulds Dep. 42:11-44:22; 54:15-55:14; 57:17-60:15; Freeborn Dep. 71:2-20; Gregg Dep. 127:19-128:8; 136:4-6, 10-14; 137:3-12; 147:5-148:10; 149:1-7; Lunn Dep. 164:12-171:1; Pl. Exs. 1, 30, 32, 43, 49, 93, 125, 214, 294, 348, 492, 496, 499, 501, 532.

[44] *E.g.,* Pl. Ex. 32. Occasionally, Shepard has claimed that customers have been "in the solar energy business." Shepard Dep. 243:11-244:3; Pl. Ex. 43 at 1 ("AM I REALLY IN THE SOLAR ENERGY BUSINESS? Yes."). But in recent years, Shepard has made it clear that "We should not consider ourselves in an 'energy' business. We are buying lenses and leasing them – THAT is our business – LEASING – NOT producing energy …" Pl. Ex. 32.

[45] Pl. Ex. 1 at 2-3 ("Tax Question" Nos. 45). A collection of Johnson's statements: IAS Dep. 162:1-165:9, 171:10-173:20; Pl. Ex. 531 at 3; *see also* Pl. Ex. 532 at 7-10. A collection of Shepard's statements: Pl. Ex. 93 (as a result of purchasing a lens, "the investor gets his $9,000 back in the form of a Tax Credit, plus the depreciation which adds extensive value over a six year period plus the income from power produced by the Solar Pod."); Shepard Dep. 148:21-149:25; *e.g.,* Pl. Ex. 125 (letter from Shepard telling a customer that he is "qualif[ied] … for the Internal Revenue Service solar energy tax credit" because RaPower-3 "put [their lenses] into service").

34. Defendants told customers that IAS, RaPower-3, or LTB "placed in service" or "put into service" their solar lenses in the year that the customers purchased the lenses.[46]

35. Starting in 2010, RaPower-3 sold lenses for a price of $3,500 per lens.[47] Johnson determined the price that RaPower-3 would charge for the lenses.

36. Customers started purchasing lenses via the internet at rapower.net. On that site, a potential customer enters the number of lenses he wishes to purchase, and the website "figures" the amount the customer owes and the amount of the customer's down payment.[48]

37. The site also provides all transaction documents for customers to sign electronically: an Equipment Purchase Agreement, an Operations & Maintenance Agreement ("O&M"), and, at times in the past, a bonus contract.[49]

38. Customers do not negotiate the price of a lens, or other terms of the transactions Defendants promote.[50]

---

[46] Pl. Ex. 1 at 3 ("Tax Question" No. 7); Pl. Exs. 44, 57, 104-105, 123-125, 176, 185, 313, 588; *see also,* Pl. Ex. 472.

[47] Johnson Dep., vol. 1, 206:15-23; Pl. Ex. 687, Deposition Designations for Robert Aulds ("Aulds Dep.") 141:3-13; 146:17-147:5.

[48] Aulds Dep. 141:3-13.

[49] RaPower-3 Dep. 39:18-41:2; Aulds Dep. 141:3-13.

[50] RaPower-3 Dep. 39:9-41:2; *e.g.,* Pl. Exs. 119, 181, 511; Aulds Dep. 141:3-13; 146:17-147:5; Gregg Dep. 55:19-56:13; Howell Dep. 39:17-40:4; 95:3-5; 134:14-135:22; Zeleznik Dep. 67:3-12; Pl. Ex. 693, Deposition Designations for Frank Lunn, IV ("Lunn Dep.") 114:11-115:4.

39. Over the years, Defendants told customers about Johnson's purported solar energy technology and the progress being made by Defendants.[51] Defendants emphasized progress being made despite their knowledge that the system was not up and running.[52]

40. From the start, Defendants have told their customers that they can "zero out" their federal income tax liability by buying enough solar lenses and claiming both a depreciation deduction and solar energy tax credit for the lenses.[53]

41. Defendants knew that when they made statements to customers and prospective customers about the tax benefits and their purported solar lens leasing "trade or business," that the only way a customer has ever "made money" from buying a lens is from the tax benefits; no customer has earned money from rental income or income from a bonus contract.[54]

---

[51] *E.g.,* Pl. Ex. 185 at 1; Johnson Dep., vol. 1, 173:11-177:16; Pl. Exs. 16 & 17. Johnson gave these white papers to Shepard. Johnson Dep., vol. 1, 185:15-23; Shepard Dep. 126:9-128:5. Shepard made them available to the public on rapower3.com. Freeborn Dep. 24:16-25:23; Pl. Exs. 441, 491; RaPower-3 Dep. 140:4-143:17; Pl. Ex. 504; Shepard Dep. 199:10-204:14; Pl. Ex. 471; Shepard Dep. 250:13-252:21; Pl. Ex. 72; Pl. Ex. 109 at 1-3; *see also* Freeborn Dep. 95:3-98:1; Pl. Ex. 425 at 1. Johnson dep., vol. 1, 211:16-215:23; Shepard Dep. 36:6-40:23, 183:14-187:13; Pl. Ex. 8A; Pl. Ex. 676; Gregg Dep. 57:18-59:12; Pl. Exs. 298-299; Pl. Ex. 26; 93; 216, 246, 270, 329, 348.

[52] J. Anderson Testimony, Trial Tr. 617:25-618:9; Pl. Ex. 602; Ruling on Plaintiff's Motions in Limine, Trial Tr. 2107:2-9; Pl. Exs. 6; 292; 411, at 10-11; 412, at 9; 413, at 6; 414, at 10; 415, at 7; 416, at 7; 509, Video 12_4_38-5_15; 509, Video 18_4_09-4_25; 526; 901; Johnson Testimony, Trial Tr. 1990:13-16; Shepard Dep. 204:15-207:8.

[53] Johnson Dep., vol. 1, 247:11-248:12; Pl. Ex. 490 at 9-10; IAS Dep. 162:1-165:9; Pl. Ex. 531. According to Shepard, "the greater one's tax liability, the greater will be the depreciation benefit." Pl. Ex. 24 at 1; *see also*, Pl. Ex. 20 at 2; Lunn Dep. 188:18-189:20; Pl. Ex. 24, 43, 48, 70, 71, 85, 88, 109, 133, 142, 158, 181, 207, 214, 220, 325, 438, 474, 490, 496, 497, 501, 532, 597, 674, 718, 721, 722, 777.

[54] Shepard Dep. 92:17-94:13; Freeborn Dep. 82:16-85:7; Pl. Ex. 246. Freeborn testified that the income from commission on solar lens sales is also "functional." Freeborn Dep. 82:16-85:17; Pl. Ex. 246. But the multi-level marketing component of RaPower-3 is not connected to lens ownership. RaPower-3 Dep. 33:8-34:9. A distributor need not buy a lens in order to sell lenses for RaPower-3. *Id*; Johnson Testimony, Trial Tr. 2242:8-2251:18.

42. LTB, which by contract was to operate and maintain the solar energy project and specifically the lenses, has never done anything; it has never had a bank account, any employees, or any revenue.[55]

43. Defendants told customers to expect income from the "lease" of their lenses, but Defendants know that no customer has been paid for the use of his or her lenses.[56]

44. Defendants' customers have been audited by the IRS for claiming the tax benefits Defendants promote.[57]

45. Based on the advice and information provided by attorneys or accountants they spoke with about the solar energy scheme, Defendants knew or had reason to know that the purported tax benefits were not permissible under the Internal Revenue Code.[58]

46. Defendants also knew or had reason to know that the purported tax benefits from their solar energy scheme were not permissible under the Internal Revenue Code because others also disagreed with their assertions about tax benefits available from the solar lenses, including:

---

[55] LTB Dep. 10:10-11:1; 14:7-16:7; 18:2-9; 42:10-43:5; 69:6-74:21; 90:19-91:8; Pl. Ex. 464; Johnson Testimony, Trial Tr. 2246:7-2247:19

[56] Shepard Dep. 34:18-35:24; 67:1-12; 76:23-82:18; 93:17-94:13; Pl. Ex. 279 at 1; Pl. Ex. 602 at 1-2; Pl. Ex. 465; Johnson Dep., vol. 1. 230:4-11; Pl. Exs. 10, 19, 48, 49, 61, 70A, 142, 151, 159, 217, 246, 283, 341, 465, 724, 796; Rowbotham Testimony, Trial Tr. 933:19-935:15; Williams Testimony, Trial Tr. 1000:9-1001:7; Olsen Testimony, Trial Tr. 1074:8-1078:16; 1086:12-1087:6; Jameson Testimony, Trial Tr. 1238:3-24; 1241:6-11; 1241:17-1245:1; 1280:21-1282:20; 1310:18-1312:9; M. Shepard Testimony, Trial Tr. 1406:12-1407:2; 1574:21-1575:14; G. Shepard Testimony, Trial Tr. 1734:9-1738:23.

[57] *E.g.*, Pl. Ex. 683, Deposition Designations of John Howell ("Howell Dep."), 211:11-213:14 (aware of 150 cases in Tax Court); Shepard Dep. 250:17-251:3.

[58] Pl. Exs. 23, 73, 135, 141, 185, 231, 370, 373, 374, 449, at 2; 450, at 4; 452, at 2; 477, 480, 547, 570, 574, 582; Freeborn Dep. 95:3-13; Dr. Mancini Testimony, Trial Tr. 75:4-15; 85:24-86:12; 90:5-94:7; 96:17-20; 105:9-107:6; Shepard Testimony, Trial Tr. 1692:25-1693:5; 1723:15-22; 1728:4-1729:25; 1730:18-1731:3; Buck Testimony, Trial Tr. 267:24-269:22; 270:3-271:4; Oveson Testimony, 331:11-23; 334:18-336:3; 341:20-342:25; 343:1-2, 6-8; 343:21-344:10; 344:21-346:19; 347:18-348:13; 352:24-355:21; 356:7-357:14; 358:13-361:2; Shepard Dep. 266:2-267:1; J. Anderson Testimony; Trial Tr. 613:12-618:9; 620:1-621:24; 622:19-623:20; 630:20-632:10; 632:17-633:1.

customers' or prospective customers' tax preparers/CPAs, the Internal Revenue Service, the Oregon Department of Revenue, the Oregon Tax Court Magistrate Division, and the Department of Justice.[59]

47. When a customer notifies Shepard that they are under audit, Shepard typically directs the customer to Enrolled Agents John Howell or Richard Jameson to represent the customer before the IRS.[60] Howell and Jameson represent RaPower-3 customers using the same arguments that Defendants make.[61]

48. Shepard has also advocated for customers under audit before the IRS.[62] He has given customers the arguments to make before the IRS and documents to submit while under audit.[63]

49. Johnson is paying the attorneys' fees for all customers whose tax benefits have been disallowed on appeal by the IRS and who have filed petitions in Tax Court.[64]

---

[59] *Id.*; *see also*, ECF Doc. No. 2; *Peter C. Gregg v. Department of Revenue*, 2014 WL 5112762 (Or. Tax. Magistrate Div. 2014); *Kevin M. Gregg v. Department of Revenue*, 2017 WL 5900999 (Or. Tax Magistrate Div. 2017); *Matthew D. Orth v. Department of Revenue*, 2017 WL 5904611 (Or. Tax Magistrate Div. 2017).

[60] Gregg Dep. 151:7-25; Pl. Exs. 333-34; Howell Dep. 183:11-184:8; 211:11-212:10; Pl. Ex 348.

[61] *See, e.g.,* Howell Dep. 221:16-223:18; Pl. Exs. 605, 608, 637.

[62] Pl. Ex. 10.

[63] Pl. Ex. 49; Pl. Ex. 697, Deposition Designations for Brian Zeleznik ("Zeleznik Dep."), 184:18-185:17; 211;4-214:4 and *compare, e.g.,* Pl. Ex. 81 (document written by Brian Zeleznik to the IRS in response to his audit) *with* Pl. Ex. 89 (email from Shepard to Zeleznik with a sample document to use with the IRS); *see also*, Pl. Ex. 163 at 1-2; Pl. Ex. 231; Pl. Ex. 340 (*id.* at 2 ("You can hand write notes or even copy the above [arguments] down by hand and read it word for word [to an auditor]. Just don't give [an auditor] this email.")).

[64] Johnson Dep., vol. 1, 282:19-284:10; IAS Dep. 229:16-230:23; Zeleznik Dep. 142:7-143:1; Jameson Testimony, Trial Tr. 1249:14-1250:1.

50. Defendants have caused serious harm to the United States Treasury as a result of their solar energy scheme.[65] Defendants' customers claimed at least $14,207,517 of improper tax refunds as a result of Defendants' scheme for tax years 2013 through 2016.[66]

51. To date, Johnson, Shepard, IAS and RaPower-3 continue to organize sales of solar lenses, and participate (directly and indirectly) in the sale of solar lenses.[67]

52. They are not deterred from promoting the scheme, not by the IRS' disallowance of their audited customers' depreciation deductions and solar energy tax credits or by the complaint filed in this case or by the announced result in the case.[68]

## II. The injunctive relief requested by the United States – in the form of an asset freeze and appointment of a receiver – is necessary or appropriate to enforce the Internal Revenue Laws.

Under 26 U.S.C. § 7402, this Court has the authority to impose an asset freeze and appoint a receiver to take control of Defendants IAS and RaPower-3's assets and business operations..[69] Section 7402(a) encompasses a broad range of powers necessary to compel

---

[65] Pl. Ex. 750; Howell Dep. 186:3-190:23; 193:22-194:10; 194:19-200:20; Zeleznik Dep. 152:10-15, 152:22-159:5; Gregg Dep. 102:7-103:25; 104:24-105:4; 105:15-106:2; 112:7-124:9; Perez Testimony, Trial Tr. 828:5-829:7, 834:11-836:14; Olsen Testimony, Trial Tr. 1136:14-1137:18; 1139:8-1145:12; Williams Testimony, Trial Tr. 1022:18-1028:14; Jameson Testimony, Trial Tr. 1282:21-1289:11; 1289:15-1293:18; 1304:4-1306:8; 1307:2-1308:17.

[66] Pl. Ex. 750; Perez Testimony, Trial Tr. 828:5-829:7, 834:11-836:14.

[67] Johnson Dep., vol. 1, 240:2-17; 245:24-246:22; Pl. Exs. 424, 426, 539, 679, 731-33.

[68] Shepard Dep., 311:2-315:5; RaPower-3 Dep. 197:13-199:4; IAS Dep. 226:9-25; Jameson Testimony, Trial Tr. 1229:11-14; M. Shepard Testimony, Trial Tr. 1526:19-21

[69] Under 26 U.S.C. § 7402(a), the district courts "shall have jurisdiction to make and issue in civil actions, writs and orders of injunction, [ ] orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws."

compliance with the tax laws.[70] Courts have exercised this broad authority under § 7402(a) in a variety of contexts, including ordering disgorgement of ill-gotten gains against a tax return preparer engaged in fraudulent return preparation,[71] appointing receivers to assist in collection of federal tax liabilities or otherwise ensure compliance with the internal revenue laws,[72] and freezing a defendant's assets.[73] The statute alone provides sufficient authority to issue an injunctive order freezing Defendants' assets.

Examination of the typical factors in imposing equitable relief before final adjudication is not necessary but demonstrates the propriety – and necessity – of this action. In the Tenth Circuit, a party seeking a preliminary injunction must show 1) that there exists a substantial likelihood that the movant will prevail on the merits; 2) that the movant will suffer irreparable injury unless the injunction issues; 3) that the threatened injury to the movant outweighs

---

[70] *See Brody v. United States*, 243 F.2d 378, 384 (1st Cir. 1957) ("It would be difficult to find language more clearly manifesting a congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the internal revenue laws."); *United States v. Kaun*, 633 F. Supp. 406, 409 (E.D. Wisc. 1986) ("By its very terms, this statutory provision authorizes the federal district courts to fashion appropriate, remedial relief designed to ensure compliance with both the spirit and the letter of the Internal Revenue laws – all without enumerating the many, particular methods by which these laws may be violated or their intent thwarted."), *aff'd on other grounds*, 827 F.2d 1144 (7th Cir. 1987); *see also United States v. ITS Financial, LLC*, 592 Fed. Appx. 387, 397 n.6 (6th Cir. 2014).

[71] *United States v. Stinson*, 239 F. Supp. 3d 1299, 1326 (M.D. Fla., March 6, 2017).

[72] *See, e.g., United States v. Latney's Funeral Home*, 41 F.Supp.3d 24, 27 (D.D.C. 2014) (receiver appointed under broad authority of section 7402(a) to oversee company's finances, prevent company from pyramiding employment taxes, and ensuring that company timely filed tax returns); *United States v. Bartle*, 159 Fed. Appx. 723, 724-25 (7th Cir. 2005) (district court did not abuse its discretion in appointing a receiver when defendant owed more than $1 million in delinquent taxes and engaged in a series of transactions to move assets and commingle funds in an attempt to thwart the government's collection efforts); *Florida v. United States*, 285 F.2d 596, 602 (8th Cir. 1960) ("'Though the precise limits of judicial discretion to appoint a receiver under Sections 7402(a) and 7403 of the 1954 [Internal Revenue] Code are not defined, where the record shows that a substantial tax liability probably exists, and that the Government's collection of the tax may be jeopardized if a receiver is not appointed, the appointment will be made.'") (quoting Mertens, Law of Federal Income Taxation, Vol. 9, § 49.222, 1960 Cum. Supp. p. 41).

[73] *United States v. First National City Bank*, 379 U.S. 378 (1965).

whatever damage the proposed injunction may cause the opposing party; and 4) that the injunction would not be adverse to the public interest.[74] The Court finds that while 26 U.S.C. § 7402(a) provides explicit authority for the relief requested, the United States, as the moving party, also meets its burden under the preliminary injunction standard for the relief requested.[75]

### A.     The United States has succeeded on the merits.

For injunctive relief to be warranted under § 7408, the United States must prove by a preponderance of the evidence that (1) Defendants organized an entity, plan, or arrangement; (2) Defendants made false or fraudulent statements concerning the tax benefits to be derived from the entity, plan or arrangement; (3) Defendants knew or had reason to know those statements were false or fraudulent; (4) the false or fraudulent statements pertained to a material matter; and (5) an injunction is necessary to prevent recurrence of this conduct. Alternatively, for injunctive relief to be warranted under § 7402, the United States must prove that an injunction is necessary *or* appropriate to enforce the internal revenue laws.[76] As the Court has found, the United States has proven that it is entitled to an injunction under 26 U.S.C. §§ 7402 and/or 7408. The evidence adduced at trial shows that Defendants organized the solar energy scheme; [77] that

---

[74] *In re Qwest Communications Intern., Inc. Securities Litigation*, 243 F.Supp.2d 1179, 1185 (D. Colo. 2003) (citing *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980)); *see also*, Fed. R. Civ. P. 65.

[75] *Lundegrin*, 619 F.2d at 63.

[76] 26 U.S.C. § 7402(a) (emphasis added).

[77] *E.g.,* Pl. Ex. 2, Pl. Ex. 511; Pl. Ex. 579,Johnson Dep., vol. 1, 228:10-234:17; Pl. Ex. 682, RaPower-3 Dep., 39:9-41:2; *United States v. Raymond*, 228 F.3d 804, 811 (7th Cir. 2000) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n. 1 (7th Cir. 2013); *see also United States v. Stover*, 650 F.3d 1099, 1107 (8th Cir. 2011) (The organizing, promoting, or selling element of § 6700 "should be defined broadly, and is satisfied simply by selling an illegal method by which to avoid paying taxes." (quotations omitted).); *United States v. Benson*, 561 F.3d 718, 722 (7th Cir. 2009); *United States v. Alexander*, 2010 U.S. Dist. LEXIS 40108, at *13-14 (D.S.C. 2010) *United States v. United Energy Corp.*, No. C-85-3655-RFP (CW), 1987 WL 4787, at *8-9 (N.D. Cal. Feb. 25, 1987).

Defendants made false or fraudulent statements about the tax benefits to be obtained from purchasing a solar lens; [78] and that Defendants knew or had reason to know that their statements were false or fraudulent pertaining to a material matter, [79] namely the tax benefits of depreciation and solar energy tax credits. Further, Defendants have testified that they have no intention of ceasing their activity related to and sales of solar lenses. An injunction is necessary to prevent recurrence of Defendants' conduct.

Disgorgement is also necessary or appropriate to enforce the internal revenue laws. Defendants profited from their scheme in the millions of dollars through money from the United States Treasury that was funneled through their customers. Defendants should not be permitted to retain their ill-gotten gains. The United States has shown that a reasonable approximation of their proceeds is at least $50,025,480. This Court has found that an injunction will issue and that disgorgement will be ordered. Thus, the United States has already succeeded on the merits.

**B.    The United States will suffer irreparable injury if an order granting the asset freeze and appointing a receiver is not issued.**

The United States Treasury has already been greatly harmed by Defendants' scheme. Defendants continue to sell lenses to this day, and Defendants' customers continue to claim the tax benefits related to those lenses. If the injunctive relief requested is not granted, Defendants

---

[78] *E.g.,* Pl. Ex. 24, Pl. Ex. 32, Pl. Ex. 93, Pl. Ex. 125, Pl. Ex. 214, Pl. Ex. 294, Pl. Ex. 492, Pl. Ex. 496, Pl. Ex. 531, Pl. Ex. 532; *see United States v. Campbell*, 897 F.2d 1317, 1320 (5th Cir. 1990); *Benson*, 561 F.3d at 724; *United Energy Corp.,* 1987 WL 4787, *9.

[79] *E.g.,* Pl. Ex. 40 at 8, Pl. Ex. 279, Pl. Ex. 246, Pl. Ex. 531, Pl. Ex. 532 at 6; *Stover*, 650 F.3d at 1108-09; *United Energy Corp.*, 1987 WL 4787, *9; *United States v. Music Masters, Ltd.*, 621 F. Supp. 1046, 1055 (W.D.N.C. 1985); *Campbell*, 897 F.2d at 1320-22 (statements about material matters include those that directly address the tax benefits purportedly available to a  participant in a tax scheme and those that concern factual matters that are relevant to the availability of tax benefits.); *United States v. Hartshorn*, 751 F.3d 1194, 1202 (10th Cir. 2014).

will have full unfettered access to the funds illicitly obtained to the detriment of the United States.[80] Defendants' entire scheme was geared to "zero-out" a customer's tax liability. Defendants requested customers make a down payment for their solar lenses of $1,050 per lens. The customers paid this with a $105 "upfront fee" and were asked to pay the remaining amount *after* they received their tax refunds.[81] Defendants funded their entire scheme through funds that were "redirected" or diverted from the United States Treasury to their pockets though the money first went through the hands of their customers. The United States will not be able to recover all of the improper refunds paid to Defendants' customers. Defendants have been dissipating assets since they learned of the criminal investigation by the Internal Revenue Service no later than June of 2012[82] and throughout the course of this litigation.[83] Defendants have moved assets into

---

[80] *See United States v. Stinson*, 239 F. Supp. 3d 1299, 1326 (M.D. Fla., March 6, 2017); *Manor Nursing Centers*, 458 F.2d at 1104 ("The effective enforcement of the federal securities law requires that the SEC be able to make violations unprofitable. The deterrent effect of a Commission enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.").

[81] Pl. Ex. 511; Shepard Dep. 150:17-153:21, 154:9-156:17; Pl. Exs. 119, 147, 265, 267.

[82] RaPower-3 Dep., vol. 197:13-199:6.

[83] Pl. Ex. 684, true and correct copies of bank statements of defendants Neldon Johnson, RaPower-3 and IAS showing some of the activity and transfers that have occurred during the pendency of this litigation; *see also*, Pl. Ex. 646, Pl. Ex. 647, Pl. Ex. 648, Pl. Ex. 649, Pl. Ex. 650; Johnson Dep., vol. 2, 202:17-220:16.

foreign jurisdictions[84] and both Johnson[85] and Shepard[86] have taken steps to frustrate the collection of a potential disgorgement award. Without the relief requested, Defendants will continue in their attempt to frustrate the collection of any disgorgement this Court may award and thus irreparably injure the United States.

      **C.**      **The balance of harm to the United States in not issuing the injunctive relief outweighs the harm to be caused to Defendants by issuing the requested relief.**

In evaluating this factor, courts look to whether the freeze itself will cause such disruption of defendants' *legitimate* business affairs that the assets would be destroyed.[87] Here, Defendants have no legitimate business. Defendants' solar energy scheme is an abusive tax scheme and not a legitimate business. Defendants do not operate the solar energy scheme – or

---

[84] Johnson Dep., vol. 2, 37:22 – 38:5; Neldon Johnson assigned the rights to six patents to Black Night Enterprises, Inc., #6 Solomon's Arcade, Main Street, Charleston, Saint Kitts and Nevis (see USPTO Patent Assignment Search, search by assignee name: "Black Night"). The assignments were executed between April 2013 and June 2015 and recorded on June 16, 2015. See USPTO assignment search for Neldon Johnson, https://assignment.uspto.gov/patent/index.html#/patent/search/result?id=neldon%20johnson&type=patAssignorName e.

[85] For example, Neldon Johnson has transferred patents to Nevis and has ownership interests in multiple foreign entities, *supra*. Further, Neldon Johnson testified that if a "government agency caus[ed] problems," then certain assets would revert back to the foreign company. Trial Tr. 2175:4-16. Johnson has structured his affairs in a convoluted manner and in such a way as to obstruct the United States' discovery of ownership interests and assets. *E.g.,* ECF Doc. No. 53, ECF Doc. No. 55, ECF Doc. No. 56, ECF Doc. No. 57, ECF Doc. No. 58, ECF Doc. No. 59, ECF Doc. No. 138, ECF Doc. No. 140, ECF Doc. No. 143, ECF Doc. No. 160, ECF Doc. No. 161, ECF Doc. No. 203, ECF Doc. No. 206, ECF Doc. No. 209, ECF Doc. No. 210, ECF Doc. No. 212, ECF Doc. No. 213, ECF Doc. No. 218, ECF Doc. No. 219. Permitting Defendants more time to engage in their solar energy scheme and moving assets while the case has been submitted and decision and judgment is forthcoming will only cause further injury to the United States.

[86] In March 2017, during this litigation, R. Gregory Shepard transferred his property right in his personal residence to a trust in the name of his wife. Pl. Ex. 914, 915, 916 (attached); *see also,* U.C.A. § 78B-5-503(7); U.C.A. § 78B-5-512. Pl. Ex. 914, 915, and 916 are certified copies of documents filed with the Salt Lake County Recorder and are self-authenticating. Fed. R. Evid. 902(4).

[87] *SEC v. Prater*, 289 F. Supp. 2d 39, 54 (D. Conn. 2003) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972)) (emphasis added).

any of the entities involved in the solar energy scheme – in a businesslike manner. Defendants do

not have any revenue or income aside from the sale of solar lenses. There is no harm to

Defendants in prohibiting them from using ill-gotten gains to fund their technology

experimentation and their personal expenses, including offshore arrangements that will be

difficult to collect against. The United States however, and the taxpaying public, will continue to

be harmed by the probable dissipation of Defendants' assets. The United States has a compelling

interest in enforcing the tax laws and ensuring that persons promoting abusive tax schemes do

not profit from their unlawful behavior.[88] As such, the balance of harms weighs in favor of the

United States and for relief to be granted.[89]

### D. An injunction will benefit, not disserve, the public interest.

The public interest is served by issuing the injunctive relief requested by the United

States. The public has an interest in enforcement of the tax laws.[90] Taxpayers have an interest in

being protected from suffering the results of other taxpayers improper tax benefits. Defendants'

activities do a disservice to the taxpaying public, undermining confidence in the fair

administration of the internal revenue laws, and have cost the United States' Treasury over $14

---

[88] *See Bull v. United States*, 295 U.S. 247, 259 (1935) (Taxes are the life-blood of government and their prompt and certain availability an imperious need.).

[89] *See United States v. Buddhu*, 2009 WL 1346607, at *5 (D. Conn. 2009) ("While the [defendants] will be denied the right to earn a livelihood preparing income tax returns, the harm to them is substantially outweighed by the harm to which their clients are subjected by having fraudulent tax returns prepared in their names.")

[90] *United States v. Anderson*, 2010 WL 1988100, at *3 (D.S.C. 2010); *accord HedgeLender*, 2011 WL 2686279, at *10 (E.D. Va. 2011) (Promoting an abusive tax shelter that caused millions of lost tax revenue "is a significant harm to society because it promotes noncompliance with federal tax laws and is a great cost to the public."); As the Senate Report regarding the enactment of § 6700 observed, "[t]he widespread marketing and use of tax shelters undermines public confidence in the fairness of the tax system and in the effectiveness of existing enforcement provisions." S. Rep. No. 97- 494, Vol I at 266.

million. Defendants should not be permitted to profit from their illicit activities. The public

interest is also served in ensuring that Defendants do not dissipate assets that can be used to

satisfy any disgorgement award this Court may order or otherwise compensate those harmed by

Defendants' abusive tax scheme.[91]

### E. A receiver is necessary or appropriate to effect the asset freeze.

This Court has explicit statutory authority to appoint a receiver pursuant to 26 U.S.C.

§ 7402(a) as may be necessary or appropriate for the enforcement of the internal revenue laws.[92]

Second, the appointment of a receiver is authorized by the inherent equitable power of a federal

court.[93] The Court finds that the appointment of a receiver is necessary and appropriate in this

case. Defendants' solar energy tax scheme involves false or fraudulent statements and the

possible dissipation of assets.[94] Given Defendants' reluctance to cooperate in discovery

regarding assets and ownership structure[95], a receiver is necessary to enforce the internal revenue

---

[91] When the public interest is involved, "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *United States v. First National City Bank*, 379 U.S. 378, 383 (1965) (quoting *Virginia R. Co. v. System Federation*, 300 U.S. 515, 552 (1937)).

[92] 26 U.S.C. § 7402(a); *see also, United States v. Latney's Funeral Home*, 41 F.Supp.3d 24, 27 (D.D.C. 2014); *United States v. Bartle*, 159 Fed. Appx. 723, 724-25 (7th Cir. 2005); *Florida v. United States*, 285 F.2d 596, 602 (8th Cir. 1960).

[93] *See SEC v. Vescor Capital Corp.*, 599 F3d. 1189, 1193-94 (10th Cir. 2010) (the district court has broad powers and wide discretion to determine relief and supervise receiverships); *United States v. Bartle*, 159 F. App'x 723, 725 (7th Cir. 2005); *Consolidated Rail Corp. v. Fore River Railway Co.*, 861 F.2d 322, 326-27 (1st Cir. 1988) (court may exercise discretion to appoint receiver upon considering fraudulent conduct, relative risks of harm, inadequacy of legal remedies, chance of success on merits, likelihood of irreparable injury, etc.); *Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994) (federal court has inherent power to appoint receiver to manager defendant's assets pending litigation); *National Partnership Investment Corp., v. National Housing Development Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998) (appointment of receiver in equity is an ancillary remedy); *see also* Fed. R. Civ. P. 66.

[94] *Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994).

[95] ECF Doc. No. 218.

laws and determine and corral the assets Defendants have, regardless of their location. This is appropriate to ensure that any disgorgement that may awarded will not be rendered meaningless.

The United States shall provide, within 30 days, the names of three possible receivers as well as a proposed order detailing the powers and responsibilities that the United States proposes the Court vest within the receiver. The Court may appoint from that list or otherwise. The proposed order should include all powers conferred upon a receiver under the provisions of 28 U.S.C. §§ 754, 959 and 1692, Fed. R. Civ. P. 66 and any additional equitable powers that the United States requests.

Unless otherwise ordered by the Court,[96] the proposed order shall provide:

1.  The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the owners, members, shareholders, officers, directors, managers and general and limited partners of IAS under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, Fed. R. Civ. P. 66 and this Court.

2.  The Receiver shall have the following general powers and duties:

    a)  To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants, including, but not limited to, monies, accounts, trusts, funds, securities, credits, stocks, bonds, effects, goods, chattels, intangible property, real property, lands, premises, leases, claims, rights

---

[96] The parties may move for modification of these terms.

and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly (""Receivership Property");

b) To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

c) To manage, control, operate and maintain the Receivership Property and hold in his/her possession, custody and control all Receivership Property, pending further Order of this Court;

d) To use Receivership Property for the benefit of the Receivership, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his/her duties as Receiver;

e) To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, members, shareholders, trustees and agents of the Receivership Defendants;

f) To engage and employ persons in his/her discretion to assist him in carrying out his/her duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, or forensic experts;

g) To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

h) The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

i) To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his/her duties as Receiver;

j) To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estates; and,

k) To take such other action as may be approved by this Court.

3. The Receivership Defendants are directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers.

4. The Receivership Defendants and all persons receiving notice of this Order by personal service, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver which would interfere with or prevent the Receiver from performing his/her duties.

5.   The Receivership Defendants shall cooperate with and assist the Receiver in the performance of his/her duties.

6.   The Receiver shall promptly notify the Court and counsel for the United States of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

7.   Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his/her fiduciary obligations in this matter.

8.   The Receiver and his/her agents, acting within the scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel nor shall the Receiver or Retained Personnel be liable to anyone for actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

9.   This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

10.   Within 60 days from the entry of the order appointing the Receiver, the Receiver shall file and serve an accounting of the Receivership Estate, reflecting (to the best of the Receiver's knowledge) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates. The Receiver shall also detail his/her efforts in

locating Receivership Property and what, if any, additional efforts need to be undertaken to provide a full accounting of each Receivership Estate to this Court.

11. The Receiver's fees shall be paid by the Receivership Defendants or from the Receivership Estates upon approval of the Court, with prior notice and opportunity for the United States to respond to any fee application.

12. The Receiver shall distribute the estate to:

    a. First Priority: The Internal Revenue Service, up to $14,207,517. This payment shall be paid in full before any distributions to the Second Priority claims.

    b. Second Priority: The taxpayers who file claims with the Receiver with sufficient evidence of:

        i. Their investment and all amounts received by payment or credit from Defendants including rental payments, bonus payments, salaries, distributions, and commissions and overrides or similar payments due to multilevel marketing; and

        ii. The resolution of all the taxpayer's issues with the Internal Revenue Service.

    Payments to claimants shall be made on a pro rata basis of the amount paid by the claimant to Defendants less all amounts received by the claimant from Defendants.

## III. Order

IT IS HEREBY ORDERED that the United States' second motion[97] to freeze the assets of Defendants RaPower-3, LLC, Neldon Johnson, International Automated Systems, Inc. and R. Gregory Shepard and to appoint a receiver is GRANTED and IT IS HEREBY ORDERED THAT:

1. This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the following Defendants: RaPower-3, LLC, Neldon Johnson, International Automated Systems, Inc. and R. Gregory Shepard (collectively, the "Receivership Defendants").

2. The United States shall provide within 30 days, the names of three possible receivers, with information regarding their qualifications, along with a proposed order of the specific powers and responsibilities that the Court should grant to the receiver in this case.

3. Except as otherwise provided herein, all assets of the Receivership Defendants are frozen until further order of this Court ("Receivership Property"). Accordingly, all persons and entities with direct or indirect control over any Receivership Property, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of or withdrawing such Receivership Property. This freeze shall include, but not be limited to Receivership Property that is on deposit with financial institutions such as banks, brokerage firms and mutual funds, shares of stock, and any patents or other intangible property.

---

[97] ECF Doc. No. 414, filed June 22, 2018.

4.  The Receivership Defendants, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service, facsimile service, or otherwise, and each of them, shall hold and retain within their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of any assets, funds, or other properties (including money, real or personal property, securities, choses in action or property of any kind whatsoever) of the Receivership Defendants. This applies to assets held by Receivership Defendants or under their control, at any time after inception of this action, whether such assets were or are held in the name of any Receivership Defendant or for their direct or indirect beneficial interest wherever situated. The Receivership Defendants shall direct each of the financial or brokerage institutions, debtors, and bailees, or any other person or entity holding such assets, funds, or other properties of any Receivership Defendant to hold or retain within their control and prohibit the withdrawal, removal, transfer, or other disposal of any such assets, funds, or other properties.

5.  The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys and other agents of the Receivership Defendants are restrained except as they may act in the ordinary course of business and shall not exercise their powers or take action inconsistent with this order. They are notified that upon appointment of the Receiver they shall likely be dismissed. and have no authority with respect to the Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver.

6.  The Receivership Defendants are directed to preserve all paper and electronic information of, and/or relating to, the Receivership Property.

The assets of Receivership Defendants Neldon Johnson and R. Gregory Shepard shall be frozen but each Defendant shall be allowed to withdraw on a monthly basis, monies for basic living expenses based on the IRS national standards. Defendants must account for these funds on or before the 15th of each month following the expenditure in the form required by the Receiver. The sums which may be withdrawn are:

| IRS National Standards | Neldon Johnson | R. Gregory Shepard |
|---|---|---|
| Housing & Utilities (Based on location) | $1,347.00 | $1,806.00 |
| Food, Clothing & Other Expenses | $1,202.00 | $1,202.00 |
| Out of pocket health costs | $114.00 | $114.00 |
| Transportation (National Standard) | $497.00 | $497.00 |
| **Monthly Total** | **$3,160.00** | **$3,619.00** |

7. To the extent that any Receivership Defendant requests the use of Receivership Property, such application shall be made to the Court. After the appointment of a Receiver, requests for the use of funds shall be made to the Receiver and any party may dispute the Receiver's decision by filing a motion with this Court.

8. The appointment of a Receiver shall not, without further order, deprive any Defendant of the right to appeal orders in this case  or otherwise defend this action through counsel (paid from sources other than Receivership Property) of Defendants' own choice.

Signed August 22, 2018.

BY THE COURT

David Nuffer
United States District Judge