IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RAPOWER-3, LLC, INTERNATIONAL AUTOMATED SYSTEMS, INC., LTB1, LLC, R. GREGORY SHEPARD, and NELDON JOHNSON<br><br>Defendants. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 2:15-cv-00828 DN<br><br>District Judge David Nuffer |

## OVERVIEW

This case was tried over 12 days in April and June 2018.[1] The United States presented testimony from 25 witnesses, both live and via deposition designation. Defendants rested their case without calling a single witness, but they thoroughly examined each witness called by the United States, including Defendants Neldon Johnson and R. Gregory Shepard. Defendants' thorough cross examination of Shepard and Johnson[2] did not lend any credibility to their case. More than 650 exhibits were received into evidence.[3] On June 22, 2018, immediately after closing arguments, partial findings of fact were delivered from the bench, concluding that Defendants engaged in a "massive fraud" for which they would be enjoined and disgorgement

---

[1] *See* Minute Entries for Trial, *United States v. RaPower-3, et al.*, 2:15-cv-00828-DN-EJF, ECF Nos. 372, 374, 378, 380, 386, 388, 391-93, 396, 409, 415.

[2] The United States examined Johnson live on direct and redirect examination for a total of 272 minutes while Defense counsel cross- and recross-examined him for 590 minutes. The United States examined Shepard live on direct and redirect for 86 minutes while Defense counsel cross- and recross-examined him for 174 minutes.

[3] Bench Trial Witness and Exhibit Lists, *United States v. RaPower-3, et al.*, 2:15-cv-00828-DN-EJF, ECF No. 416.

(continued...)

would be ordered.[4] An interim order of injunction issued requiring that, no later than June 29, Defendants (1) post a notice on their websites that this Court found tax information Defendants provided was false and (2) remove tax information from their websites.[5] As requested, the United States submitted draft findings of fact and conclusions of law before trial, as did Defendants. Then, following trial, revisions and additional findings were delivered to the parties. The United States submitted revised draft findings of fact and conclusions of law,[6] and Defendants objected.[7] After careful consideration of all this testimony, evidence, ] submissions and materials, these final Findings of Fact and Conclusions of Law are filed.

---

[4] Gov. Ex. BK0001, T. 2515:5-11.

[5] *United States v. RaPower-3, et al.*, 2:15-cv-00828-DN-EJF, ECF No. 413.

[6] ECF No. 463.

[7] [Defendants'] Objections re: Findings of Fact and Conclusions of Law, ECF No. 452.

# Table of Contents

I.   Introduction ................................................................................................................ 1

II.  Findings of Fact ........................................................................................................ 2

A.   Defendants organized (or assisted in the organization of) a plan or arrangement, and participated (directly or indirectly) in the sale of an interest in the plan or arrangement. ............... 2

    1.   Neldon Johnson ............................................................................................ 2

    2.   R. Gregory Shepard ...................................................................................... 7

    3.   Roger Freeborn ........................................................................................... 11

    4.   Orders Placed by Customers........................................................................ 13

    5.   Receipts by Lens-Selling Entities................................................................ 15

    6.   Receipts by Johnson and Shepard ............................................................... 16

    7.   The Role of Tax Return Preparers Selected by Defendants ........................ 16

    8.   Defendants' Roles in Tax Audits of Customers .......................................... 20

    9.   Post-Litigation Conduct.............................................................................. 20

B.   In connection with organizing or selling any interest in a plan or arrangement, Defendants made or furnished (or caused another person to make or furnish) statements regarding the allowability of any deduction or credit because of participating in the plan or arrangement. ....... 22

    1.   Defendants told customers, and prospective customers, about the structure of the transactions. ...................................................................................................... 22

    2.   Defendants told customers, and prospective customers, about Johnson's purported solar energy technology. ................................................................................... 31

    3.   Defendants sold solar lenses by emphasizing the purported tax benefits.................. 35

C.   Defendants knew or had reason to know that their statements were false or fraudulent as to material matters................................................................................................................ 43

    1.   Defendants knew, or had reason to know, that Johnson's purported solar energy technology did not work, and would not work to generate commercially viable electricity or other energy. ..................................................................................................... 43

    2.   Defendants knew, or had reason to know, that the only way a customer has "made money" from buying a lens is from the purported tax benefits. ........................................... 54

        a.   No customer has been paid rental income generated from the use of his lens to generate power bought by a third-party purchaser. ......................................................... 54

        b.   No customer has been paid a bonus. .................................................................... 61

    3.   Defendants knew, or had reason to know, that their customers are not required to pay the full down payment, much less the full purchase price for a lens. .................................. 62

    4.   Defendants knew, or had reason to know, that Johnson, and not their customers, controlled the customers' purported "solar lens leasing businesses." .................................. 64

i

    5.    Defendants knew, or had reason to know, that their customers do not have special expertise or prior experience in the solar lens leasing business.............................................. 66

    6.    Defendants knew, or had reason to know, that advice from independent professionals did not support their claims about tax benefits. .................................................................... 67

    7.    Defendants knew, or had reason to know, that the IRS disallowed their customers' depreciation deductions and solar energy tax credits. ........................................................ 81

    8.    Defendants knew, or had reason to know, that the Oregon Tax Court rejected their customers' depreciation deductions and solar energy tax credits. ......................................... 82

D.   In connection with organizing or selling any interest in a plan or arrangement, Defendants made or furnished (or caused another person to make or furnish) gross valuation overstatements as to the value of the solar lenses. ................................................................ 83

E.   The harm caused by Defendants' conduct is extensive. ........................................................ 83

III.   Conclusions of Law ................................................................................................ 85

A.   Defendants organized, or assisted in organizing, the solar energy scheme, and sold solar lenses pursuant to the scheme. .............................................................................................. 85

B.   While promoting the solar energy scheme, Defendants made or furnished (or caused others to make or furnish) statements about the allowability of a depreciation deduction and a solar energy tax credit as a result of buying solar lenses, which statements Defendants knew or had reason to know were false or fraudulent. ...................................................................... 87

    1.    Defendants knew, or had reason to know, that their customers were not allowed a depreciation deduction or the solar energy credit because customers were not in a "trade or business" related to the solar lenses and did not hold the lenses for the production of income.......................................................................................................................... 90

        a.    Defendants knew, or had reason to know, that their customers were not in a "trade or business" related to the solar lenses and did not buy lenses for the production of income........................................................................................................................ 90

        b.    Defendants knew, or had reason to know, that their customers were not allowed a depreciation deduction. ..................................................................................... 105

        c.    Defendants knew, or had reason to know, that their customers were not allowed the solar energy credit.................................................................................................. 109

    2.    Defendants knew, or had reason to know, that their customers were not allowed to deduct their purported expenses related to the solar lenses against their active income or use the credit to reduce their tax liability on active income.................................................... 110

    3.    Defendants knew, or had reason to know, that that the full "purchase" price of the lenses was not at risk in the year a customer signed transaction documents. ..................... 114

    4.    Defendants knew, or had reason to know, that all of their statements were false or fraudulent in spite of the legal advice upon which they claim reliance............................. 116

C.   While promoting the solar energy scheme, Defendants made or furnished (or caused others to make or furnish) gross valuation overstatements as to the value of the solar lenses.............. 119

D.   An injunction and other equitable relief are necessary and appropriate to enforce the internal
revenue laws of the United States. ............................................................................................ 121

ORDER ................................................................................................................................... 130

I.      **Introduction**

For more than ten years, Defendants Neldon Johnson, RaPower-3, LLC, International Automated Systems, Inc. ("IAS"), LTB1, LLC ("LTB"), R. Gregory Shepard, and Roger Freeborn[8] have promoted an abusive tax scheme centered on purported solar energy technology featuring "solar lenses" (called, herein, the "solar energy scheme") to customers across the United States. The evidence shows, however, that the solar lenses were only the cover story for what Defendants were actually selling: unlawful tax deductions and credits. Defendants have repeatedly engaged in conduct subject to penalty under the Internal Revenue Code.[9] Defendants' conduct has caused serious harm to the United States Treasury and the system of honest and voluntary tax compliance. Defendants received more than $50 million dollars from the solar energy scheme at the expense of the United States Treasury. Defendants will be enjoined from promoting their abusive solar energy scheme and ordered to disgorge their gross receipts to mitigate the harm their conduct caused the Treasury.[10]

---

[8] Defendants filed a notice of Freeborn's death on December 17, 2017. ECF No. 267. He will be dismissed as a defendant. Fed. R. Civ. P. 25(a)(1). Facts about Freeborn's conduct are included herein, nonetheless, because his conduct helps explain the facts and circumstances described and it is relevant to whether the remaining Defendants engaged in certain penalty conduct under 26 U.S.C. § 6700(a)(2).

[9] 26 U.S.C. § 6700(a)(2)(A), (a)(2)(B).

[10] 26 U.S.C. §§ 7402(a), 7408(b).

## II.       Findings of Fact

**A.       Defendants organized (or assisted in the organization of) a plan or arrangement, and participated (directly or indirectly) in the sale of an interest in the plan or arrangement.[11]**

### 1.       Neldon Johnson

1.       Neldon Johnson is and has been the manager, and a direct and indirect owner of, RaPower-3, LLC, International Automated Systems, Inc., and LTB1, LLC (among other entities). He is the sole decision-maker for each entity.[12]

2.       Johnson claims to have invented certain solar energy technology.[13]

3.       Johnson's purported solar energy technology involves solar thermal lenses placed in arrays on towers.[14]

4.       His idea is that the lens arrays will track the sun as it moves across the sky during the day.[15]

5.       His idea is that radiation from the sun would hit the lens, which would then bend and intensify the radiation in a specific point called a "solar image."[16]

6.       His idea is that the solar image would hit a receiver which would be suspended underneath the lenses.[17]

---

[11] 26 U.S.C. § 6700(A)(1).

[12] ECF No. 22 ¶ 12; Pl. Ex. 579, Deposition Designations for Neldon Johnson, vol. 1, ("Johnson Dep., vol. 1") 36:1-39:12, 46:3-47:3, 52:20-57:1, 74:1-14, 77:4-87:12 (June 28, 2017).

[13] Johnson Dep., vol. 1, 134:19-135:2; Pl. Ex. 509 at video clip 12_4_38-5_15.

[14] Johnson Dep., vol. 1, 87:16-91:1; Pl. Ex. 509 at video clip 12_4_00-4-23; Johnson Dep., vol. 1, 139:23-144:19.

[15] Pl. Ex. 504 at 14.

[16] Johnson Dep., vol. 1, 87:16-91:1; Pl. Ex. 509 at video clip 16_12_24-12_41; Johnson Dep., vol. 1, 139:23-144:19; Pl. Ex. 509 at video clip 12_4_38-5_15.

[17] Johnson Dep., vol. 1, 87:16-91:1; Pl. Ex. 509 at video clip 16_12_24-12_41; Johnson Dep., vol. 1, 139:23-144:19; Pl. Ex. 509 at video clip 12_4_38-5_15.

7.      Groups of 32 lenses grouped in a circular shape are attached to one receiver in his current design. Four of these collectors are attached to a single pole.

8.      Many poles with receivers installed have no collector or mechanism to transmit energy from a receiver to a generator.



9.      The site in Delta Utah currently has approximately 90 towers.

10.     The beam of concentrated light would then heat a heat transfer fluid in the receiver.[18]

11.     The heat transfer fluid – oil, molten salt, water, or another heat transfer fluid – Johnson has not decided, to date, which to use[19] – would then be pumped to a heat exchanger[20].

---

[18] Johnson Dep., vol. 1, 139:23-144:19.

[19] Johnson Dep., vol. 1, 151:18-163:3.

[20] Johnson Dep., vol. 1, 139:23-144:19.

(continued...)

12.     The heat exchanger would use the heat to boil water and create steam.[21]

13.     Johnson's idea is that the steam would turn a turbine, which would generate

electricity.[22]

14.     His idea is that the electricity would then be sent onto electric wires.[23]

15.     The wires would be connected to the electrical grid.[24]



16.     Once the lenses were installed and "started up," the "operation and maintenance"

of the lenses would be turned over to a company called LTB, LLC.[25]

17.     LTB, LLC, is another entity that Johnson created and controls.[26]

---

[21] Johnson Dep., vol. 1, 139:23-144:19.

[22] Johnson Dep., vol. 1, 139:23-144:19.

[23] Johnson Dep., vol. 1, 139:23-144:19.

[24] Johnson Dep., vol. 1, 139:23-144:19.

[25] Pl. Ex. 94 at 2.

[26] LTB, LTB1, and still another entity called LTB O&M, LLC, are all Johnson-created and -controlled entities. Pl. Ex. 673, Deposition Designations for LTB1, LLC, ("LTB1 Dep.") 8:11-13:23 (July 1, 2017). The only difference between them is their names. *Id.* For all practical purposes, Johnson makes no distinction between the entities; each has come into existence because the prior LTB-entity was dissolved in its state of incorporation. *Id.* Because all contracts described herein reference "LTB," the Court will use that name going forward. *See also* Pl. Ex. 77 at 2 ("Contact info. for LTB, LLC is Neldon Johnson, 801-372-4838").

(continued...)

18.     According to Johnson, LTB would maintain and operate the lenses and "market the power generated by the solar units."[27]

19.     LTB would pay lens owners an annual payment of $150 "[o]nce the Owner's Alternative Energy System(s) are installed and producing revenue."[28]

20.     Johnson illustrated this idea as early as 2006[29] as follows:



21.     Johnson took some college classes in the sciences and engineering in or before 1975 but does not have a college degree in any subject.[30]

22.     Neither Johnson, nor anyone else connected with him or one of his entities, has ever operated or maintained a solar energy power plant of any kind.[31]

---

[27] Pl. Ex. 531 at 2. Over the years, Defendants have used terms like "solar unit" or "alternative energy system" to mean "lens." *See* Johnson Dep., vol. 1, 185:11-186:9, 192:1-193:12, 242:25-243:5; Pl. Ex. 685, Deposition Designations for R. Gregory Shepard ("Shepard Dep."), 61:24-63:4 (May 22, 2017); Pl. Ex. 462 at 1. The only things that IAS and RaPower-3 have ever sold are "lenses." Johnson Dep., vol. 1, 185:18-19; Pl. Ex. 682, Deposition Designations for RaPower-3, LLC ("RaPower-3 Dep.") 32:25-33:3 (June 30, 2017).

[28] Operation and Maintenance Agreements, Pl. Ex. 121 (April 18, 2016), 510 (November 23, 2011), 512 (December 29, 2014), 537 (draft), 555 (August 29, 2008) and 621 (undated, unsigned).

[29] Pl. Ex. 581, Deposition Designations for International Automated Systems, Inc., ("IAS Dep."), 162:1-165:9, 171:10-173:20 (June 29, 2017); Pl. Ex. 532 at 6; *see also* Pl. Ex. 531.

[30] Pl. Ex. 681, Deposition Designations for Neldon Johnson, vol. 2, 43:23-44:1, 69:8-71:5, 81:18-23 (Oct. 3, 2017).

[31] RaPower-3 Dep. 12:25-15:12, 61:10-62:15; LTB1 Dep. 8:11-14, 19:16-31:9.

(continued...)

23.     In or around 2006 through 2008, Johnson directed IAS to erect, at most, 19 towers on "the R&D Site" near Delta, Utah, in Millard County.[32]

24.     Johnson also directed that IAS install solar lenses in those towers.[33]

25.     To date, those are the only towers that Johnson has built, and the only lenses that he has had installed.[34]

26.     Johnson promotes this purported solar energy technology through the IAS website, radio spots, and social media.[35]

27.     To make money from this purported solar energy technology, Johnson decided to sell a component of the purported technology: the solar lenses.[36]

28.     Johnson recognized that his strength was not in sales, so he directed that IAS use independent sales representatives to sell lenses.[37]

29.     He also created a bonus incentive program for people who bought lenses, to spread the word about the solar lenses and sell them to more and more people.[38]

30.     Johnson decided that the bonus program would be a cheaper and more effective way to sell lenses than doing conventional advertising.[39]

---

[32] IAS Dep. 62:15-64:1; Pl. Ex. 8A at 12-13; Shepard Dep. 128:6-129:1, 172:23-173:3.

[33] IAS Dep. 62:15-64:1.

[34] IAS Dep. 62:15-64:1; Johnson Dep., vol. 1, 88:20-89:10; Pl. Ex. 509 at video clip 12_4_00-4-23.

[35] *E.g.*, Pl. Ex. 2; Johnson Dep., vol. 1, 240:2-17; IAS Dep. 242:10-247:22; Pl. Ex. 539; Pl. Ex. 731 at "JohnsonN Show - KNRS 11-18-17.mp3."

[36] *See* RaPower-3 Dep. 36:4-39:8.

[37] IAS Dep. 145:21-146:9; Pl. Ex. 463; *see* RaPower-3 Dep. 140:9-143:4; Pl. Ex. 504.

[38] Johnson Dep., vol. 1, 228:19-234:17.

[39] Johnson Dep., vol. 1, 228:19-234:17.

(continued...)

31.     Johnson drafted some promotional materials to describe this arrangement, "IAUS Solar Unit Purchase Overview" and IAS "Solar Equipment Purchase."[40]

32.     Johnson showed IAS salespeople these descriptive materials about the structure of the transaction, the purported technology, and the federal tax benefits that Johnson said a customer could lawfully claim when he bought a lens from IAS.[41]

33.     He told IAS's initial salespeople what he understood the tax laws to mean.[42]

**2.     R. Gregory Shepard**

34.     R. Gregory Shepard's role was not in inventing the technology, but rather the marketing, sales and disseminating false information regarding the availability of tax benefits to customers.

35.     Shepard has been an IAS shareholder since the mid-1990s.[43] He became one of IAS's initial salespeople in or around September 2005, and began selling solar lenses.[44]

36.     IAS paid Shepard (and its other salespeople) a commission of 10 percent of the money generated from his sales.[45]

37.     Shepard's professional background, before becoming involved with the solar energy scheme, was in sports performance as a coach and trainer.[46]

---

[40] IAS Dep. 162:1-165:9, 171:10-173:20; Pl. Exs. 531, 532.

[41] IAS Dep. 162:1-165:9, 171:10-173:20; Pl. Exs. 531, 532.

[42] Johnson Dep., vol. 1, 240:18-241:10, 247:11-248:12; RaPower-3 Dep. 117:22-119:11; Pl. Ex. 473.

[43] Shepard Dep. 43:19-46:1.

[44] Shepard Dep. 70:14-71:22; Pl. Ex. 463.

[45] Shepard Dep. 70:14-72:8; Pl. Ex. 463.

[46] Shepard Dep. 27:2-30:24.

(continued...)

38.     Shepard's information about Johnson's purported solar energy technology came from Johnson or members of Johnson's family, and Shepard's own observations on his site visits over the years.[47]

39.     Johnson told Shepard that a depreciation deduction and the solar energy tax credit are related to the sale of lenses.[48]

40.     Shepard never questioned how Johnson determined that purchasers of solar lenses were purportedly eligible for a depreciation deduction and the solar energy tax credit.[49]

41.     Johnson created, owns, and controls at least three entities that sell or have sold solar lenses: SOLCO I,[50] XSun Energy,[51] and RaPower-3, LLC[52].

42.     Johnson created RaPower-3 in 2010. He is its manager and the sole decision-maker for the company.[53]

43.     Once formed, RaPower-3, not IAS, sold solar lenses to individuals.[54]

44.     RaPower-3's only business activity is selling solar lenses through a multi-level marketing (otherwise known as "network marketing") approach to increase sales.[55]

---

[47] Johnson Dep., vol. 1, 209:11-210:3, 211:16-215:23; Shepard Dep. 36:6-40:23, 46:2-57:5, 183:14-187:13; Pl. Ex. 8A; RaPower-3 Dep. 155:4-166:18; Pl. Ex. 267.

[48] Johnson Dep., vol. 1, 279:19-22; IAS Dep. 162:1-165:9, 194:6-20; Pl. Ex. 531.

[49] Shepard Dep. 284:23-286:3.

[50] Johnson Dep., vol. 1, 82:8-83:6, LTB1 Dep. 78:22-79:5, 79:12-80:9, IAS Dep. 38:10-40:6, 45:4-17.

[51] *See generally* Pl. Ex. 355; IAS Dep. 47:2-19, Johnson Dep., vol. 1, 79:8-81:7.

[52] RaPower-3 Dep. 32:16-33:14, 44:4-14, 45:9-10.

[53] RaPower-3 Dep. 32:16-33:14.

[54] RaPower-3 Dep. 32:16-33:14; *see* IAS Dep. 23:22-25:22.

[55] RaPower-3 Dep. 32:16-33:14, 36:4-39:8.

(continued...)

45.     If a person wants to sell solar lenses through RaPower-3, that person need only sign up to become a "distributor."[56]

46.     RaPower-3 encourages distributors to bring still more people in to the multi-level marketing system and build an extensive "downline."[57]

47.     RaPower-3 pays its distributors as much as 10 percent commission on lens sales in each distributor's respective downline.[58]

48.     Johnson directed RaPower-3 to create a site online (https://rapower3.net) where a customer can access and sign a contract to buy lenses and sign other transaction documents that Johnson provides (described below).[59]

49.     Changing from a direct-sales model through IAS to an internet-ready, multi-level marketing model through RaPower-3 led to "[h]undreds of people across the nation purchas[ing] solar lenses."[60]

50.     Selling lenses through RaPower-3 gave Johnson "much needed revenue" to continue his operations.[61]

51.     When Johnson started RaPower-3, Shepard transitioned from being an IAS salesperson to a RaPower-3 distributor.[62]

---

[56] RaPower-3 Dep. 32:22-34:9.

[57] *See* RaPower-3 Dep. 36:4-39:8, 49:10-15; Pl. Ex. 683, Deposition Designations for John Howell ("Howell Dep.") 63:16-64:11, 150:2-20 (Aug. 23, 2017); Pl. Ex. 595, Pl. Ex. 596.

[58] RaPower-3 Dep. 36:4-39:8. Zeleznik Dep. 125:9-128:13; Pl. Ex. 60; *see also* Aulds Dep. 157:1-8; Pl. Ex. 398.

[59] RaPower-3 Dep. 39:9-41:2; Pl. Ex. 511; LTB1 Dep. 39:6-25; Pl. Ex. 61.

[60] Pl. Ex. 8A at 9; Pl. Exs. 669, 742A, 742B, 749;; T. 858:12-863:16.

[61] Pl. Ex. 8A at 9; Pl. Ex. 749; T. 758:10-793:2.

[62] RaPower-3 Dep. 48:8-49:1. By January 2015, Shepard had approximately one thousand people on his RaPower-3 email distribution list. Shepard Dep. 305:11-19.

(continued...)

52.     Shepard considers himself and other distributors in the RaPower-3 system as "team members."[63]

53.     But Shepard, who gave himself the title "Chief Director of Operations" for RaPower-3 to sell more lenses, is the team member "at the top."[64]

54.     Among other things, Shepard created the website www.rapower3.com[65] and moderates an online discussion board called "IAUS & RaPower[-]3 Forum."[66]

55.     Shepard gets paid for his work promoting RaPower-3 through his company, Shepard Global.[67]

56.     On the RaPower-3 website, Shepard describes the technology and the transactions underpinning the solar energy scheme, promotes sales, and provides links to the site with the transaction documents.[68]

57.     Shepard uses the Forum to communicate with people who have already bought lenses and who own IAS stock.[69]

58.     Shepard also organizes groups of people to visit the R&D Site, the site where component parts of the purported solar technology system are manufactured (the "Manufacturing

---

[63] Shepard Dep. 113:8-115:3.

[64] Shepard Dep. 102:11-103:3, 113:8-115:3, 123:6-15; *see also* RaPower-3 Dep. 108:5-18

[65] Shepard Dep. 25:22-26:8; Pl. Ex. 459; *see also* Pl. Exs. 1, 5, 19, 20-21, 24-25, 34, 352, 419, 674, 676, 678-80.

[66] Shepard Dep. 286:5-24.

[67] T. 1293:8-1304:1; 1412:18-1415:10.

[68] *See* Pl. Ex. 688, Deposition Designations for Roger Freeborn ("Freeborn Dep.") 23:2-24:14 (May 31, 2017); Pl. Ex. 490; Pl. Ex. 689, Deposition Designations for Peter Gregg ("Gregg Dep.") 56:20-57:13.

[69] Shepard Dep. 286:5-289:13; Pl. Ex. 481.

(continued...)

Facility"), and the site on a large field with a few semi-constructed component parts (the "Construction Site").[70]

59.     He organized at least one "RaPower[-]3 National Convention" in 2012, at which Johnson spoke.[71]

60.     When other RaPower-3 distributors have issues or questions, they look to Shepard for guidance and advice, and to be the conduit to Johnson.[72]

### 3.     Roger Freeborn

61.     Shepard told Roger Freeborn about RaPower-3, asked Freeborn if he wanted to buy lenses, and brought Freeborn into his multi-level marketing downline.[73]

62.     The two men knew each other through a company Shepard used to own, Bigger, Faster, Stronger ("BFS").[74] BFS sold athletic equipment and strength and conditioning programming primarily to high schools and middle schools around the country.[75]

63.     Freeborn was a teacher and football coach, and taught BFS clinics around the country.[76]

64.     When Freeborn started selling lenses for RaPower-3, at the end of a BFS clinic, he would "talk to the coaches about the possibility of creating a fundraising program to raise money for their sport" through the sale of RaPower-3 solar lenses.[77]

---

[70] *E.g.*, Pl. Exs. 21, 419 at 1; Johnson Dep., vol. 1, 87:23-89:10; Pl. Ex. 509 at video clip 12_4_00-4-23.

[71] Shepard Dep. 302:8-303:23; RaPower-3 Dep. 140:4-145:15; Pl. Ex. 504; Pl. Exs. 114, 270.

[72] Shepard Dep. 113:8-115:3, Pl. Ex. 469; Pl. Ex. 189 at 1-3.

[73] Shepard Dep. 115:11-117:10; Freeborn Dep. 15:21-18:18; .

[74] Shepard Dep. 115:11-117:10; Freeborn Dep. 15:21-18:18.

[75] T. 901:8-903:14; Freeborn Dep. 15:21-18:18.

[76] Shepard Dep. 115:11-117:10; Freeborn Dep. 15:21-18:18, 28:2-11, 107:10-108:21; Pl. Ex. 503; T. 904:21-905:9.

[77] Freeborn Dep. 98:10-102:6; Pl. Ex. 246.

(continued...)

65.     Freeborn was a prolific salesman for RaPower-3, especially among the teachers and coaches that he reached through BFS's customer list.[78]

66.     Freeborn called himself the "National Director" of RaPower-3.[79]

67.     Freeborn's information about IAS, RaPower-3, the transactions and the technology underpinning the solar energy scheme, and the tax benefits purportedly associated with buying lenses came from Johnson, Shepard, and Freeborn's own observations on his site visits.[80]

68.     Freeborn used marketing materials that Shepard sent him and created his own to send or present to customers.[81]

69.     Freeborn also organized webinars for people to hear from him and Shepard about RaPower-3.[82] He spoke at the 2012 "National Convention" that Shepard organized.[83]

70.     Because Freeborn lacked a background in federal tax, Freeborn relied on Johnson's assurance that Johnson would pay his attorneys' fees if he ever ran into trouble because of RaPower-3.[84]

---

[78] Shepard Dep. 115:11-117:10; T. 935:17-936:20; Freeborn Dep. 46:2-47:17; Pl. Ex. 493 (partial Freeborn downline list); Pl. Ex. 54; Pl. Ex. 697, Deposition Designations for Brian Zeleznik ("Zeleznik Dep.") 19:9-23, 45:16-46:11; 51:7-56:13 143:7-20, 23-145:10 (Aug. 2, 2016); Pl. Ex. 56; Pl. Ex. 62; Gregg Dep. 21:18-22:9, 34:6-25, 39:9-19 (Nov. 16, 2016); Pl. Ex. 693, Deposition Designations for Frank Lunn, IV ("Lunn Dep.")33:24-37:20 (Aug. 1, 2016).

[79] Freeborn Dep. 44:7-45:23; Pl. Ex. 492 at 2.

[80] Shepard Dep. 117:18-118:11; Freeborn Dep. 20:15-22:23, 28:19-34:18; *see also* Pl. Ex. 109 at 1-3.

[81] Freeborn Dep. 48:2-55:1; Pl. Exs. 496, 497; *see* Pl. Ex. 492 at 2 (directing customers to www.rapower3.com); Pl. Ex. 294. Freeborn Dep. 86:10-93:7; Pl. Ex. 501; Pl. Ex. 85.

[82] Pl. Ex. 237.

[83] Pl. Ex. 504 at 5. Topic: "The Ra3 role behind the scenes."

[84] Freeborn Dep. 102:7-108:21; Pl. Ex. 412 at Response to Interrogatory No. 7 (Freeborn stated that he is "SELF-EDUCATED" in the field of federal income taxes and energy tax credits.).

(continued...)

71.     At Johnson's direction, Shepard fired Freeborn from RaPower-3 in June 2013.[85]

72.     Freeborn continued, however, to collect commissions on solar lens sales through his downline through at least the end of 2016.[86]

73.     IAS or RaPower-3 paid Freeborn more than $230,000 in commissions for his sales of solar lenses and sales of solar lenses in his downline.[87]

74.     Freeborn generated, through a "charitable foundation," approximately $75,000 more in commissions for lens sales.[88]

### 4.     Orders Placed by Customers

75.     By careful derivation of data from a proprietary database (consisting of 18 MB of data, with 13 tables)[89] maintained by defendants, Lamar Roulhac was able to extract data used in analysis of financial transactions. Extracted data was placed into three tabs in an Excel spreadsheet to which an analytical tab was added.[90]

76.     The extracted data in the Excel spreadsheet was totaled to show that the total sale price of orders placed with defendants by customers was between 50,025,480.00[91] to 50,097,672.15.[92]

---

[85] Freeborn Dep. 55:14-56:28; Shepard Dep. 118:12-119:14; Pl. Ex. 80.

[86] Pl. Ex. 678. The United States served these Requests for Admission on December 29, 2016. *Id.* at 6. Freeborn never responded. Accordingly, all Requests are admitted. Fed. R. Civ. P. 36(a)(3).

[87] Pl. Ex. 678. Freeborn Dep. 98:10-102:6.

[88] Freeborn Dep. 72:2-10, 98:10-102:6; Pl. Ex. 498, 499 & 500.

[89] T. 754:19-755:9.

[90] Pl. Ex. 749; T. 754:24-757:8; 758:10-759:4.

[91] Pl. Ex. 749, "Order Product" table of the Defendants' database.

[92] Pl. Ex. 749, "Order" table of the Defendants' database.

(continued...)

77.    Many of those sale records show the word "full" in the comments field which would tend to show payment in full.  The sum of those records is $17,911,507.[93]

78.    Some of those record comments show an export to QuickBooks.  But no QuickBooks data file was provided by defendants.[94]

79.     Amanda Reinken testified that she made an analysis of data provided from defendants showing customers and lenses purchased and found that between 45,205[95] and 49,415[96] lenses had been purchased. At the usual sales price of $3,500 each, this represents gross sales of between $158,217,500 and $172,952,500. At the stated down payment price of $1,050 each, this would represent revenue of $47,465,250 to $51,885,750. At the lowest possible payment level of $105 per lens, this would represent revenue of $4,746,525 to $5,188,575.

| Lenses purchased | Price per lens | Gross sales | Stated down payment | Revenue | Lowest down payment | Revenue |
|---|---|---|---|---|---|---|
| 45,205 | $3,500 | $158,217,500 | $1,050 | $47,465,250 | $105 | $4,746,525 |
| 49,415 | $3,500 | $172,952,500 | $1,050 | $51,885,750 | $105 | $5,188,575 |

Although there was some testimony that not all customers paid the full down payment, Defendants offered no credible evidence to show the amount by which these amounts could or should be reduced.

---

[93] T. 820:19-822:1.

[94] T. 785:4-11.

[95] Pl. Ex. 742A.

[96] Pl. Ex.724B.

(continued...)

### 5.  Receipts by Lens-Selling Entities

80.  By extraction from 32,000 pages of bank records for accounts of all defendant entities other than LTB, Reinken extracted the total amount of deposits to the defendants' accounts.[97]

81.  From 2009 through early 2018, RaPower-3 received at least $25,874,066 from its role in the solar energy scheme.[98]

82.  From 2008 through 2016, IAS received at least $5,438,089 from its role in the solar energy scheme.[99]

83.  From 2011 through 2016, non-defendant XSun Energy received at least $1,126,888 from its role in the solar energy scheme.[100]

84.  From 2010 through 2016, non-defendant SOLCO I received at least $3,434,992 from its role in the solar energy scheme.[101]

85.  From 2005 through February 28, 2018, all lens-selling entities have received at least $32,796,196.

86.  Testimony at trial showed that the total sales price of lenses which appears to have been paid is at least $50,025,480.[102]

---

[97] T. 863:18-875:15.

[98] Pl. Ex. 735; T. 863:18-868:24; *see also* Pl. Exs. 742B, 749.

[99] Pl. Ex. 738; T. 869:1-25; Pl. Ex. 852 at 59; T. 257:7-258:20, 271:9-272:12, 293:1-294:11, 312:5-15; Pl. Ex. 371; Pl. Ex. 507 at 20, 35; T. 1812:4-12.

[100] Pl. Ex. 740; T. 871:9-872:8; Johnson Dep., vol. 1, 79:8-81:7; 82:8-10; IAS Dep. 47:2-19; Pl. Exs. 208, 355, 356, 510, 743 at 11.

[101] Pl. Ex. 739; T. 863:18-866:18; 870:3-871:8; Johnson Dep., vol. 1, 82:8-85:2; IAS Dep. 38:10-40:6; 45:4-21; LTB1 Dep. 78:22-79:5; 79:12-80:9;81:12-21; Pl. Exs. 38, 325, 495, 545..

[102] T. 758:10-777:10; Pl. Ex. 749.

(continued...)

87.     While Johnson testified that substantial sums were expended in his work on the solar energy project, these sums were spent from funds received only by reason of the deceptive information on tax benefits that Defendants provided, described below. Further, the expenditures were in aid of a solar energy production system that, as described below, had and has no reasonable possibility of success.

88.     Much of these "substantial sums" were paid to Johnson and his family members or entities.[103]

### 6.     Receipts by Johnson and Shepard

89.     From 2008 through 2016, Johnson, personally, received $623,449 from his role in the solar energy scheme.[104] In 2012, the year the IRS began investigating the solar energy scheme, and since, direct payments to Johnson dropped to zero or near zero.[105]

90.     Johnson controls the flow of money among his entities and directs payments from their funds to himself and his immediate family members.[106]

91.     From 2006-2017, Shepard has received at least $702,001 either directly or through his entities, from his role in the solar energy scheme.[107]

### 7.     The Role of Tax Return Preparers Selected by Defendants

92.     Shepard directs customers to use tax return preparers who are familiar with the Defendants' "solar energy" project and important to the solar energy scheme, like John Howell,

---

[103] T. 1808:16-1814:24, T. 1816:16-1818:22.

[104] Pl. Ex. 737; T. 874:5-875:11.

[105] Pl. Ex. 737; *see* Pl. Ex. 10 at 2; Shepard Dep. 311:2-313:2.

[106] RaPower Dep. 101:19-102:15; T. 1808:16-1814:24, T. 1816:16-1818:22; Pl. Exs. 649; 743-44; 748.

[107] Pl. Ex. 411 at 16-17; Pl. Ex. 445; T. 1296:14-1304:1, 1596:5-1598:15.

(continued...)

in Wichita Falls, Texas; Kenneth Alexander in Florida; and Richard Jameson in St. George, Utah.[108] They have prepared the majority of returns for RaPower-3 customers on which solar energy credits and depreciation were claimed.[109]

93.     Jameson testified at trial. His presence in the case demonstrates how Defendants rely on people with minimal qualifications, sophistication and expertise. Though the areas of science and law involved in Defendants' enterprise are complex, Defendants do not themselves have the expertise that would be expected in a legitimate enterprise of this complexity, and they do not associate with, employ or retain persons with expertise.

94.     Jameson is an enrolled agent with the IRS with an office in St. George, Utah, who is not a CPA, has no degree in accounting, has a masters of science in taxation, and has worked at H&R Block, a tax preparation service.[110]

95.     Jameson prepared tax returns for clients based on his review of documents such as the Equipment Purchase Agreement, O&M Agreement, and placed in service letter, and proof of the client's payment for lenses.[111]

96.     The number of tax returns Jameson prepared for RaPower-3 customers increased every year from 2012 to the present.[112]

97.     Jameson wrote a letter to the IRS for a client stating "As a matter of fact, I have been to the site and have seen the home that is currently being powered by the lenses in the

---

[108] Pl. Exs. 242-245; Pl. Ex. 597; Gregg Dep. 121:14-25; Pl. Ex. 606; T. 826:23-830:17, 1304:4-1305:7; Pl. Ex. 334.
[109] Pl. Ex. 752 at 1.

[110] T. 1319:11-16; 1221:11-1223:23.

[111] T. 1225:13-25.

[112] T. 1228:18-1229:14.

(continued...)

testing of the units. Attached are pictures of the home that I took on site when I was there."
However, Jameson admitted he had no idea if the home was actually powered by solar energy or
if his client's lenses were installed at that time.[113] Jameson relied on "placed in service" letters as
his sole evidence that the client's lenses were used.[114]

98.     While he did not see generation of electricity, he was told that the house on site
was powered by the project components.[115]

99.     Jameson wrote another letter to the IRS for a different client stating that the lenses
produce heat that "can be used to heat a building, a greenhouse, to produce clean drinking water
and yes steam to drive a turbine that would product [sic] power."[116] But he did not know if the
client's lenses did any of these things.[117]

100.     Jameson never asked Johnson who would pay for electricity, heat, or water
generated by solar lenses, and did not see heat captured by solar lenses used in any way other
than to burn a piece of wood[118] or make "a hole in the ground that would, you know, fry things.
It was pretty hot."[119]

101.     Jameson never asked Shepard who would pay for electricity, heat, or water
generated by solar lenses.[120]

---

[113] Pl. Ex. 637; T. 1258:16-1263:20.

[114] T. 1228:11-14, 1265:21-1266:4.

[115] T. 1234:1-1235:7, 1263:11-16.

[116] Pl. Ex. 163.

[117] T. 1268:3-1269:14.

[118] T. 1232:2-1233:25.

[119] T. 1314:7-1315:1.

[120] T. 1236:15-1237:2.

(continued...)

18

102.     Jameson recommended that he prepare a draft tax return for a person so that the person could see the potential tax liability so the person could decide whether to make a RaPower-3 purchase.[121]

103.     Jameson attached the letters from Kirton McConkie[122] and The Anderson Law Center[123] (described below) to letters sent to materials he sent to IRS auditors "to establish the basis for a request for abatement [of] penalties under reasonable cause because this information was provided to the clients and they didn't know any better."[124]

104.     Though Jameson was aware that LTB was not acting as a lessee on lenses at the time, Jameson testified under oath in the Oregon Tax Court that he visited the LTB facility.[125]

105.     While Jameson is aware the Oregon Tax Court has ruled against his clients, his opinion has not changed.[126]

106.     His hostility toward the IRS was evident during his testimony.[127]

107.     Jameson's memory and credibility were shown to be deficient in his testimony by his demeanor and by specific instances of contradictions with his deposition.[128]

---

[121] Pl. Ex. 632; T. 1253:15-1256:21.

[122] Pl. Ex. 362.

[123] Pl. Ex. 23.

[124] T. 1252:21-1253:7.

[125] T. 1278:22-1279:18.

[126] T. 1279:19-1280:11.

[127] T. 1309:25-1310:15, 1345:9-1346:9.

[128] T. 1234:8-1235:7, 1238:2-1245:1, 1253:15-1256:21; Pl. Ex. 637, T. 1258:16-1262:22; Pl. Ex. 163, T. 1268:3-1269:14, 1278:6-1279:18, 1309:22-1312:9.

(continued...)

### 8.     Defendants' Roles in Tax Audits of Customers

108.    Defendants' customers have been audited by the IRS for claiming the tax benefits Defendants promote.[129]

109.    When a customer notifies Shepard that they are under audit, Shepard typically directs the customer to Enrolled Agents John Howell or Richard Jameson to represent the customer before the IRS.[130] Howell and Jameson represent RaPower-3 customers using the same arguments that Defendants make.[131]

110.    Shepard has also advocated for customers under audit before the IRS.[132] He has given customers arguments to make before the IRS and documents to submit while under audit.[133]

111.    Johnson is paying the attorneys' fees for all customers whose tax benefits have been disallowed on appeal by the IRS and who have filed petitions in Tax Court.[134]

### 9.     Post-Litigation Conduct

112.    The United States filed this injunction case in November 2015.[135]

---

[129] *E.g.*, Pl. Ex. 683, Howell Dep. 211:11-213:14 (aware of 150 cases in Tax Court); Shepard Dep. 250:17-251:3.

[130] Gregg Dep. 151:7-25; Pl. Exs. 333-34; Howell Dep. 183:11-184:8, 211:11-212:10; Pl. Ex. 348.

[131] *See, e.g.,* Howell Dep. 221:16-223:18; Pl. Exs. 605, 608; T. 1221:20-25, 1247:17-1249:9; Pl. Ex. 637.

[132] *E.g.* Pl. Ex. 10.

[133] Pl. Ex. 49; Zeleznik Dep. 184:18-185:17, 211:4-214:4 and *compare, e.g.*, Pl. Ex. 81 (document written by Brian Zeleznik to the IRS in response to his audit) *with* Pl. Ex. 89 (email from Shepard to Zeleznik with a sample document to use with the IRS); *see also* Pl. Ex. 163 at 1-2; Pl. Ex. 231; Pl. Ex. 340 (*id.* at 2 ("You can hand write notes or even copy the above [arguments] down by hand and read it word for word [to an auditor]. Just don't give [an auditor] this email.")).

[134] Johnson Dep., vol. 1, 282:19-284:10; IAS Dep. 229:16-230:23; Zeleznik Dep. 142:7-143:1.

[135] ECF No. 2.

(continued...)

113.    Johnson is paying for Shepard's and Freeborn's attorneys' fees to defend this case.[136]

114.    To date, Johnson, Shepard, IAS, and RaPower-3 continue to organize sales of solar lenses, and participate (directly or indirectly) in the sale of solar lenses.[137]

115.    They are not deterred from promoting the scheme, not by the IRS' disallowance of their audited customers' depreciation deductions and solar energy tax credits or by the complaint filed in this case.[138]

116.    Shepard testified that the only change in his behavior since the United States filed this case is that he "bowed [his] back and [is] fighting harder."[139]

---

[136] Johnson Dep., vol. 1, 282:19-284:10; IAS Dep. 229:16-230:23.

[137] Johnson Dep., vol. 1, 240:2-17; 245:24-246:22; Pl. Ex. 539; ; Pl. Exs. 424, 426, 679, 731-33, 901, 903.

[138] Shepard Dep. 311:2-315:5; RaPower-3 Dep. 197:13-199:4; IAS Dep. 226:9-25.

[139] Shepard Dep. 314:1-5.

**B.    In connection with organizing or selling any interest in a plan or arrangement, Defendants made or furnished (or caused another person to make or furnish) statements regarding the allowability of any deduction or credit because of participating in the plan or arrangement.[140]**

117.    While they sold solar lenses, and organized efforts to sell solar lenses, Defendants told their customers that, if they bought a solar lens and signed the transaction documents Defendants provide, their customers were in the "trade or business" of "leasing" solar lenses.[141]

118.    According to Defendants, because their customers are in the trade or business of leasing solar lenses, their customers are allowed to claim on their federal income tax returns a business tax deduction for depreciation on the solar lenses and a solar energy tax credit.[142]

119.    According to Defendants, one of the reasons their customers may claim these tax benefits is that their customers "materially participated" in their purported solar lens leasing business.[143]

**1.    Defendants told customers, and prospective customers, about the structure of the transactions.**

120.    The structure and pricing of the transactions that purportedly create the customers' solar lens leasing business have changed over time.

---

[140] 26 U.S.C. § 6700(A)(2)(a).

[141] *E.g.*, Pl. Ex. 32. Occasionally, Shepard has claimed that customers have been "in the solar energy business." Shepard Dep. 243:11-244:3; Pl. Ex. 43 at 1 ("AM I REALLY IN THE SOLAR ENERGY BUSINESS? Yes."). But in recent years, Shepard has made it clear that "We should not consider ourselves in an 'energy' business. We are buying lenses and leasing them – THAT is our business – LEASING – NOT producing energy . . . ." Pl. Ex. 32.

[142] Pl. Ex. 1 at 2-3 ("Tax Question" Nos. 4-5). A collection of Johnson's statements: IAS Dep. 162:1-165:9, 171:10-173:20; Pl. Ex. 531 at 3; *see also* Pl. Ex. 532 at 7-10. A collection of Shepard's statements: Pl. Ex. 93 (as a result of purchasing a lens, "the investor gets his $9,000 back in the form of a Tax Credit, plus the depreciation which adds extensive value over a six year period plus the income from power produced by the Solar Pod."); Shepard Dep. 148:21-149:25; *e.g.*, Pl. Ex. 125 (letter from Shepard telling a customer that he is "qualif[ied] . . . for the Internal Revenue Service solar energy tax credit" because RaPower-3 "put [their lenses] into service"). A collection of Freeborn's statements: Freeborn Dep. 47:24-53:18; Pl. Exs. 214, 294, 492, 496, 499, 501.

[143] *E.g.*, Pl. Ex. 1 at 3; Pl. Ex. 43.

(continued...)

121.     As early as 2005, Johnson directed that IAS "lease" the solar lenses to customers.[144]

122.     Customers paid $9,000 for leasing the lenses from IAS.[145]

123.     Shepard leased lenses from IAS in 2005.[146]

124.     According to the lease agreement, IAS would build solar towers and install the customers' lenses at a specific site – in the case of Shepard's lenses, Yermo, California.[147]

125.     At the same time a customer leased the lenses from IAS, he signed a sublease agreement with LTB.[148]

126.     The idea was that, once IAS had installed (for example) Shepard's lenses in Yermo, California, LTB would take over operation and maintenance of Shepard's lenses to generate revenue for Shepard.[149]

127.     Shepard's lease agreement states that IAS will provide him "plans, specifications and other documentation and engineering as required to obtain approval" to operate the lenses from "local state and federal agencies" at an "undetermined" time.[150]

128.     IAS set benchmarks for additional approvals and for installation of Shepard's lenses based on that "undetermined" date for plans.[151]

---

[144] Shepard Dep. 57:7-59:3; Pl. Ex. 462; LTB1 Dep. 43:16-46:24; T. 914:6-916:13; Pl. Exs. 91-92.

[145] Pl. Ex. 462 at 2.

[146] Pl. Ex. 462.

[147] Pl. Ex. 462.

[148] Shepard Dep. 57:7-59:3, 73:1-74:2; Pl. Exs. 462, 464.

[149] LTB1 Dep. 43:16-46:24; Pl. Ex. 464 at 2.

[150] Pl. Ex. 462 at 1.

[151] Pl. Ex. 462 at 2.

(continued...)

129.    In 2006, Johnson changed the transaction's structure. Instead of a customer leasing lenses from IAS, the customer would buy lenses.[152]

130.    At that time, the total price for a lens was $30,000, but the customer paid only $9,000 in down payment."[153]

131.    IAS financed the remaining $21,000, interest free.[154]

132.    According to the 2006 contract, the $21,000 would be paid by the customer in $700 annual payments over 30 years.[155]

133.    But the obligation to start paying $700 annually would only begin five years *after* IAS installed and began operating the customer's lens at a specific "Installation Site" in Delta, Utah.[156]

134.    Shepard's contract, which he signed on December 22, 2006, required IAS to install and "startup" his lenses within seven days: on or before December 29, 2006. [157]

135.    According to the contract, if IAS failed to "furnish, deliver, install and startup" the lenses by December 31, 2007, it would refund the Shepard's down payment of $9,000.[158]

136.    IAS continued to sell lenses with, generally, the same or similar transaction terms through 2009.[159]

---

[152] Pl. Ex. 8A at 7; Pl. Ex. 93; Pl. Ex. 94.

[153] Pl. Ex. 93; Pl. Ex. 94 ¶ 3; *see also* Pl. Ex. 532 at 7-8.

[154] Pl. Ex. 531 at 2.

[155] Pl. Ex. 94¶ 3.

[156] Pl. Ex. 94¶ 3.

[157] *E.g.*, Pl. Ex. 94 ¶ 3.

[158] Pl. Ex. 94 ¶ 7.

[159] IAS Dep. 182:16-183:4; Pl. Ex. 533; *see also* Pl. Exs. 95, 181, 535; IAS Dep. 196:21-198:19.

(continued...)

137.     Freeborn bought his first lenses from IAS under these terms in August 2009.[160]

138.     With the transition to RaPower-3 in 2010, Johnson changed the price of a lens to $3,500.[161]

139.     Customers also started purchasing lenses via the internet at rapower3.net.

140.     On that site, a potential customer enters the number of lenses he wishes to purchase, and the website "figures" the amount the customer owes and the amount of the customer's down payment.[162]

141.     The site also provides all transaction documents for customers to sign electronically: an Equipment Purchase Agreement, an Operations & Maintenance Agreement ("O&M"), and, at times in the past, a bonus contract.[163]

142.     Customers do not negotiate the price of a lens, or other terms of the transactions Defendants promote.[164] The lack of price negotiation is because the customer is not focused on buying a lens but on buying a tax benefit package. A high price results in large tax benefits. Testimony to the contrary from lens purchasers is not credible because they face serious tax consequences from the adjudication of the truth of this solar energy scheme.

---

[160] Pl. Ex. 533.

[161] Johnson Dep., vol. 1, 206:15-23; Pl. Ex. 687, Deposition Designations for Robert Aulds ("Aulds Dep.") 141:3-13, 146:17-147:5 (March 14, 2017). For a time, the price for a lens was $3,000. *E.g.*, Pl. Ex. 346 at 1 ("Kevin purchased 10 systems. Each system costs $3,000. Therefore his total purchase price is $30,000.")

[162] Aulds Dep. 141:3-13.

[163] RaPower-3 Dep. 39:18-41:2; Aulds Dep. 141:3-13.

[164] RaPower-3 Dep. 39:9-41:2; *e.g.* Pl. Exs. 119, 181, 511. Aulds Dep. 141:3-13, 146:17-147:5; Gregg Dep. 55:19-56:13; Howell Dep. 39:17-40:4, 95:3-5, 134:14-135:22; T. 1247:7-9; Lunn Dep. 114:11-115:4; T. 1078:17-1079:2; T. 987:3-12; Zeleznik Dep. 67:3-12.

(continued...)

143.    The Equipment Purchase Agreement states the number of lenses the customer purportedly purchases from RaPower-3.[165]

144.    The contract states that RaPower-3 will install and "startup" the lenses the "Installation Site," which is "a site yet to be determined."[166]

145.    The Installation Site is "any place that Neldon [Johnson] wants it to be."[167]

146.    There is no date-certain in the Equipment Purchase Agreement by which the customer's lenses must be installed in a tower and producing revenue.[168]

147.    Instead, the "Installation Date" is defined as "the date the [lens] has been installed and begins to produce revenue."[169]

148.    RaPower-3 commits that each lens will sustain a specific "energy production rate" for the first five years from the "Installation Date."[170]

149.    If the lenses do not sustain the promised "energy production rate," the buyer may terminate the Equipment Purchase Agreement and is not obligated to pay any remaining balance for his lenses.[171]

---

[165] Pl. Ex. 25 at 1; Pl. Ex. 511. The contract uses the term "Alternative Energy System," which is undefined in the contract itself. *See generally* Pl. Ex. 511. It means "solar lens." IAS Dep. 181:9-182:5; Pl. Ex. 181; T. 914:13-919:24 ; Pl. Exs. 92, 94; *see* Shepard Dep. 57:7-59:6; Pl. Ex. 462.

[166] Pl. Ex. 511 at 1.

[167] Shepard Dep. 157:18-24; Pl. Ex. 119 at 1.

[168] *See generally* Pl. Ex. 511.

[169] Pl. Ex. 511 at 2.

[170] Pl. Ex. 511 at 4-5.

[171] Pl. Ex. 511 at 5; Shepard Dep. 234:14-235:4; Pl. Ex. 475.

(continued...)

150.     At the same time the customer electronically signs the Equipment Purchase Agreement, the customer electronically signs an Operation and Maintenance Agreement ("O&M") with LTB. [172]

151.     According to Defendants, by signing the O&M, the customer is "holding out for lease" his solar lenses to LTB. [173]

152.     The O&M states that once a customer's lenses are installed at a "Power Plant" on the "Installation Site" (defined only by reference to the Equipment Purchase Agreement), LTB will operate and maintain the customer's lenses to produce revenue. [174]

153.     According to the O&M, LTB is "entitled to receive all revenue" from sales, but will make a quarterly "rental payment" to the customer for using that customer's lens(es) to produce the energy it will sell. [175]

154.     In a single year, the total rental payments to any customer for a single lens may not exceed $150. [176]

155.     There is no date-certain in the O&M by which a customer's lenses are required to begin producing revenue. [177]

156.     Defendants told customers that IAS, RaPower-3, or LTB "placed in service" or "put into service" their solar lenses in the year that the customers purchase the lenses. [178]

---

[172] Pl. Ex. 121; Pl. Ex. 25 at 1. Defendants maintain that LTB is the committed entity on the O&M, despite the contract being on RaPower-3 letterhead and being signed by "Seller," "Neldon Johnson," Director of "RaPower-3." Johnson Dep., vol. 1, 219:2-223:23; *e.g.*, Pl. Exs. 511, 512. *See also* ECF No. 22 ¶ 25, ECF No. 23 ¶ 25.

[173] Pl. Ex. 121; Pl. Ex. 25 at 1; Pl. Ex. 557 at 1; Pl. Ex. 473; Pl. Ex. 533 at 2.

[174] Pl. Ex. 121 at 1, 2, 4.

[175] Pl. Ex. 121 at 4.

[176] Pl. Ex. 121 at 4.

[177] *See generally* Pl. Ex. 121, 512.

[178] Pl. Ex. 1 at 3 ("Tax Question" No. 7); Pl. Exs. 44, 57, 104-105, 123-125, 176, 185, 313, 588; *see also* Pl. Ex. 472.

(continued...)

157.    The Equipment Purchase Agreement states that the full price of a single lens is $3,500.[179]

158.    But a typical solar lens customer does not pay the full price upon signing the Equipment Purchase Agreement.

159.    Instead, a customer pays for his lenses in the following stages.[180]

160.    First, he pays $105 per lens at the time he signs the Equipment Purchase Agreement, often near the end of the calendar year.[181]

161.    Second, he pays an additional $945 on or before June 30 of the following year, for a total of $1,050.[182]

162.    This leaves $2,450 remaining on the $3,500 lens purchase price.

163.    The Equipment Purchase Agreement states that the customer will begin paying off the remaining $2,450 once the customer's lens has been installed and producing revenue for five years.[183]

164.    For the first five years of revenue production, the customer will receive $150 yearly rental payment per lens.[184]

---

[179] Pl. Ex. 511 at 2.

[180] Pl. Ex. 511 at 2.

[181] Pl. Ex. 511 at 2.

[182] Shepard Dep. 150:17-153:21; Pl. Ex. 119 at 2, Pl. Ex. 511 at 2.

[183] Pl. Ex. 511 at 2; Shepard Dep. 154:9-156:17.

[184] Pl. Ex. 511 at 2; Shepard Dep. 154:9-156:17.

(continued...)

165.    After the first five years, LTB will take the customer's $150 annual rental payment and divide it between the customer and RaPower-3: $82 per year for RaPower-3 to pay off the outstanding balance and $68 for the customer/lens owner.[185]

166.    LTB will make these payments for 30 years.[186]

167.    RaPower-3 provides nearly interest-free financing for the $2,450 debt remaining on each lens.[187]

168.    The only security for the customer's promise to pay is the lens itself.[188]

169.    Defendants do not check customers' credit.[189]

170.    At times, the Equipment Purchase Agreement has provided that, if the tax laws change after the date the customer signs the contract in a way that "materially reduce[s] any tax benefit" of the agreement to the customer, the customer may retroactively reduce the number of lenses he bought on the date of signing.[190]

171.    Also, if a solar lens customer no longer desires to "own" lenses, Johnson will refund the person's money and let them out of the contract.[191]

---

[185] Pl. Ex. 511 at 2; Shepard Dep. 154:9-156:17.

[186] Pl. Ex. 511 at 2; Shepard Dep. 154:9-156:17.

[187] *E.g.*, $82 per year times 30 years is $2,460. Thus, according to the Equipment Purchase Agreement, RaPower-3 would collect $10 per lens in interest, for financing $2,450 for at least 30 years.

[188] Pl. Ex. 511 at 3.

[189] Pl. Ex. 677 at 2.

[190] Pl. Ex. 511 at 4 (2014 contract); Pl. Ex. 119 at 4 (2012 contract); Pl. Ex. 174 (2010 contract).

[191] Shepard Dep. 304:4-305:10; Pl. Ex. 282; Shepard Dep. 110:9-113:7; Pl. Ex. 468; Pl. Ex. 282 (In January 2015, Shepard told customers being audited that "[w]e . . . believe we will prevail against the IRS in court. However, if you would like to part company, we will refund your money and you can pay the IRS and move in a different direction.").

(continued...)

172.     From time to time in the past, a solar lens customer could also sign a "bonus referral contract."[192]

173.     The bonus contracts, over time, varied in the amount a customer could purportedly earn, and the basis for the customer's payout – either the first billion dollars in IAS gross sales or the second billion dollars in IAS gross sales.[193]

174.     If a customer signed a bonus contract before May 23, 2011, the bonus contract states that the customer will be paid a maximum of $6,000 per lens the customer bought based on a percentage of IAS's first billion dollars in gross sales.[194]

175.     If a customer signed a bonus contract between May 24, 2011 and February 29, 2012, the contract states that the customer will be paid a maximum of $2,000 per lens the customer bought during that time period based on a percentage of IAS's first billion dollars in gross sales.[195]

176.     If a customer purchased lenses and signed a bonus contract between March 1, 2012 and July 31, 2014, the contract states that the customer will be paid a maximum of $2,000 per lens the customer bought during that time period based on a percentage of IAS's second billion dollars in gross sales.[196]

---

[192] Johnson Dep., vol. 1, 228:19-234:17; Pl. Ex. 185 at 3; *compare* ECF No. 2 Compl. ¶ 25 *with* ECF No. 22 ¶¶ 25 & 32; Pl. Ex. 1.

[193] ECF No. 22 ¶ 32.

[194] ECF No. 22 ¶ 32; *see also* Pl. Ex. 297.

[195] ECF No. 22 ¶ 32.

[196] ECF No. 22 ¶ 32.

(continued...)

177.    Defendants told customers that the bonus contract was the key to being able to claim a depreciation deduction related to the solar lenses because the promise of the bonus made the "system . . . profitable in order to meet IRS requirements."[197]

178.    Johnson told a customer in 2010 that "[t]his bonus program makes certain that each purchase was made for an economic reason. This reason would be such that anyone would see the value of the transaction as to its economic values beyond just a tax savings."[198]

179.    But Johnson has not offered bonus contracts since July 2014.[199]

### 2.    Defendants told customers, and prospective customers, about Johnson's purported solar energy technology.

180.    Defendants told customers, and prospective customers, about Johnson's purported solar energy technology.[200]

181.    Over the years, Shepard touted "[g]reat progress"[201] having been made on component parts of the technology through "[e]laborate testing"[202] and "research and development"[203] of "technologies needing refinement"[204].

---

[197] Johnson Dep., vol. 1, 234:18-237:15; Pl. Ex. 185 at 1; IAS Dep. 203:7-204:6; Johnson Dep., vol. 1, 235:17-25; Shepard Dep. 261:17-262:7; Pl. Ex. 1 at 3 ¶ 5; Pl. Ex. 340.

[198] Pl. Ex. 185 at 1; *see also* Pl. Ex. 34.

[199] ECF Doc. 22 ¶ 32.

[200] *E.g.*, Pl. Ex. 185 at 1; Johnson Dep., vol. 1, 173:11-177:16; Pl. Exs. 16 & 17. Johnson gave these white papers to Shepard. Johnson Dep., vol. 1, 185:15-23; Shepard Dep. 126:9-128:5. Shepard made them available to the public (including Freeborn) on rapower3.com. Freeborn Dep. 24:16-25:23; Pl. Ex. 491; T. 1351:19-1352:24, 1398:4-1399:18; Pl. Ex. 441. RaPower-3 Dep. 140:4-143:17; Pl. Ex. 504; Shepard Dep. 199:10-204:14; Pl. Ex. 471; Shepard Dep. 250:13-252:21; Pl. Ex. 72; Pl. Ex. 109 at 1-3; *see also* Freeborn Dep. 95:3-98:1; T. 1381:1-1387:12; Pl. Ex. 425 at 1. Johnson Dep., vol. 1, 211:16-215:23; Shepard Dep. 36:6-40:23, 183:14-187:13; Pl. Ex. 8A; Pl. Ex. 676; Gregg Dep. 57:18-59:12; Pl. Exs. 298-299; Pl. Ex. 26.

[201] Pl. Ex. 8A at 10.

[202] Pl. Ex. 8A at 10.

[203] Pl. Ex. 8A at 7.

[204] *E.g.*, Pl. Ex. 8A at 8; Pl. Ex. 504 at 5-7, 10-22.

(continued...)

182.     Shepard and Freeborn also told customers and prospective customers to expect construction of new towers, beyond the 19 towers on the R&D Site.[205]

183.     As early as November 2006, Shepard said that IAS had "a goal of finishing 50 Solar Pods before the end of the year for those who were previously on the lease program. . . . For new investors, [IAS] has a goal to put up 50 additional Solar Pods before year's end."[206]

184.     Freeborn stated, in June 2010, "Neldon Johnson of IAUS and [R. Gregory] Shepard are hard at work bringing [the rental] income stream into operation. We are very close to making putting [*sic*] everything together and becoming fully operational perhaps before the end of the summer."[207]

185.     Then, in February 2012, Freeborn told customers that "the IAUS energy fields are about to be erected."[208]

186.     In June 2012, Defendants told participants in the "RaPower[-]3 National Convention" about "what's been accomplished in the last year" with respect to research and development, manufacturing, and construction.[209]

187.     In July 2012, Shepard wrote to customers "[n]ow that the R&D is done and the Manufacturing Plant is completed along with the manufacturing of so many components is done [*sic*], CONSTRUCTION WILL BEGIN THIS MONTH."[210]

---

[205] *E.g.*, Pl. Exs. 216, 246, 270.

[206] Pl. Ex. 93.

[207] Pl. Ex. 246.

[208] Pl. Ex. 216 at 1.

[209] Pl. Ex. 504 at 5-4.

[210] Pl. Ex. 270.

(continued...)

188.     In November 2012, Shepard told a customer that there were "21,000 lenses in inventory" and "150 towers ready to install" with "$15M" in the bank."[211]

189.     In July 2013, Shepard told one customer "I THINK ALL 19 TOWERS ARE UP NOW. WE ARE JUST ABOUT READY TO FLIP THE SWITCH".[212] But in August 2013, Shepard told customers being audited by the IRS that a photo attached to his email showed "the main tower. There will be 17 to 18 satellite towers that will feed the main tower's turbine and heat exchanger producing 1.5 megawatts of power."[213]

190.     In November 2013, Shepard told customers "[w]e are doing great down in Delta."[214]

191.     He identified one tower as "fully completed," "another ten satellite towers nearly completed," and an additional four towers "not yet complete."[215]

192.     Shepard told customers that "[t]hese fifteen towers will complete the first project. Probably in two weeks, the 2d project will begin. It will consist of 150 towers. All towers and trusses have already been delivered. All the lenses have been framed and many other components have already been made."[216]

---

[211] Shepard Dep. 172:9-179:17 *and* Pl. Ex. 141.

[212] Pl. Ex. 329 at 1.

[213] Shepard Dep. 250:13-251:3; Pl. Ex. 72 at 1.

[214] Pl. Ex. 348 at 1

[215] Pl. Ex. 348 at 1

[216] Pl. Ex. 348 at 1

(continued...)

193.    Shepard also told customers that "[t]he dual axis hydraulic tracking systems were working with the new Ram. The lenses heated up our molten salt storage container to over a thousand degrees."[217]

194.    As of June 2014, Shepard wrote to customers "[t]wenty-five construction workers will be employed to install twenty towers a day or close to two megawatts a day. To install that many towers/megawatts per day with only 25 workers is unprecedented in the history of energy construction. Target date to begin is before summer's end in 2014."[218]

195.    In December 2015, Shepard heard from a customer who was "a little worried about the amount of time that it is taking to get those lenses on towers and generating rental income."[219]

196.    Shepard assured the customer that "The extra time was getting the mass production and installation capabilities up to 25 towers a day. That has pretty much been completed. I'm pretty sure that the first quarter of 2016 will be a very good one for us. It will all work out."[220]

197.    When the customer asked if Shepard could say if he thought "the lenses will be on towers and generating rental income in 2016," Shepard responded "I very much think so!"[221]

198.    Defendants have also told customers about progress toward obtaining a contract to sell power to a third party purchaser.[222]

---

[217] Pl. Ex. 348 at 1

[218] Shepard Dep. 179:21-183:8; Pl. Ex. 420 at 1.

[219] Pl. Ex. 159.

[220] Pl. Ex. 159.

[221] Pl. Ex. 159.

[222] Pl. Exs. 157, 185 at 2, 292.

(continued...)

199.    In 2010, Johnson assured a customer that "[w]e do have power purchase agreements tentatively in place with other companies that have agreed to purchase the power produced from the solar energy equipment once the system is placed in service."[223]

200.    In August 2013, Shepard told customers that 18 or 19 towers would be producing 1.5 megawatts of power which would "soon be put on power poles going to Rocky Mountain Power which is Utah's largest utility company."[224]

201.    In April 2015, Shepard told customers that "we are now in the process of negotiating a [power purchase agreement] for the first set of towers that will be going up,"[225] such that rental income from their lenses could start soon.

202.    Over the years, Shepard and Freeborn also told customers to expect bonus contract payouts "soon."[226]

### 3.    Defendants sold solar lenses by emphasizing the purported tax benefits.

203.    From the start, Defendants have told their customers that they can "zero out" their federal income tax liability by buying enough solar lenses and claiming both a depreciation deduction and solar energy tax credit for the lenses.[227]

---

[223] Pl. Ex. 185 at 2.

[224] Shepard Dep. 250:13-251:3; Pl. Ex. 72 at 1; *see also* RaPower-3 Dep. 155:4-166:18; Pl. Ex. 267 at 1 ("The first project will consist of 15 towers that will produce about 1.5 Megawatts for Rocky Mountain Power. We are almost done.").

[225] Shepard Dep. 204:15-209:11; Pl. Ex. 292.

[226] *E.g.*, Pl. Ex. 61 at 1 (In 2010, "They have really started putting an emphasis on the bonus contract which seems to indicate that we are close."); Pl. Ex. 48 at 1 (In 2012, "Rental income & Bonus payments are expected to begin soon."); Pl. Ex. 49 at 1 ("Rental and bonus income should start in 2014.").

[227] Johnson Dep., vol. 1, 247:11-248:12; Pl. Ex. 490 at 9-10; *see also* IAS Dep. 162:1-165:9, Pl. Ex. 531. According to Shepard, "the greater one's tax liability, the greater will be the depreciation benefit." Pl. Ex. 24 at 1; *see also* Pl. Ex. 20 at 2; *See* Lunn Dep. 188:18-189:20.

(continued...)

35

204.    In the materials he wrote in 2006, Johnson included four pages on the tax benefits of buying a lens, due to depreciation and the solar energy tax credit.[228]

205.    Defendants tell customers to calculate both the deduction and the credit based on the full price of a lens, not the amount the customer actually pays.[229]

206.    Defendants also tell customers that they may use deductions related to solar lenses to offset the customers' active income, like W-2 wages from employment.[230]

207.    Johnson wrote that "[t]he person buying a [lens] receives a $9,000 tax credit from the IRS for each [lens] purchased. . . . The retail value of IAUS's [lens] is $30,000. The federal tax credit at 30% of $30,000 is $9,000."[231]

208.    Johnson connected the amount of depreciation a purchaser could take to the impact of the tax credit: "Half of the tax credit ($4,500) must be subtracted from the $30,000 purchase amount when using it to calculate depreciation of the equipment. Therefore, only $25,000 of the $30,000 value can be depreciated."[232]

209.    Johnson presented tables for purchasers who were in different tax brackets to illustrate the tax-reducing effect of buying lenses and claiming a depreciation deduction and the solar energy tax credit for them.[233]

210.    At the same time, Johnson told people they could[234]:

---

[228] Pl. Ex. 531 at 3-6.

[229] *E.g.*, Pl. Ex. 24 at 1; Pl. Ex. 43 at 1; Pl. Ex. 531 at 2-3 (using prices Johnson established in 2006).

[230] Pl. Ex. 181 at 2 ¶ 6; Pl. Exs. 30, 40 at 4, 146, 147 at 1, 205, 346.

[231] Pl. Ex. 531 at 3.

[232] Pl. Ex. 531 at 3.

[233] Pl. Ex. 531 at 4-6.

[234] Pl. Ex. 532 at 12.

# Earn $$ From Your Federal Income Tax 0% of Your Own $$ Invested

211. Defendants also illustrated the tax benefits and flow of money this way:[235]



212. Shepard offered a way for a prospective or returning customer to "determin[e] how many solar lenses you should buy": "look at the taxes you paid last year and what you expect to pay this year."[236]

---

[235] Pl. Ex. 496; *see also* Pl. Exs. 497, 777 at 1-2.

[236] Shepard Dep. 232:4-234:10; Pl. Exs. 20, 24, 474; *see also* Pl. Ex. 597.

(continued...)

213.     According to Shepard, the "objective" is to "zero out your taxes while maximizing your ability to bring clean, renewable energy to our country."[237]

214.     To accomplish this objective, Shepard gave prospective customers the formula to decide how many lenses to buy: take the customer's anticipated tax liability for the current year and multiply it by a number that "has been designed to give most taxpayers 1.5 times their money back in relation to their total down payment. For example, for a $10K down payment . . . you may get back at least $15K in tax benefits."[238]

215.     Shepard showed customers and prospective customers how to calculate those tax benefits[239]:

**Example:** Taxable 2014 Liability is projected to be $10,000 plus there was $10,000 paid in 2013 taxes. (10,000 + 10,000 X .00085 = 17.

**Purchase Price:** 17 systems X $3,500 = $59,500.

**Down Payment:** 17 systems X $1,050 = $17,850.

**Tax Credit:** $59,500 X 30% = $17,850.

**Depreciation (Net Operating Loss):** One half of the tax credit is $8,925. Subtract that from the purchase price of $59,500 = $50,575.

216.     Shepard showed the financial bottom line for a prospective lens buyer[240]:

**Money Details:**
1. You purchased 9 systems and paid $9,450 as a down payment.
2. After your tax refund of $10,000 in 2014, you will have made $550 thanks to your RaPower3 purchase plus you will make about another $4,800 over the next four years.
3. Your profit is created by your depreciation.
4. Don't forget the rental income of $150 X 9 X five years = $6,750 and $68 X 9 X 30 years = $18,360 (for a total of $25,110).

---

[237] Shepard Dep. 232:4-234:10; Pl. Ex. 20 at 2; Pl. Ex. 24 at 1; T. 1130:2-23; Pl. Ex. 158.

[238] Pl. Ex. 20 at 2.

[239] Pl. Ex. 24 at 1; *see also id.* at 2.

[240] Pl. Ex. 24 at 1; *see also* Pl. Ex. 20 at 2.

(continued...)

217.    Put more simply, Shepard showed customers exactly where and how, on a federal individual income tax return, to enter numbers to "zero out" their tax liability[241]:

Form **1040** Department of the Treasury—Internal Revenue Service   (99)
U.S. Individual Income Tax Return **2011**   OMB No. 1545-0074   IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2011, or other tax year beginning , 2011, ending , 20   See separate instructions.

Your first name and initial: RAPOWER 3   Last name: TEAM MEMBER   Your social security number

If a joint return, spouse's first name and initial   Last name   Spouse's social security number

Home address (number and street). If you have a P.O. box, see instructions.   Apt. no.   ▲ Make sure the SSN(s) above and on line 6c are correct.

. . .

1099-R if tax was withheld.

| 11 | Alimony received | 11 |
| 12 | Business income or (loss). Attach Schedule C or C-EZ   DEPRECIATION | 12 | 2,973 | Air System |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ □ | 13 |
| 14 | Other gains or (losses). Attach Form 4797 | 14 |
| 15a | IRA distributions   15a   b Taxable amount | 15b |

If you did not get a W-2, see instructions.

. . .

*Get this number low enough for Zero Taxes*

Form 1040 (2011)   Page 2

**Tax and Credits**

| 38 | Amount from line 37 (adjusted gross income) | 38 |
| 39a | Check if: □ You were born before January 2, 1947, □ Blind. } Total boxes |
| | □ Spouse was born before January 2, 1947, □ Blind. } checked ▶ 39a |
| b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ 39b |
| 40 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | 40 |
| 41 | Subtract line 40 from line 38 | 41 |
| 42 | Exemptions. Multiply $3,700 by the number on line 6d | 42 |
| 43 | Taxable income. Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | 43 | GOAL IS ZERO |
| 44 | Tax (see instructions). Check if any from: a □ Form(s) 8814 b □ Form 4972 c □ 962 election | 44 |

Standard Deduction for—
• People who check any box on line 39a or 39b or who can be claimed as a dependent,

. . .

**Other Taxes**

widow(er), $11,600. Head of household, $8,500.

| 52 | Residential energy credits. Attach Form 5695 | 52 | TAX CREDIT IF NEEDED |
| 53 | Other credits from Form: a □ 3800 b □ 8801 c □ | 53 |
| 54 | Add lines 47 through 53. These are your total credits | 54 | 1,250 | Per System |
| 55 | Subtract line 54 from line 46. If line 54 is more than line 46, enter -0- | 55 |
| 56 | Self-employment tax. Attach Schedule SE | 56 |
| 57 | Unreported social security and Medicare tax from Form: a □ 4137 b □ 8919 | 57 |
| 58 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 58 |
| 59a | Household employment taxes from Schedule H | 59a |
| b | First-time homebuyer credit repayment. Attach Form 5405 if required | 59b |
| 60 | Other taxes. Enter code(s) from instructions | 60 |
| 61 | Add lines 55 through 60. This is your total tax | ▶ 61 | GOAL IS ZERO |

**Payments** | 62 | Federal income tax withheld from Forms W-2 and 1099 | 62 |

. . .

[241] Shepard Dep. 239:16-240:10; Pl. Ex. 40 at 13; Lunn Dep. 164:12-171:1; *see also* Shepard Dep. 241:18-243:8; T. 1130:2-23; Pl. Ex. 158; Pl. Ex. 490 at 9-10.

218.    Shepard encouraged customers to sell lenses to others by emphasizing the tax benefits. He wrote, in one promotional document, "Remember, if your people are happy, meaning they received all their tax benefits, then they will purchase even more systems. That means you make commissions all over again. . . . Have your people make a copy of their refund check so the both of you can use it as a valuable tool in your presentations."[242]

219.    Freeborn told customers "you can be tax free like GE for 15 years" by buying lenses.[243] Freeborn gave customers the following calculations[244]:

> Fourth, there are certain numbers that all RaPower3 team members need to have down per system:
> 1. Retail Price - $3500;
> 2. Full Down Payment - $1050;
> 3. Up Front/Enrollment Cost - $105;
> 4. Federal Energy Credit - $1050;
> 5. Bonus - $2,000;
> 6. Residual Income - $150/year first 5 years, $68/year the next 30 years;
> 7. Depreciation - $2,975, 50% Bonus depreciation the first year;
> 8. Rule of thumb – multiply Line 55 of From 1040 by 6, and then multiply that sum by .0007 to determine the number of systems to be purchased to offset federal income taxes through 2016.  Remember, your client can always purchase more systems to extend his tax free status beyond 2016 since the tax credits may be forwarded 20 years.

---

[242] Pl. Ex. 504 at 8; T. 1603:1-1604:7

[243] Pl. Ex. 220; *see also* Pl. Ex. 207 ("With this program you are awarded the . . . tax privileges that General Electric gets, i.e., pay no federal taxes. In fact, full [par]ticipation makes you tax free till [*sic*] 2020.").

[244] Pl. Ex. 501 at 2; *see also* Freeborn Dep. 71:2-20; Pl. Ex. 499. Freeborn and his brother created a charity that they used to sell solar lenses. Pl. Exs. 498, 499, 500. The "charity" sold at least 450 lenses. Pl. Ex. 498.

(continued...)

220.    Freeborn told people in his downline to start with the following pitch if they wanted to sell more lenses[245]:

> 1. Listen for the tax return complaining conversations
>
> 2. Ask the M A G I C Question: "Do you like figuring (Paying) taxes?"
>
> 3. Explain to them your experience: "Well neither do I; that's why I DON'T pay any. Would you like to learn how not to as well?"

221.    Shepard and Freeborn also assisted customers with preparing their federal income taxes to claim a depreciation deduction and solar energy tax credit as a result of buying solar lenses.[246]

222.    Shepard told people how to complete their tax returns "properly" to claim the tax benefits purportedly associated with buying solar lenses.[247]

223.    As Shepard told other RaPower-3 "leadership" team members in 2011, "I have someone from Florida that is FAXING his 1040 return to me. I told him that I can tell him in two minutes if his CPA did it right."[248]

224.    Shepard has corresponded with tax professionals to give them information and instruction about the transactions and the technology that purportedly qualify their customers for the tax benefits Defendants promote.[249]

---

[245] Pl. Ex. 85 at 3; *see also* Pl. Ex. 214.

[246] *E.g.*, Pl. Exs. 88, 109, 674 ("TAX TIME SUCCESS STORIES" note customers having received help from Shepard and Freeborn to complete taxes). Pl. Ex. 323; Gregg Dep. 127:19-128:8; *see also* Pl. Ex. 218 (offering information from RaPower-3 to support claimed tax benefits on customers' returns); Pl. Ex. 217 (offering instructions on how to use TurboTax to claim tax benefits).

[247] *E.g.* Shepard Dep. 243:11-244:14; Pl. Ex. 43 at 1.

[248] Shepard Dep. 241:1-14; Pl. Ex. 112.

[249] Shepard Dep. 210:20-211:24; Pl. Ex. 471; Pl. Ex. 346.

(continued...)

225.     Shepard also advises customers under audit on how to respond to the IRS to defend disallowed and lens-related depreciation deductions and solar energy tax credits.[250] Shepard advised customers not to answer the IRS's questions for information about the solar energy scheme.[251]

226.     RaPower-3 has touted "success stories" on its website. None of the "success stories" involved the actual production of solar energy.[252]

227.     Rather, all of the so-called "success stories" involved customers receiving the substantial tax benefits that Defendants promote.[253]

228.     Defendants have not changed their promotion in any appreciable way since 2005, with one exception.[254]

229.     In mid-2016, after this lawsuit was filed, Johnson changed the way RaPower-3 and Shepard promoted the tax benefits purportedly connected with solar lenses.[255]

230.     According to Shepard and Johnson, a customer may still buy lenses on the same terms described above, and claim depreciation and the solar energy tax credit.[256]

---

[250] *E.g.*, Pl. Ex. 70 at 1-2; Pl. Ex. 71; Pl. Ex. 325; Gregg Dep. 136:4-6; 10-14; 137:3-12; Pl. Ex. 330 at 2; Gregg Dep. 147:5-148:10, 149:1-7.

[251] Gregg Dep. 57:18-58:4; Pl. Ex. 298 ("**Solar Energy Tax Scheme Interview Questions:** Some of you may have been asked to fill out this questionnaire with 11 questions. . . . Simply say that you don't believe RaPower[-]3 is a tax scheme and then ask for written facts as to why they think that it is a scheme." (emphasis in original)).

[252] *E.g.* Pl. Ex. 674.

[253] *E.g.* Pl. Ex. 674.

[254] Shepard Dep. 311:2-315:5; RaPower-3 Dep. 197:13-199:4; IAS Dep. 226:9-25.

[255] Shepard Dep. 244:22-250:11. Recently, Defendants also began promoting a "home system" for solar energy production. Pl. Ex. 680. They tell customers that they can get the home system "for free" if customers "use[] the federal tax solar credit program correctly." *Id.* at 1.

[256] Shepard Dep. 244:22-250:11; RaPower-3 Dep. 190:5-193:18; Pl. Ex. 352.

(continued...)

231.    But the customer may instead pay a lower price, *not* claim depreciation, and still claim the solar energy tax credit.[257]

232.    Customers are likely still claiming depreciation for lenses they bought after Johnson made this change.[258]

### C.    Defendants knew or had reason to know that their statements were false or fraudulent as to material matters.[259]

233.    Defendants knew, or had reason to know, that their customers were not in a trade or business of leasing out solar lenses and, therefore, that their customers were not allowed the depreciation deduction or solar energy tax credit.[260]

234.    This is because Defendants knew, or had reason to know, the following facts throughout the entire time they promoted the solar energy scheme:

### 1.    Defendants knew, or had reason to know, that Johnson's purported solar energy technology did not work, and would not work to generate commercially viable electricity or other energy.

235.    Johnson testified that he has "generated electricity" using lenses on the R&D Site a "hundred times,"[261] but no one other than him has seen it happen[262].

236.    Johnson testified that he could have "put power on the grid" at "any time since 2005" and he "could have done that easily"[263].

---

[257] Shepard Dep. 244:22-250:11; RaPower-3 Dep. 190:5-193:18; Pl. Ex. 352.

[258] Howell Dep. 233:9-234:3; Pl. Ex. 749 (showing lens sales made as recently as February 2018); Pl. Ex. 752; T. 824:19-837:25.

[259] 26 U.S.C. § 6700(A)(2)(a).

[260] Shepard Dep. 239:16-240:10; Pl. Ex. 40 at 8.

[261] Johnson Dep., vol. 1, 164:3-165:17.

[262] Johnson Dep., vol. 1, 164:3-165:17; Shepard Dep. 129:17-131:18; Freeborn Dep. 20:15-22:23, 28:19-34:18, 42:12-25.

[263] RaPower-3 Dep. 163:15-166:18

(continued...)

237.    But Johnson testified that, since 2005, he has made a "business decision" not to put electricity on the grid.[264]

238.    Johnson also testified that every time he thinks he is finished and ready to connect to a third-party purchaser, he finds a problem, needs to create some new invention, or otherwise needs to make an improvement to his system.[265] So he has never been finished.[266]

239.    Johnson has not produced data (for example, from testing the components alone or as a purported system), research, or third-party validation, to support his ideas of how he claims his system would work, or records of it working.[267]

240.    Johnson has no records of electricity production or of any other application of energy to a useful purpose.

241.    In 2005, when he first began selling solar lenses, Shepard knew that IAS was "still a long ways away" from generating electricity for a third-party purchaser[268] and that "more research and development had to be done . . . to make the technology economically viable"[269].

242.    To date, Shepard has never seen the lenses in the towers at the R&D Site generate electricity.[270] He testified at trial that he was "not sure that [he had] seen everything work right

---

[264] RaPower-3 Dep. 163:15-166:18.

[265] RaPower-3 Dep. 155:4-166:18; Pl. Ex. 267.

[266] RaPower-3 Dep. 155:4-166:18; Pl. Ex. 267.

[267] *E.g.*, Johnson Dep., vol. 1, 69:8-10, 109:10-16, 151:18-153:4, 164:3-165:17, 177:13-179:24.

[268] Shepard Dep. 46:2-47:12.

[269] Shepard Dep. 54:17-24.

[270] Shepard Dep. 129:17-131:18.

(continued...)

now simultaneously to produce electricity"[271] and that "that "no solar lens is putting electricity on a grid.""[272]

243.    Johnson has told Shepard that they have done so "for R&D purposes."[273]

244.    As of December 2013, Shepard advised customers that Defendants' "intention . . . is to produce electricity."[274] Nonetheless, as recently as February 19, 2016, Shepard admitted having "no proof that [the purported solar] towers are up and running."[275]

245.    Freeborn never saw the lenses in the towers that currently stand at the R&D Site generate electricity.[276]

246.    Nonetheless, Freeborn believed that because he saw lenses concentrate heat on an early site visit, he had "proof of concept" that they would be used in a system to generate electricity.[277]

247.    Freeborn thought that the other components of the system "would all be added later."[278]

---

[271] T. 1693:1-5.

[272] T. 1729:19-25.

[273] Shepard Dep. 129:17-131:18.

[274] Pl. Ex. 602.

[275] Pl. Ex. 279 at 1; *see also* Shepard Dep. 187:14-195:3 (noting that a prospective lens purchaser in or around 2013 "wanted to see a project up and running before they committed," which Shepard could not show them); Pl. Ex. 470 at 6-7; Pl. Ex. 602.

[276] Freeborn Dep. 20:15-22:23, 28:19-34:18, 42:12-25.

[277] Freeborn Dep. 28:19-34:18.

[278] Freeborn Dep. 28:19-34:18. In early 2010, Freeborn told customers he would be sending out a "video [he] shot with Neldon while [he] visited the site last week." Pl. Ex. 213 at 1.

(continued...)

248.    Freeborn testified that getting the "individual parts" of Johnson's purported technology to "work in concert . . . seems to be the hurdle."[279]

249.    Johnson has no concrete plan to connect his purported solar energy technology to the electrical grid, such that a third party could purchase electricity generated.[280]

250.    There are extensive requirements Defendants must meet before "putting electricity on the grid," particularly through Rocky Mountain Power, a component of PacifiCorp.[281]

251.    PacifiCorp would require Defendants to obtain an "interconnection agreement," which would give Defendants permission physically connect their purported energy generating facility to PacifiCorp's equipment.[282]

252.    Defendants do not have an interconnection agreement with PacifiCorp.[283]

253.    As of April 2017, there was no grid connection to the IAS system to the power grid. Instead, there is a brown pole with wires dangling from the top.[284] There is no transmission line or power substation near Defendants' site with sufficient capacity to carry the power Johnson claims his system can generate.[285]

---

[279] Freeborn Dep. 95:3-13; *see also* Pl. Ex. 412 at Response to Interrogatory No. 10 ("I am unaware of the status of production [of energy], whether or in what form and measurements.").

[280] Johnson Dep., vol. 1, 111:11-114:3; Pl. Ex. 509 video clip 18_2_27-2_39 at timestamp 14:21:28; Johnson Dep., vol. 1, 115:24-120:13.

[281] *E.g.*, Pl. Ex. 713, Deposition Designations for PacifiCorp ("PacifiCorp Dep.") 15:22-16:15, 68:1-69:8, 71:2-76:22, 78:6-81:15, 82:1-18, 83:2-95:23, 97:1-12, 107:18-114:8 (Nov. 15, 2016); Pl. Ex. 196; Pl. Ex. 198B; Pl. Ex. 199.

[282] PacifiCorp Dep. 73:13-17.

[283] PacifiCorp Dep. 115:4-117:15.

[284] Exhibit 509 video clip 18_0_4_09-4_25 at 14:23:16; T. 108:5-109:11.

[285] T. 109:12-111:5.

(continued...)

254.    Johnson has never sold power to Rocky Mountain Power, the only power company in the area of the test site.[286] No power purchase agreements have ever been signed with any end-user.[287] This did not stop Johnson from telling a lens purchaser, in March 2010, that "we do have power purchase agreements tentatively in place with other companies that have agreed to purchase the power produced from the solar energy equipment once the system is placed in service."[288]

255.    The IAS website contains intentional misrepresentations about the laws obligating power producers to buy power from generators of renewable energy and the status of agreements between IAS and PacifiCorp/Rocky Mountain Power.[289]

256.    Dr. Thomas Mancini testified as the United States' expert witness on concentrating solar power ("CSP"). Dr. Mancini earned his Ph.D. in Mechanical Engineering from Colorado State University in 1975. For ten years thereafter, Dr. Mancini was a professor at New Mexico State University, where he taught courses on thermodynamics, heat transfer, fluid mechanics and solar energy. From January 1985 to July 2011, Dr. Mancini worked at Sandia National Laboratories, in Albuquerque, New Mexico. Among other job titles, Dr. Mancini was the CSP Program Manager at Sandia. Dr. Mancini has been consulting on solar energy projects since 2011 through his own business, TRMancini Solar Consulting.  He engages in work similar to what he did at Sandia, reviewing system and component designs for concentrating solar

---

[286] T. 1779:9-11

[287] T. 2238:15-21.

[288] Pl. Ex. 185.

[289] Pl. Ex. 901; 1781:2-1786:23.

(continued...)

energy projects and advising clients on the likely performance and costs of their proposed technology.[290]

257.    At the United States' request, Dr. Mancini reviewed the documents Defendants produced in this case and information on www.rapower3.com, along with information and documents provided by third parties. He reviewed patents Johnson has obtained. Dr. Mancini attended two site visits to view Defendants' purported solar energy technology, its components, and the places where Defendants manufacture and claim to use such components. During both visits, Dr. Mancini heard from Neldon Johnson about Johnson's purported solar energy technology and its components as he conducted Dr. Mancini around the sites. [291]

258.    Dr. Mancini credibly testified that Johnson's purported solar energy technology does not produce electricity or other useable energy from the sun.[292]

259.    Johnson's purported solar energy technology consists, and has always consisted, of separate component parts that do not fit together in a system that will operate effectively or efficiently.[293] For example, there is no evidence the turbine will work in the system.[294]

260.    The solar lenses do not, either on their own or in conjunction with other components, use solar energy to generate marketable electricity.[295] There is no evidence they ever have orever will.[296]

---

[290] T. 40:21-43:18.

[291] T. 69:1-73:12

[292] T. 49:23-50:2.

[293] T. 86:4-86:8, 119:5-120:19.

[294] T. 140:21-141:5.

[295] T. 75:14-24, 86:1-16, 90:11-97:4, 106:13-22, 162:17-25.

[296] T. 162:17-25 .

(continued...)

261.     The solar lenses do not, either on their own or in conjunction with other components, use solar energy to heat or cool a structure.[297] They never have and they never will.[298]

262.     The solar lenses do not, either on their own or in conjunction with other components, use solar energy to provide hot water for use in a structure.[299] They never have and they never will.[300]

263.     The solar lenses do not, either on their own or in conjunction with other components, use solar energy to generate solar process heat.[301] "Solar process heat" is heat from the sun that accomplishes some function or application, like heating potash to speed the process of turning it into fertilizer. Shepard testified that that the lenses produce heat and the only application that he heard of for that heat was to burn wood, grass, shoes, a man, and a rabbit.[302] These are not examples of using heat from the sun for a useful application. The lenses never have been used to generate heat for some function or application, and they never will.[303]

264.     Johnson's purported solar energy technology is not now, has never been, and never will be a commercial-grade solar energy system that converts sunlight into electrical power or other useful energy.[304]

---

[297] *See* T. 49:23-50:7. .

[298] T. 161:17-162:24.

[299] *See* T. 49:23-50:7..

[300] T. 161:17-162:24.

[301] *See* T. 49:23-50:7.

[302] T. 1735:24-1737:5.

[303] T. 161:17-162:24, 105:13-106:9..

[304] T. 49:23-50:7, 111:17-112:10.

(continued...)

265.     The project does not have the numbers of people with intellectual capacity in terms of training and background sufficient to produce or develop a commercial system.[305] Johnson has no documentation of the credentials of any persons working on the project, except his own, which shows he has no degree.[306] There is no evidence that anyone involved in the project has experience needed for the regulatory compliance required to place power on market.[307]

266.     Johnson's project has none of the documents which would be typical of a solar power project, including a detailed analysis of each of the components; computer models of the different components; computer models of a proposed system or multiple systems; tests that showed the performance of the individual components; systems tests that showed the actual power output solar energy input, what the issues were and identified; a complete suite of engineering drawings and component interface documents; documents reflecting how the project as a whole would conduct operations or be monitored during operations; a list of materials for all of the components and for the system itself; and the cost estimate of the components in the system.[308] If a system was close to being operational, these documents would be in place.[309]

267.     Dr. Mancini's qualifications, his demeanor on the witness stand and answers during direct and cross examination, and the comprehensive fit of the whole of his testimony

---

[305] T. 112:4-119:4.

[306] T. 115:10-116:25.

[307] T. 115:10-116:25.

[308] T. 75:25-78:19, 123:23-124:2, 157:22-159:7.

[309] T. 78:10-78:13.

(continued...)

together show that he is credible and his conclusions and observations are reliable, without any significant exception or question.

268.    Further, Defendants did not have a present a qualified to testify as an expert under Fed. R. Evid. 702 to rebut Dr. Mancini's testimony. They proffered Johnson, but he was excluded because his testimony was not based on sufficient (and verifiable) facts or data and was not the product of reliable and accepted principles and methods.[310] There was insufficient proof that he reliably applied scientific or engineering principles and methods to the facts of this case.[311]

269.    Although Johnson has claimed to have received evaluations of his technology from people like the Dean of Electrical Engineering at Stanford University and other experts, Johnson could not identify any of them by name.[312] Defendants offered no evidence from them.

270.    The complete lack of third party verification of any of Johnson's designs, in light of the unconventional design of his systems, demonstrates that Johnson does not have the capability of designing a system that can produce usable products from solar energy, that his claims of capability are not credible, and that he misrepresents the truth about his systems, their viability and third party confirmation of his skills and systems.

271.    Further, Johnson claims to have done the work himself to test all of the components of his purported solar energy technology thousands of times and that they work. But he has no data from those tests, other than videos.[313] No such videos were presented at trial.

---

[310] T. 2104:5-2107:16.

[311] T. 2104:5-2107:16.

[312] T. 1756:16-1768:13; Pl. Ex. 553.

[313] T. 1773:13-1774:9.

(continued...)

272.     Johnson has no record that his system has produced energy. There are no witnesses to his production of a useful product from solar energy. He testified that when he tests, he "will do it usually on the weekends when no one was around because [he] didn't want people to see what [he] was doing with it."[314] This explanation of a lack of witnesses is not credible and indicates his statements regarding testing are false. Johnson's statements about the experiments are fabricated in order to create an impression of success which is not based in fact.

273.     The complete lack of records or witnesses to any useful production of energy, combined with the unconventional design of his systems, demonstrates that Johnson does not have the capability of designing a system that can produce usable products from solar energy, and that his claims to the contrary are not credible. Further, it is logical to conclude that his system cannot produce usable products from solar energy.

274.     Johnson appeared confused during some of his testimony and exhibited difficulty in comprehending questions and responding to them. More than most witnesses, he shuffled pages in exhibits because he had difficulty finding materials at issue. He also exhibited confrontational behavior on direct and cross-examination. He found it very hard to be responsive to questions.

275.     For example, Johnson gave an unintelligible explanation of why he has not put power on the grid since 2005:

> Q. BY MR. SNUFFER: Mr. Johnson, you have testified that you
> could have produced power at any time since 2005. Do you recall
> making that statement?
> A. That's correct.
> Q. On what basis do you make that statement?
> A. All I'd have to do is raise the temperature of the water and drive
> it through the turbines. That isn't the problem.
> MS. HEALY-GALLAGHER: Objection; foundation.

---

[314] T. 2024:3-17.

THE COURT: Well, he's trying to get it. He said on what basis. So
I'm overruling that objection.
Q. BY MR. SNUFFER: You said that wasn't the problem. What is
the problem?
A. The problem with a business program over just fun and games
is making money. And up until now the whole project relies upon
the cost of developing a power plant. And the cost and the
maintenance still wasn't overcome in 2005 on the heat exchangers
that now which we didn't even know in 2005 we could do it, and
that's why we went solar. But solar turned out to be a 20-hour
thing. And that paper kind of shows what you're talking about. You
see what I'm saying?[315]

276.    Johnson's inability to communicate coherently or answer questions posed

challenges for his counsel but also demonstrates his lack of coherent thought. [316] His conclusions

are not supported by valid reasoning, rendering his tax analysis, engineering analysis, financial

analysis, marketing analysis, and business analysis, all suspect. Johnson's failure to put energy

on the grid or to have an agreement to do so, demonstrates the lack of viability of his designs and

construction.

277.    Johnson's methodology and lack of overall plan or predictability render his

conclusions about the status of his work unreliable, and in many cases false. His statements are

particularly false when they pertain to more than a single component or a single element of a

component. His work pattern moves from one detail to the next, without a comprehensive

strategy for conclusion, except to keep working. This method renders unreliable any statements

about the capacity of his overall system to create any useful production. His statements about his

overall system do not have supporting facts, but are merely opinions, goals and aspirations. But

he and Shepard, as communicator, amplifier and marketer, speak in conclusory absolutes,

deceiving customers and prospective customers.

---

[315] T. 2013:13-2014:8.

[316] T. 1928:15-1931:13, 2275:18-2277:11.

      **2.**      **Defendants knew, or had reason to know, that the only way a customer has "made money" from buying a lens is from the purported tax benefits.**

278.    Shepard and Freeborn sold the lenses by telling people "There's three ways you can make money [from owning a lens]. You can do it through tax benefits, you can do it through the rental program, and you can do it through the bonus program."[317]

279.    But they both knew that the only way a customer has ever "made money" from buying a lens is through the tax benefits; no customer has earned money from rental income or income from a bonus contract.[318]

      **a.**      **No customer has been paid rental income generated from the use of his lens to generate power bought by a third-party purchaser.**

280.    The only towers that currently exist are the same towers that Johnson built in 2006: the (at most) 19 towers on the R&D site.[319]

281.    Assuming 19 towers, at most 2,584 lenses have been installed.[320]

282.    According to Johnson, he owned the lenses that were originally installed in the towers in 2006.[321]

---

[317] Shepard Dep. 92:17-94:13, 241:1-14; Pl. Ex. 112 ("The first way to make money at RaPower[-]3 is with taxes. So we need to make sure everyone is maximizing their return."); Freeborn Dep. 82:16-83:19; Pl. Ex. 246; *see also* Freeborn Dep. 48:2-55:1; Pl. Exs. 48 at 1, 496, 497.

[318] T. 1734:9-1738:23; Shepard Dep. 92:17-94:13; Freeborn Dep. 82:16-85:7; Pl. Ex. 246. Freeborn testified that the income from commissions on solar lens sales is also "functional." Freeborn Dep. 82:16-85:17; Pl. Ex. 246. But the multi-level marketing component of RaPower-3 is not connected to lens ownership. RaPower-3 Dep. 33:8-34:9. A distributor need not buy a lens in order to sell lenses for RaPower-3. *Id.*

[319] RaPower-3 Dep. 80:16-18.

[320] *See* Shepard Dep. 129:17-131:2 (assuming 18 towers installed rather than 19).

[321] IAS Dep. 63:24-67:3.

(continued...)

283.     Since that date, Johnson testified, as customers purchased lenses, ownership of different lenses in the towers transferred from him to the customer.[322]

284.     Johnson testified that he created another entity, Cobblestone Centre, LLC ("Cobblestone"), to construct towers and install lenses.[323]

285.     His idea is that once the towers are constructed and the lenses installed, he would have LTB take over operation and maintenance of the towers and lenses.[324]

286.     No customer has authorized Cobblestone to install his lenses.[325]

287.     Shepard knows that an entity named Cobblestone exists, but does not know anything else about it.[326]

288.     Hundreds, if not thousands, of customer "lenses" are *not* installed in towers.[327] They are in undifferentiated stacks of pallets of uncut plastic sheets in a warehouse in Millard County, Utah.[328]

---

[322] IAS Dep. 63:24-67:3.

[323] LTB1 Dep. 32:8-34:6.

[324] LTB1 Dep. 32:8-24.

[325] LTB1 Dep. 38:25-39:5.

[326] Shepard Dep. 123:16-124:6.

[327] *See* Shepard Dep. 39:13-42:5, 60:21-61:17; Pl. Ex. 460.

[328] T. 102:2-21; Pl. Ex. 460.

(continued...)



289.    Plaskolite ships IAS rectangular sheets of grooved plastic, in pallets wrapped in still more plastic.[329]

290.    Before any rectangular sheet of plastic can be installed on a tower, Cobblestone must cut the rectangle into triangles and add frames to the plastic triangles.[330]

291.    Whether a customer's plastic lens is purportedly on a tower or in a pallet inside a warehouse, Defendants do not know which customer owns which lens.[331]

---

[329] Johnson Dep., vol. 1, 192:15-197:1; *compare* Pl. Ex. 2 *with* Pl. Ex. 460.

[330] Johnson Dep., vol. 1, 52:20-53:2, 74:11-14, 192:15-197:1; LTB1 Dep. 32:8-24.

[331] Johnson Dep., vol. 1, 199:10-206:14; Pl. Ex. 509 at video clip 10_0_47-0_57; Pl. Ex. 669, at 1 ("RaPower[-]3, LLC does not currently track the location of lenses as all lenses are located at the facility warehouse or are being installed into solar arrays at the Delta, Utah, facility."); *E.g.*, Pl. Ex. 412 at Response to Interrogatory No. 12; Shepard Dep. 59:4-61:17.

(continued...)

292.    After 11 years of selling lenses, Johnson's technology has never generated energy for which a third-party "power purchaser" has paid[332] according to Johnson's vision from 2006[333]:



293.    In fact, LTB has never done anything; it has never had a bank account, any employees, or any revenue.[334]

294.    Shepard first heard about LTB when he obtained his first lenses in 2005.[335]

295.    At that time, he did not ask about LTB's experience with operating and maintaining solar energy equipment.[336]

---

[332] Johnson Dep., vol. 1, 164:3-165:17, 167:22-168:3, 172:4-17. Johnson testified that he or RaPower-3 (and not a third party power purchaser) paid a single customer a single check for having used her lenses to generate electricity that was used at Johnson's former grocery store in 2010. (RaPower-3 Dep. 6:18-7:23; Pl. Ex. 188.) The United States disputes that this customer was paid for the production of electricity, and instead submits that Johnson sent the customer a check because her CPA inquiring about the promised income from "energy sales." (RaPower-3 Dep. 18:9-19:3; Pl. Ex. 690, Deposition Designations for Roger Halverson ("Halverson Dep.") 43:22-53:24 (Oct. 18, 2016); Pl. Exs. 185, 186). Even if the Court were to credit Johnson's testimony, it does not change the analysis herein.

[333] IAS Dep. 162:1-165:9, 171:10-173:20; Pl. Ex. 532 at 6; *see also* Pl. Ex. 531; LTB1 Dep. 71:25-74:21, 88:7-17.

[334] T. 2232:3-22; LTB1 Dep. 10:10-11:1, 14:7-16:7, 18:2-9, 42:10-43:5; Pl. Ex. 464; LTB1 Dep. 69:6-74:21, 90:19-91:8.

[335] Shepard Dep. 73:1-76:15; Pl. Ex. 464; LTB1 Dep., 75:25-77:14.

[336] Shepard Dep. 73:1-76:15; Pl. Ex. 464; LTB1 Dep., 75:25-77:14.

(continued...)

296.    Shepard simply signed the agreement to lease his lenses to LTB. [337]

297.    Shepard does not know what LTB did with his lenses after they had been subleased.[338]

298.    Shepard does not know from whom LTB would collect any rent that it might pay him some day.[339]

299.    Shepard knows, and has known since 2005, that LTB has never generated any income using his lenses.[340]

300.    Shepard knows that no customer has been paid for the use of his or her lenses.[341]

301.    He does not know who owns LTB, who runs it, or whether it has any expertise in operating and maintaining solar lenses,[342] although he does believe that Johnson is connected to LTB in some fashion[343].

302.    He has never asked Johnson why LTB has never made a rental payment.[344]

303.    In 2013, however, Shepard reported to customers that LTB was "considering using the solar lenses they are renting from RaPower[-]3 Team Members to provide heat and water for crop production in greenhouses."[345]

---

[337] Shepard Dep. 73:1-76:15; Pl. Ex. 464.

[338] Shepard Dep. 73:1-76:15; Pl. Ex. 464.

[339] Shepard Dep. 153:22-154:4.

[340] Shepard Dep. 34:18-35:24, 61:24-63:4, 73:1-76:15; Pl. Ex. 464; Pl. Ex. 602 at 1-2.

[341] Shepard Dep. 34:18-35:24, 67:1-12 93:17-94:13; Pl. Ex. 279 at 1; Pl. Ex. 602 at 1-2.

[342] Shepard Dep. 73:1-76:15; Pl. Ex. 464.

[343] Shepard Dep. 96:19-100:4; Pl. Ex. 77.

[344] LTB1 Dep. 86:20-87:9.

[345] Pl. Ex. 557.

(continued...)

304.     Johnson has told customers that LTB "placed [their lenses] in service" because LTB "has utilized solar energy from [the customer's lenses] for the purpose of assisting IAS in research and development" for various components of Johnson's solar energy technology.[346]

305.     In July 2016, Shepard has told customers the same thing: that LTB "rents your solar lenses and utilizes the solar energy from your panels for the purpose of assisting IAS in research and development."[347]

306.     Shepard also made such a claim in 2014, when he told customers that LTB had rented their lenses to IAS for research and development since 2010.[348] Shepard claimed that, therefore, customers' "rental payments began to accrue" *in 2010.*[349] Shepard said that he was "99.5% sure [customers would] start receiving rental payments" in 2014 for IAS's purported past use of their lenses.[350] This never happened.[351]

307.     Freeborn knew, since 2009, that he never received rental income from his lenses.[352]

308.     Freeborn never asked any questions about LTB, either before or after he agreed to "lease out" his lenses to LTB in 2009.[353]

309.     Freeborn never asked Johnson why LTB has never made a rental payment.[354]

---

[346] LTB1 Dep. 92:7-93:22; Pl. Ex. 558; RaPower-3 Dep. 117:22-118:23; Pl. Ex. 473.

[347] Pl. Ex. 473; *see also* Pl. Ex. 547.

[348] Pl. Ex. 341.

[349] Pl. Ex. 341.

[350] Pl. Ex. 341.

[351] Shepard Dep. 258:5-261:16; Johnson Dep., vol. 1, 239:18-240:1; LTB1 Dep. 88:18-90:18.

[352] IAS Dep. 182:16-183:4; Pl. Ex. 533; Freeborn Dep. 39:23-40:24.

[353] LTB1 Dep. 75:15-77:14.

[354] LTB1 Dep. 75:15-77:14.

(continued...)

310. No customer has asked questions of LTB, either before or after signing an agreement to "lease out" their lenses to LTB. [355]

311. Defendants know that if the solar lenses are going to generate rental income for customers, a third party must be willing to purchase power that the lenses will purportedly create.[356]

312. This agreement is typically called a "power purchase agreement" ("PPA").[357]

313. They know, or have reason to know, that there never has been such an agreement in place. [358]

314. Shepard testified that, since 2010, he has "tried to put his own projects together" to get a third-party purchaser.[359] "But we just kept running into road blocks. . . . Never got that far.  Every time I got close, they wanted to see a power project up and running. . . . And we didn't have that running yet."[360]

315. Any other information that Shepard has about progress toward selling energy to an outside purchaser comes from Johnson.[361]

---

[355] LTB1 Dep. 75:15-77:14.

[356] Johnson Dep., vol. 1, 130:5-131:6; Shepard Dep. 34:18-35:24, 153:22-154:4; Freeborn Dep. 48:2-55:1; Pl. Ex. 496 & 497; Pl. Ex. 185 at 2 (Johnson told a customer, in early 2010, "[w]e do have power purchase agreements tentatively in place with other companies that have agreed to purchase the power produced from the solar energy equipment once the system is placed in service.") *but see contra* IAS Dep. 149:4-16 (Johnson testified that IAS has never entered a power purchase agreement.). *See also* Pl. Ex. 504 at 22 (as of June 2012, Defendants knew that power purchase agreements were an integral part of a solar energy project).

[357] Shepard Dep. 204:24-205:6; PacifiCorp Dep. 46:22-48:14.

[358] Shepard Dep. 34:18-35:24, 153:22-154:4; Johnson Dep., vol. 1, 131:7-134:6; Pl. Ex. 412 at Response to Interrogatory No. 8; PacifiCorp Dep. 46:22-48:14..

[359] Shepard Dep. 204:15-209:11; Pl. Ex. 292.

[360] Shepard Dep. 205:21-12; *see also* IAS Dep. 204:24-207:10.

[361] Shepard Dep. 46:2-57:5.

(continued...)

316.    On March 28, 2018, just before trial, RaPower-3 announced that rental payments would be paid to all customers "who have fully paid [their] obligation to [RaPower-3]. . . ."[362] The payments were made in the form of additional lenses for which the owners would owe a total price of "$3,500 but your rental fees would pay the difference."[363] The announcement did not explain why rental payments were made by RaPower-3 while LTB had the obligation to make the payment or why payments were made though most Operation and Maintenance Agreements do not require payment until power is produced.

317.    This "payment" with lenses illustrates the illusory nature of the agreements and the absolute discretion Johnson exercises in relation to customers. The "payment" was unsolicited by customers and imposed a tax gain on them.[364] RaPower-3 advised that this tax gain could be mitigated by tax credits related to the lenses.[365] Thus, even at the eve of trial, Defendants were undeterred in their promotions and tax advice.

### b.    No customer has been paid a bonus.

318.    The bonus contracts Johnson offered in the past are keyed to IAS's gross sales revenue.

319.    Shepard and Freeborn know that no customer has been paid a bonus.[366]

320.    Shepard does not know whether IAS has received sales revenue.[367]

---

[362] Pl. Ex 796.

[363] *Id.*

[364] Pl. Ex. 796 at 2.

[365] Pl. Ex. 796 at 2.

[366] Shepard Dep. 34:18-35:24, 76:23-82:18, 93:17-94:13; Pl. Ex. 465.

[367] Shepard Dep. 77:6-78:18.

(continued...)

321.    Shepard does not know what sales would generate such revenue.[368]

322.    Shepard admitted that, even if IAS had generated sales revenue, he would not necessarily know about it.[369]

323.    According to Johnson, IAS has never received any sales revenue.[370]

324.    No customer has been paid a bonus.[371]

> **3.    Defendants knew, or had reason to know, that their customers are not required to pay the full down payment, much less the full purchase price for a lens.**

325.    Shepard testified that Johnson "doesn't seem to be too forceful in trying to collect delinquent payments,"[372] and does not seem to even track which customers might be delinquent in paying their full down payment.[373]

326.    Shepard does not believe that Johnson "does anything with people when they don't pay."

327.    For example, one customer who purportedly purchased 500 lenses in January 2012 has not yet paid the "full down payment" of $1,050 on all 500.[374]

328.    This customer has not done so yet because he has not yet received the benefit of using all 500 to reduce his tax liability.[375]

---

[368] Shepard Dep. 77:6-78:18.

[369] Shepard Dep. 77:6-78:18.

[370] Johnson Dep., vol. 1, 230:4-11.

[371] Shepard Dep. 92:17-94:13; Freeborn Dep. 82:16-85:7; Pl. Ex. 246.

[372] Shepard Dep. 112:9-113:7.

[373] Shepard Dep. 110:9-113:7; Pl. Ex. 468.

[374] Aulds Dep. 140:15-146:5.

[375] Aulds Dep. 140:15-146:5.

(continued...)

329.    RaPower-3 has not taken action to collect the remaining down payment.[376]

330.    If a solar lens customer no longer desires to "own" lenses, Johnson will refund the person's money and let them out of the contract.[377]

331.    Johnson "has always" offered this out.[378]

332.    In December 2010, Johnson promised to refund customers' money and void their Equipment Purchase Agreement, if they did not receive the tax benefits Defendants promote.[379]

333.    Johnson, via Shepard, reiterated this offer in January 2015 to customers who were being audited for having claimed the tax benefits that Defendants promote:

> We . . . believe we will prevail against the IRS in court. However, if you would like to part company, we will refund your money and you can pay the IRS and move in a different direction. You can most likely get the IRS to drop the penalties. But, if you decide on the refund, then you would give up all bonuses and rental fees associated with those solar lenses.[380]

334.    Customers know that they are not liable to make any payments on the debt they purportedly owe to RaPower-3 for the difference between their down payment and the remainder of the purchase price, at least until their lenses begin producing revenue.[381]

---

[376] Aulds Dep. 140:15-146:5; *see also* Pl. Ex. 448, Deposition Designations for Mike Penn ("Penn Dep.") 11:21-15:23, 38:10-40:22 (Mar. 13, 2017), Pl. Ex. 391.

[377] Shepard Dep. 304:4-305:10; Pl. Ex. 282; Shepard Dep. 110:9-113:7; Pl. Ex. 468.

[378] Shepard Dep. 304:4-305:10.

[379] Johnson Dep., vol. 1, 237:16-239:13; Pl. Ex. 383; Shepard Dep. 304:4-305:10; Pl. Ex. 282 at 1.

[380] Pl. Ex. 282.

[381] Shepard Dep. 153:2-16; Gregg Dep. 53:20-55:9;

### 4.  Defendants knew, or had reason to know, that Johnson, and not their customers, controlled the customers' purported "solar lens leasing businesses."

335.    Johnson, Shepard, and Freeborn knew that RaPower-3 customers do not exercise any control over their purported lens leasing business.[382]

336.    No customer has ever decided, for example, to buy a lens and then lease it to an entity other than LTB.[383]

337.    Customers never take direct physical possession of their lenses.[384]

338.    Because Defendants do not track which lens belongs to which customer, there is no way for a customer to know which specific lens he owns.[385] No customer testified that the owned lenses could be identified.

339.    Johnson's entities retain the lenses and control what happens to them (if anything).[386]

340.    Defendants emphasize how *little* any customer would have to do with respect to "leasing out" their lenses: "[s]ince LTB installs, operates and maintains your lenses for you, having your own solar business couldn't be simpler or easier."[387]

---

[382] *E.g.*, Freeborn Dep. 28:19-40:16 (noting that he did not know where his lenses were or are, or what, exactly, they were being used for, or by whom).

[383] *See* LTB1 Dep. 87:10-88:6; RaPower-3 Dep. 62:21-64:5.

[384] LTB1 Dep. 87:10-88:6.

[385] *See* Johnson Dep., vol. 1, 199:10-206:14; Pl. Ex. 509 at video clip 10_0_47-0_57; Pl. Ex. 669 at 1 ("RaPower[-]3, LLC does not currently track the location of lenses as all lenses are located at the facility warehouse or are being installed into solar arrays at the Delta, Utah, facility."); *E.g.*, Pl. Ex. 412 at Response to Interrogatory No. 12; Shepard Dep. 59:4-61:17; *see also Gregg v. Dep't of Revenue*, No. TC-MD 140043C, 2014 WL 5112762, at *6 (Or. T.C. Oct. 13, 2014) ("Gregg acknowledged on cross-examination that he was not certain whether the lenses were placed on the 'array' (*i.e.*, whether the lenses were or are in use) in Utah or stored someplace in boxes in a warehouse."); *e.g.*, Lunn Dep. 119:6-120:3; Zeleznik Dep. 35:21-38:13; Aulds Dep. 107:18-21, 130:21-131:11.

[386] LTB1 Dep. 32:8-34:15.

[387] Pl. Ex. 19.

(continued...)

341.     As early as March 2011, Shepard was put on notice by the tax return preparer for

RaPower-3 customer Kevin Gregg that she was "coming up empty handed with doing the

business credit when there actually is no business."[388] Shepard told her that "Kevin has chosen

not to work very hard at his business, but the IRS does not require hard work or even smart

work. Kevin is still entitled to depreciate his systems."[389]

342.     Over the years, other tax professionals have questioned the validity of different

aspects of the solar energy scheme.[390]

343.     Shepard keeps customers updated about what Johnson's entities are doing with

their lenses (if anything). Shepard described this very process when he wrote to customers in

June 2014[391]:

| | |
|---|---|
| **From:** | Greg Shepard <greg@rapower3.com> |
| **Sent:** | Friday, June 20, 2014 8:32 PM |
| **To:** | undisclosed-recipients |
| **Subject:** | Ra3 Construction Update |
| **Attach:** | 016.JPG; 017.JPG |

TO ALL:  A big RaPower3 Welcome to all our new members.

PHOTOS #16 & 17 installation: These two canvas buildings will add 20,000 square feet of construction space at the Delta, Utah project site. Twenty-five construction workers will be employed to install twenty towers a day or close to two megawatts a day. To install that many towers/megawatts per day with only 25 workers is unprecedented in the history of energy construction. Target date to begin is before summer's end in 2014.

QUESTIONS AND ANSWERS:

. . .

Q: Also, how do I as an owner know what my product is doing?
A: Through my e-mails and rapower3.com website.  Your lenses are being used right now by virtue of your Bonus Contract.  It is our goal to have your lenses operating in a tower before summer is over.

---

[388] Pl. Ex. 346 at 1; *see also Kevin Gregg v. Dep't of Revenue*, No. TC-MD 160068R, 2017 WL 5900999, at *3-5 (Or. T.C. Nov. 30, 2017).

[389] Pl. Ex. 346 at 1.

[390] *E.g.*, Pl. Ex. 150; T. 1124:24-1127:7; Pl. Ex. 477; Shepard Dep. 235:20-239:14.

[391] Pl. Ex. 420.

(continued...)

344.   Johnson knows that solar lens customers do not contact LTB for any reason.[392]

345.   They do not inquire into LTB's experience operating and maintaining solar energy equipment, either before or after they sign the O&M to "lease out" their lenses to LTB.[393]

346.   For example, in early 2014, one long-time RaPower-3 customer wrote to Shepard asking whether LTB has "a website, e-mail, contact #, or all of the above . . . ? I was unable to find anything online."[394]

347.   This customer, who was being audited by the IRS for having claimed the tax benefits Defendants promote, noted that none of this information is in his O&M, and "[w]hen you google the company name and address there is zero information about the company."[395]

348.   This customer told Shepard "I just want to be able to provide contact information for LTB if asked about it. . . . I fear it would be a big red flag if I cannot provide any contact information about the company who is supposed to be paying my rental fees."[396]

**5.   Defendants knew, or had reason to know, that their customers do not have special expertise or prior experience in the solar lens leasing business.**

349.   Johnson wanted to allow "everyday people" to "take advantage of all the generous tax benefits" of "not just receiving solar tax credits, but also getting the depreciation benefit" from buying solar lenses through RaPower-3.[397]

---

[392] LTB1 Dep. 75:15-77:14.

[393] LTB1 Dep. 75:15-77:14; *e.g.*, Lunn Dep. 103:16-104:6; T. 1072:21-1074:4,  999:18-1000:24; Zeleznik Dep. 93:18-96:3.

[394] Pl. Ex. 77 at 1.

[395] Pl. Ex. 77 at 1-2.

[396] Pl. Ex. 77 at 1-2; Shepard Dep. 250:13-251:3; Pl. Ex. 72; *see also* Halverson Dep. 61:13-65:14; Pl. Ex. 189 at 1-3 (In 2011, a customer's accountant wrote to Shepard asking what, if anything, was happening with the customer's 2009 lens "purchase.")

[397] Pl. Ex. 8A at 7.

(continued...)

350.     Defendants knew that they sold solar lenses to individuals who generally work full-time jobs, like teachers, school administrators, coaches, and others.[398]

351.     They knew, or had reason to know, that their customers do not have special expertise in the solar energy industry.[399]

### 6.   Defendants knew, or had reason to know, that advice from independent professionals did not support their claims about tax benefits.

352.     In August 2009, Shepard consulted Ken Oveson, a CPA at Mantyla McReynolds.[400] He told Oveson that IAS had a system that could generate solar power.[401]

353.     Shepard gave Oveson a basic overview of the transaction structure: that IAS and he wanted to promote a program where they would sell lenses to people for $3,500 total, with a partial down payment and the remaining payments financed with a note.[402] The purchasers would then make money off of the sale of electricity that was generated using their lenses, according to Shepard.[403]

---

[398] Shepard Dep. 239:16-240:10; Pl. Ex. 40 at 12 (showing purported tax benefits of solar lens purchase for a "typical teaching couple."); Pl. Ex. 674 (touting "TAX TIME SUCCESS STORIES" from RaPower-3 customers with school-based jobs). Freeborn Dep. 44:11-45:3; Pl. Ex. 492 at 1 (noting that RaPower-3 program allows "'Average Joes' like you and I" to qualify for solar energy tax credits; using as an example RaPower-3 customer a husband and wife who are a teacher and a nurse, respectively); Pl. Ex. 216 (noting a "teacher from the Midwest" who is a customer); Pl. Ex. 109 at 1 ("Sadly, right now most of the $6 Million is going to businesses rather than to teachers and coaches . . . ."); Pl. Ex. 214 ("The average dual income household, that pays taxes, forks over $5,000 each year to the IRS. Enrolling into RaPower[-] could reduce your federal income tax burden to ZERO!"); Pl. Ex. 544; Johnson Dep., vol. 1, 96:19-97:13; Zeleznik Dep. 9:10-13:5, 14:13-22, 24:9-28:21, 29:4-30:12; Gregg Dep. 22:10-33:24; T. 1066:4-1069:22, 978:2-979:24.

[399] *See* Shepard Dep. 239:16-240:10; Pl. Ex. 40 at 12; Pl. Ex. 674 (touting "TAX TIME SUCCESS STORIES" from RaPower-3 customers with school-based jobs). *See* Freeborn Dep. 44:11-45:3; Pl. Ex. 492 at 1; Zeleznik Dep. 9:10-13:5, 14:13-22, 24:9-28:21, 29:4-30:12; Gregg Dep. 22:10-33:24; T. 1066:4-1069:22, 978:2-979:24.

[400] T. 328:24-330:9; Pl. Exs. 372-374.

[401] T. 336:7-11.

[402] T. 337:5-340:19.

[403] T. 339:9-340:19.

(continued...)

354.     Shepard wanted an opinion from Oveson on whether a customer could claim a depreciation deduction and solar energy tax credit.[404] Among the specific topics Shepard wanted to know were whether solar lenses could be considered "placed in service" and how customers could meet "material participation" standards.[405] It was Oveson's understanding that Shepard was going to use the Mantyla McReynolds' tax opinion letter to market the solar energy program.[406]

355.     In 2009, Shepard told Oveson that the company was producing solar energy, that they would be selling the solar lenses to investors, and that these investors were counting on receiving the energy credit, and that they would also be taking depreciation deductions since they own the equipment.[407]

356.     Shepard told Oveson that '[h]aving our solar property 'placed in service' with absolutely no gray areas is fundamental to our selling units for our solar project west of Delta."[408] Shepard also told Oveson that IAS "has sent every client a letter stating the units have been placed in service. The IRS guidelines on that are easy to meet. The [IAS] units have done that."[409]

357.     In researching and preparing the letter that Shepard wanted, Oveson became concerned about the developmental stage of the company. Oveson testified he told Shepard that, in order for customers to take both depreciation and the energy credit, the lenses had to be placed

---

[404] T. 330:17-331:16.

[405] Pl. Exs. 372 at 1, 373 at 1-2, 374 at 2; T. 344:7-346:19, 358:9-361:3 .

[406] T. 331:11-23.

[407] T. 334:3-15, 336:7-20.

[408] Pl. Ex. 373 at 1.

[409] Pl. Ex. 372 at 1.

(continued...)

in service. Since the company was a developmental company and it was not operating, the lenses could not be placed in service yet.[410]

358.    Oveson's "biggest concern was that the placed in service issue, that we didn't feel that the equipment was placed in service" because the lenses did not have the ability to perform or function to create electricity. "[A]nd therefore [the lenses] wouldn't qualify for the credit or the depreciation."[411]

359.    Oveson told Shepard his opinions: that the lenses were not placed in service and therefore would not qualify for a depreciation deduction or the solar energy tax credit for purchasers.[412]

360.    Oveson's colleagues at Mantyla McReynolds, led by Cody Buck, were auditing IAS's financial statements around the same time.[413] The audit revealed the lenses were not placed in service for financial auditing purposes because they were not connected within a system that was generating electricity and therefore revenue.[414] Therefore, customers' lens down payments could not be booked as current income for IAS and had to be deferred until the lenses were placed in service.[415] The down payments were liabilities for IAS because customers could demand refunds of their down payments if the lenses did not produce revenue.[416] According to Buck, the financial statements he received from IAS from its prior CPA showed deferred

---

[410] T. 343:1-344:10.

[411] T. 343:21-344:10.

[412] T. 350:22-354:7; Pl. Ex. 372.

[413] T. 242:14-243:1.

[414] T. 268:3-270:12.

[415] T. 255:3-256:2, 257:7-258:1.

[416] T. 259:14-261:9.

(continued...)

revenue for customer deposits, and therefore an understanding that the lenses were not yet placed in service.[417]

361.    Because "[t]here must be consistency between the books of [IAS] and the taxpayer," if IAS's books did not recognize the lenses as placed in service, Oveson told Shepard that the taxpayers could not either.[418]

362.    Shepard had told customers that Oveson would be available to explain the purported tax benefits of buying lenses on a conference call.[419] Shepard misrepresented the information generally, and his personal relationship with Oveson to lens customers.[420] Via email Shepard stated "I met with my CPA today…I have retained him and his firm…"[421] Oveson testified that he was not Shepard's personal CPA.[422]

363.    When Oveson reported his conclusion that the lenses were not placed in service (which is a "key factor in taking deductions for depreciation and credits"[423]), Shepard said that they would find another CPA to give him the opinion he was looking for.[424]

364.    Within a week of first meeting with Shepard, Oveson had withdrawn the engagement.[425]

---

[417] T. 255:25-262:9.

[418] Pl. Ex. 372 at 1.

[419] Pl. Ex. 136 at 2-3; T. 366:1-18.

[420] *See* Pl. Ex. 136 at 2-3; T. 363:4-364:5.

[421] Pl. Ex. 163.

[422] T. 363:4-364:5.

[423] Pl. Ex. 372 at 1.

[424] T. 358:9-359:21; Pl. Ex. 373 at 1.

[425] T. 364:19-365:8.

(continued...)

365.     As of October 2010, Shepard wrote to Johnson with his concern that certain aspects of the solar energy scheme were "problematic" under the internal revenue laws, including the fact that lenses "are purchased and then rented back."[426] Shepard stated that an opinion from Johnson's attorney on "the seven criteria for determining active participation would be essential."[427]

366.     Around the same time, Johnson approached Todd Anderson, of the Anderson Law Center, with some questions about principles of tax law.[428] Todd Anderson referred the questions to his wife and partner in the Anderson Law Center, Jessica Anderson.[429]

367.     Johnson gave Jessica Anderson only limited information about the factual context for the questions he had about tax law.[430] She relied on the information Johnson provided.[431]

368.     Jessica Anderson researched the law applicable to general tax principles and summarized it.[432] She delivered a letter to Johnson in or about October 2010 with her summary of the three general principles of tax law he had asked about, including "material participation," which goes to whether a customer's activity in a trade or business is substantial enough such that business deductions may be claimed against other active income or must be claimed against passive income and the requirements to claim depreciation.[433]

---

[426] Pl. Ex. 574.

[427] Pl. Ex. 574.

[428] T. 490:24-491:6; Pl. Ex. 570; T. 573:10-14.

[429] T. 500:17-501:3.

[430] T. 573:2-25.

[431] T. 573:15-576:5.

[432] *E.g.*, T. 498:14-23; 580:1-10;; Pl. Ex. 570; Pl. Ex. 23.

[433] Pl. Ex. 570; T. 578:4-22; 580:21-581:5; 589:2-598:12.

(continued...)

369.    Citing 26 U.S.C. § 469(c)(2) & (4), the October 2010 letter stated that "losses generated from equipment leasing are considered to be passive," and that "material participation" standards do not apply to equipment leasing.[434] The letter noted exceptions to these rules, but expressly did not opine that any exception would apply to the limited facts stated in the letter.[435]

370.    Further, the letter stated that, even if material participation standards did apply, "[i]nvestor-type activities do not count [toward material participation] unless the taxpayer is directly involved in day-to-day management or operations."[436] The "investor-type activities" that do not count include[437]:

- Studying or reviewing financial statements or reports.
- Preparing or compiling summaries of analyses for the individual's own use.
- Monitoring finances or operations in a non-managerial capacity.
- (This list is not all inclusive. Other activities could include organizing records, preparing taxes, and paying bills.)

371.    Jessica Anderson also noted it is unlikely that a taxpayer will have "materially participated" in an activity if (among other things)[438]:

---

[434] Pl. Ex. 570 at 2.

[435] Pl. Ex. 570 at 2-4.

[436] Pl. Ex. 570 at 5 (citing 26 C.F.R. § 1.469-5T(f)(2)(ii)(B)).

[437] Pl. Ex. 570 at 5.

[438] Pl. Ex. 570 at 6.

- The taxpayer was not compensated for services. Most individuals do not work significant hours without expecting wages or commissions.
- The taxpayer's residence is hundreds of miles from the activity.
- The taxpayer has a W-2 job requiring 40+ hours a week for which he or she receives significant compensation.
- The taxpayer has numerous other investments, rentals, business activities, or hobbies that absorb significant amounts of time.
- There is a paid on-site management/foreman/supervisor and/or employees who provide day-to-day oversight and care of the operations.
- The taxpayer is elderly or has health issues
- The majority of the hours claimed are for work that does not materially impact operations.
- Business operations would continue uninterrupted if the taxpayer did not perform the services claimed.

372.    Johnson was unhappy with the October 2010 letter.[439] He thought the letter was too technical and wanted something more akin to marketing materials.[440] He also wanted energy credits to be included.[441]

373.    Jessica Anderson and Todd Anderson revised the October 2010 letter in an attempt to address Johnson's concerns.[442] In November 2010, they gave Johnson their revisions in a working draft.[443] Jessica Anderson and Johnson were going to review it together.[444]

374.    The October 2010 letter and the November 2010 draft provide a general summary of what the law is.[445] They do not include specific facts about the transactions, purported energy

---

[439] T. 599:10-600:19.

[440] T. 601:2-14.

[441] T. 601:21-602:3.

[442] T. 602:11-603:7.

[443] Pl. Ex. 23A; T. 611:3-611:21; Pl. Ex. 23; T.603:19-604:10, 511:8-514:19.

[444] T. 604:4-10.

[445] Pl. Exs. 570 & 23.

(continued...)

property, or people or entities at issue in the solar energy scheme.[446] Neither the October 2010 letter nor the November 2010 draft state that purchasers of solar lenses are in a "trade or business" with respect to the solar lenses or are holding the lenses to generate income, or that any person who purchases solar lenses through RaPower-3 may lawfully claim the tax benefits Defendants promote.[447]

375.    Only *after* Johnson received the November 2010 draft did he give the Andersons specific facts of the transactions he proposed for RaPower-3 customers.[448] Johnson wanted an opinion letter saying that, on the facts he provided, RaPower-3 customers could claim a depreciation deduction and solar energy tax credit on the energy equipment.[449] He wanted the opinion letter to say that the lenses were placed in serviced immediately upon purchasing as opposed to when a lens started actually producing energy.[450]

376.    Johnson was trying to find a way to generate tax benefits (a depreciation deduction and a solar energy tax credit) for lens purchasers before his purported solar energy equipment ever produced energy.[451] Johnson admitted that customers would not be running a solar energy power plant and would not be involved in the day-to-day operations of running the energy equipment.[452]

---

[446] Pl. Exs. 570 & 23.

[447] *See generally* Pl. Ex. 570 at 6-7 (To be depreciable, property "must be used in your business or income-producing activity."); Pl. Ex. 23 at 2 ("To be depreciable, the property must meet all of the following requirements: . . . it must be used in your business or income-producing activity . . . .").

[448] T. 608:22-609:12, 612:11-625:25.

[449] T. 612:11-613:1.

[450] T. 620:11-17.

[451] T. 613:12-614:6, 617:8-620:17, 621:7-625:11 .

[452] T. 583:14-584:2, 618:22-619:25.

(continued...)

377.     When Jessica Anderson questioned Johnson about how customers would materially participate in their business, none of Johnson's answers led her to conclude that there would be active participation by any customer. Johnson believed that RaPower-3 customers would actively participate in an energy production business, and thus be entitled to tax benefits, by being a member of the multi-level marketing structure, and their participation would be in selling more equipment to others.[453]

378.     After taking the information Johnson provided and performed research, Jessica Anderson could not find any information that would indicate that the tax benefits would be applicable to RaPower-3 customers immediately upon purchase of the equipment.[454]

379.     Johnson came into Anderson Law Center, and Jessica Anderson expressed her concerns about the energy credits, specifically (1) customers couldn't take energy credit for equipment that was not producing energy, (2) just by taking energy equipment and using it as a billboard wasn't placing it in service, and (3) selling energy equipment didn't qualify as active participation in an energy producing business.[455]

380.     When Jessica Anderson told Johnson she was not sure that the energy equipment would qualify for the energy credit, Johnson brushed it off and they didn't talk about it again.[456]

---

[453] T. 618:10-619:25.

[454] T. 621:25-622:18.

[455] T. 622:19-623:20.

[456] T. 623:21-624:1.

(continued...)

381.    Jessica Anderson believed that equipment leasing under the IRS laws qualified as passive and told Johnson that she did not believe sales activity qualified as active participation in running an energy production business.[457]

382.    Johnson remained confident that his ideas were going to fit within the parameters of the tax code and asked Jessica Anderson to go back and look at it again.[458]

383.    Jessica Anderson and Todd Anderson discussed the issue and decided that their opinion remained the same, that "these principles" did not immediately apply to a RaPower-3 customer.[459]

384.    Over the next several weeks, Johnson returned to the Anderson Law Center to propose different hypotheticals to change Jessica Anderson's opinion that the tax principles would apply to RaPower-3 customers.[460]

385.    Jessica Anderson communicated to Johnson that these new hypotheticals did not change her opinion and a purchaser of energy equipment from RaPower-3 would not meet the active participation requirement.[461]

386.    Jessica Anderson ultimately decided that she could not reach the conclusions that Johnson wanted her to reach regarding the tax principles as it applied to RaPower-3 customers.[462]

---

[457] T. 624:14-625:4.

[458] T. 625:5-11.

[459] T. 626:3-9.

[460] T. 626:10-627:6.

[461] T. 627:7-21.

[462] T. 627:7-628:3.

(continued...)

387.    In January 2011, Jessica Anderson told Johnson that she could not reach the conclusions she wanted him to and he would need to find another attorney.[463]

388.    Via email, Jessica Anderson wrote Johnson and reiterated that she did not believe customers who purchased solar equipment and then turned over the operation of the equipment to generate power to a third party would be considered active participants in a business. Also, in this email Jessica Anderson informed Johnson that he would need to find a new attorney.[464]

389.    In fall 2012, Johnson retained Kirton McConkie, through its partner Kenneth Birrell, on behalf of his entity or entities XSun Energy, SOLCO I, and/or International Automated Systems, Inc.[465]

390.    Birrell provided SOLCO I and Johnson with a memorandum containing a general overview of the tax benefits associated with the solar business that was described.[466] It summarizes "certain tax consequences for the buyers . . . of solar lenses from SOLCO I, LLC . . . based on factual circumstances that are substantially similar in all material respects" to the facts set forth in the memorandum.[467]

391.    Among the facts stated or assumed in the memorandum is that the solar lens buyer is an entity taxed as a C corporation.[468] The memorandum does not address a solar lens buyer

---

[463] T. 629:12-630:23.

[464] T. 629:12-632:15; Pl. Ex. 582.

[465] T. 406:8-18, 407:14-18, 408:5-22, 412:8-23; Pl. Ex. 364 at 2; Pl. Exs. 355, 358, 370.

[466] Pl. Ex. 363 at 33-45; T. 412:10-23, 423:4-22.

[467] Pl. Ex. 363 at 33 ("Introduction").

[468] Pl. Ex. 363 at 33 ("Factual Background"); T. 422:25-424:7; Pl. Ex. 361 at 2-5; Pl. Ex. 362 at 1 ("Please note that this analysis is limited to C corporations – there would be different issues for an individual, partnership or S corporation purchaser.").

(continued...)

that is an individual or a pass-through entity like a partnership or an S corporation.[469] The memorandum does not address whether an individual (or owner of a pass-through entity) could be considered to be in a "trade or business" or holding the lenses to generate income.[470]

392.    The memorandum also assumes that the purported solar energy technology actually works as a system to generate electricity from solar radiation.[471] Birrell relied on the representation that the technology had been approved for a § 1603 grant.[472] If Birrell had known that there was no system that would work using the lenses to convert solar radiation to any sort of energy, he would not have written the memorandum because the lenses would not be eligible for the solar energy tax credit.[473]

393.    Another assumption in the memorandum is that any lens purchase and lease arrangement would be executed using the transaction documents that Birrell prepared.[474]

394.    Johnson knew these features of the memorandum. Birrell reminded him that the memorandum applies only to C corporations.[475]

395.    RaPower-3 put the Kirton McConkie memo on its website and has used the memo to market solar lenses, not just to C corporations, but to individuals as well.[476]

---

[469] Pl. Ex. 363 at 33, 45; Pl. Ex. 361 at 2-5; Pl. Ex. 362 at 1; T. 422:25-424:7.

[470] *See generally* Pl. Ex. 363 at 33-45; Pl. Ex. 370 at 1-2; T. 422:25-424:7.

[471] Pl. Ex. 363 at 33-34, 37; T. 429:12-25, 440:6-18, 713:16-715:2.

[472] T. 420:24-25.

[473] T. 429:12-25, 440:6-18, 713:16-715:2.

[474] Pl. Ex. 363 at 33-34.

[475] Pl. Ex. 364.

[476] T. 454:6-8.

(continued...)

396.     Shepard received both the Anderson November 2010 draft and the Kirton McConkie memorandum from Johnson.[477]

397.     In or around July 2013, the Andersons learned that Johnson was using their November 2010 draft to encourage people to buy solar lenses, and take a depreciation deduction and solar energy tax credit on their tax returns.[478] The Andersons retained an attorney to send a cease-and-desist letter to Johnson and RaPower-3, stating that the November 2010 draft was "only in the 'rough draft' stage and was intended to solicit additional information" and was not a final product.[479]

398.     Similarly, Birrell learned that the Kirton McConkie memorandum was on the RaPower-3 website.[480] On or about January 10, 2014, Birrell sent a cease-and-desist letter to Johnson.[481] Birrell told Johnson that: 1) the memorandum is a general summary of tax principles regarding an energy tax credit and is not an opinion letter; 2) the memorandum is written with the assumption that the taxpayer claiming the credit is "taxed as a subchapter C corporation[] for federal income tax purposes," and is not an individual or subchapter S corporation; and 3) the analysis in the memorandum is only valid if the solar lens transactions are completed on the terms and conditions of the transaction documents Birrell drafted and attached to the memorandum.[482]

---

[477] Shepard Dep. 280:24-281:18; RaPower-3 Dep. 172:24-173:5.

[478] T. 5336-9 ; *see also* Aulds Dep. 157:1-8; Pl. Ex. 399.

[479] Pl. Ex. 480 at 1; T. 533:6-536:21 .

[480] T. 454:4-457:15.

[481] Pl. Ex. 370; T. 460:4-10; Pl. Ex. 579, Johnson Dep., vol. 1, 277:18-279:3.

[482] Pl. Ex. 370 at 1-2; *accord* Pl. Ex. 363 at 34-45 (general principles described), 33 (purchaser taxed as C corporation), 33-34 and 2-32 (transactions completed per transaction documents supplied).

(continued...)

399.     Shepard learned, soon after the Kirton McConkie memorandum was issued, that Birrell said that the memorandum could not be used to support the solar energy scheme.[483] Yet Shepard expressly told customers that Shepard "believe[d] that the vast majority, if not all, of the references and information contained therein also applies to sole proprietor."[484]

400.     Shepard continuously misled and made false statements to RaPower customers about these writings. Plaintiff's Exhibit 231 is an example of how Shepard disseminated false information to customers regarding tax benefits. Shepard attempted to summarize the Kirton McConkie memorandum and in doing so altered a major fact. Although the analysis in the memorandum applies only to C corporations, Shepard's summary asserts that the memorandum also applies to LLCs and sole proprietors:

> **Shepard's Note:** The Kirton-McConkie Memorandum was written specifically for corporations or limited liability companies.  While some RaPower3 Team Members have purchased their Solar Lenses as an LLC, most have purchased as a sole proprietor.  However, Shepard believes that the vast majority, if not all, of the references and information contained therein also applies to sole proprietors

401.     Shepard also summarizes the memorandum and titles his summary "Kirton-McConkie Memorandum Comments." Birrell did not write these comments nor did he review Shepard's comments. This is confusing to RaPower-3 customers.[485]

402.     Shepard told RaPower-3 customers that he wrote Birrell "a detailed letter about the situation and asked [him] to write a letter of clarification." Birrell testified that he did not

---

[483] Shepard Dep. 276:8-22; Pl. Ex. 231.

[484] Pl. Ex. 479 at 3; *see also generally id.* at 1-4; Shepard Dep. 270:7-271:4, 279:10-280:21.

[485] Pl. Ex. 231.

(continued...)

receive any letter from Shepard; he never wrote a clarification letter; and he never talked to Shepard after his one visit to Kirton McConkie.[486]

403.    Shepard also falsely told RaPower-3 customers that Kirton McConkie could not rescind the memorandum.

404.    The Andersons' November 2010 draft and the Kirton McConkie memorandum remained on RaPower-3's website until this Court ordered them to remove it – even after Defendants heard the Andersons and Birrell testify to the reasons the writings could not be used as Defendants were using them.[487]

405.    Defendants had reason to know, and did in fact know that RaPower-3 customers were not entitled to the tax benefits they promoted based on their serial solicitations and rejections from multiple attorneys, and the misrepresentations to RaPower-3 customers regarding who they met with and the attorneys' work product. Therefore, Defendants knew that their statements made to RaPower-3 customers were false or fraudulent.

406.    Furthermore, based on the testimony presented, Johnson did not meet with any engineers regarding the scheme. But he consulted with tax professionals and attorneys regarding the tax issues. This shows that this is not a bona fide energy activity, but a tax scheme.

>       **7.    Defendants knew, or had reason to know, that the IRS disallowed their customers' depreciation deductions and solar energy tax credits.**

407.    The IRS began investigating Defendants' conduct in June 2012.[488]

---

[486] Pl. Ex. 231; T. 468:7-469:25.

[487] Pl. Ex. 903 at 2 ( "Tax Opinion (Anderson)" and "Tax Letter (K&M)"); *see also* RaPower-3 Dep. 125:2-129:6; T. 537:8-540:8; Pl. Ex. 548; T. 454:4-457:25; Pl. Exs. 27, 351.

[488] *See* Pl. Ex. 10 at 2; Shepard Dep. 311:2-313:2.

(continued...)

408.    Defendants knew, at least as of June 2013, that the IRS was auditing their customers and disallowing the tax benefits Defendants promoted.[489]

409.    Defendants knew, as of November 2014, that IRS investigators had contacted tax return preparers who had prepared returns for Defendants' customers and claimed the tax benefits Defendants promoted.[490]

**8.    Defendants knew, or had reason to know, that the Oregon Tax Court rejected their customers' depreciation deductions and solar energy tax credits.**

410.    Defendants knew, as early as 2013, that the State of Oregon disallowed tax benefits their customers claimed on their state tax returns.[491]

411.    To date, there have been three decisions issued by the Oregon Tax Court, Magistrate Division, which disallowed the tax benefits Defendants promote. The first decision came out in October 2014.[492]

412.    These three decisions follow federal law in evaluating the allowability of the customers' claimed depreciation deduction and solar energy tax credit because Oregon state tax law is intended to be "identical in effect to the [internal revenue code] for the purpose of determining [Oregon state] taxable income of individuals."[493]

---

[489] *E.g.*, Pl. Ex. 328; Gregg Dep. 141:20-142:7; Pl. Exs. 71 & 73; Zeleznik Dep. 165:13-166:10, 167:3-21; Pl. Ex. 602; Howell Dep. 216:16-217:15.

[490] Pl. Ex. 606; Howell Dep. 226:11-227:23; *see also* Pl. Ex. 642;.

[491] T. 1275:2-18; ; Pl. Ex. 279; Gregg Dep. 147:5-148:10, 149:1-7, Pl. Exs. 330-33.

[492] *Kevin Gregg v. Dep't of Revenue*, No. TC-MD 160068R, 2017 WL 5900999, at *10 (Or. T.C. Nov. 30, 2017); *Orth v. Dep't of Revenue*, No. TC-MD 160075R, 2017 WL 5904611, at *10 (Or. T.C. Nov. 30, 2017); *Peter Gregg v. Dep't of Revenue*, No. TC-MD 140043C, 2014 WL 5112762, at *6 (Or. T.C. Oct. 13, 2014). Former counsel for Defendants, Justin Heideman, represented the taxpayers in the two most recent cases. *K. Gregg*, 2017 WL 5900999, at *1; *Orth*, 2017 WL 5904611, at *1.

[493] *K. Gregg*, 2017 WL 5900999, at *2 (citing ORS § 316.007); *P. Gregg*, 2014 WL 5112762, at *4 (same).

(continued...)

413.    All three cases concluded, based on the customers' conduct and a comprehensive analysis of the relevant provisions of the internal revenue code, that the customers did not have a trade or business involving the solar lenses.[494]

414.    All three cases disallowed all tax benefits related to the solar lenses.[495]

**D.    In connection with organizing or selling any interest in a plan or arrangement, Defendants made or furnished (or caused another person to make or furnish) gross valuation overstatements as to the value of the solar lenses.**

415.    Defendants currently sell a single solar lens for a total purported price of $3,500.

416.    But the record evidence showed that Plaskolite charged IAS between $52 and $70 dollars for a rectangular sheet of plastic.[496]

417.    Assuming each rectangle could be cut into a single triangular "lens," the raw cost of that "lens" is very low.

418.    There is no other credible evidence about other possible costs of a "lens."

419.    The correct valuation of any "lens" is close to its raw cost, and does not exceed $100.

**E.    The harm caused by Defendants' conduct is extensive.**

420.    Defendants' customers followed the solar energy scheme and claimed depreciation deductions and solar energy credits on their tax returns.

---

[494] *K. Gregg*, 2017 WL 5900999, at *5; *Orth*, 2017 WL 5904611, at *5; *P. Gregg*, 2014 WL 5112762, at *4.

[495] *K. Gregg*, 2017 WL 5900999, at *10; *Orth*, 2017 WL 5904611, at *10; *P. Gregg*, 2014 WL 5112762, at *6.

[496] Pl. Ex. 518, 519, 520.

(continued...)

421.    The United States was able to identify and collect information about certain of Defendants' customers' tax returns for tax years 2013-2016.[497] Over 1,600 tax returns from 9 preparers were examined.[498]

422.    A reasonable approximation of the harm to the Treasury, from depreciation and tax credits claimed, from this sample is at least $14,207,517.[499]

423.    Critically, these numbers do not include the still-unknown harm to the Treasury from Defendants' misconduct.

424.    It does not include tax returns for tax years 2008 through 2012, when customers bought lenses and claimed unwarranted tax benefits as a result.

425.    It does not include tax returns for tax year 2017, although Defendants sold lenses in 2017 and it is reasonable to conclude that the people who "bought" lenses in 2017 claimed the tax benefits Defendants' promoted for tax year 2017.

426.    The United States' numbers also do not include, for example, customers' tax returns that claimed the tax benefits Defendants promoted throughout the solar energy scheme, but which the IRS has not yet identified.[500]

427.    Defendants' conduct wrongfully deprived the U.S. Treasury of the taxes Defendants' customers lawfully owed.

---

[497] Pl. Ex. 752; T. 825:1-826:3;; *see also, e.g.*, Howell Dep. 186:3-190:23, 193:22-194:10, 194:19-200:20; Pl. Exs. 598-99; T. 1221:17-25; Pl. Exs. 128-32, 316-17, 636; T. 1137:5-18; Zeleznik Dep. 152:10-15, 152:22-159:5; Pl. Exs. 63-68; Gregg Dep. 102:7-103:25, 104:24-105:4, 105:15-106:2, 112:7-124:9; Pl. Exs. 308, 314-17

[498] Pl. Ex. 752 at 1, T. 825:13-15; 829:8-830:17.

[499] Pl. Ex. 752 at 3; T. 833:22-833:25.

[500] Penn Dep. 38:10-43:21; Pl. Ex. 391 at 33; Aulds Dep. 154:22-155:16 & 158:17-; *compare* Pl. Exs. 397, 400, 401 (which have no connection to RaPower-3 on the face of the return) *with* Pl. Ex. 402 at 19 (with connection to RaPower-3 on the face of the return); Howell Dep. 199:7-200:10; *see* T. 1228:18-1229:14, 1247:17-1248:4.

### III.     Conclusions of Law

One of the statutes under which the United States seeks an injunction is 26 U.S.C.

§ 7408. Section 7408(a) authorizes a district court to enjoin any person from engaging in conduct

subject to penalty under 26 U.S.C. § 6700 if injunctive relief is appropriate to prevent recurrence

of that conduct or any other activity subject to penalty under the Internal Revenue Code.[501]

Section 6700 is meant to attack abusive tax shelters "at their source: the organizer and

salesman."[502] It creates a penalty for a person who 1) organizes or sells any plan or arrangement

involving taxes and 2) makes or furnishes, or causes another to make or furnish, a statement

connecting the allowability of a tax benefit with participating in the plan or arrangement, which

statement the person knows or has reason to know is false or fraudulent as to any material

matter.[503]

### A.     Defendants organized, or assisted in organizing, the solar energy scheme, and sold solar lenses pursuant to the scheme.

"[A]ny 'plan or arrangement' having some connection to taxes" is a "plan" under

§ 6700.[504] The solar energy scheme is a "plan" under § 6700 because the key component of the

scheme was its promoted connection to the federal tax benefits of a depreciation deduction and a

solar energy tax credit.

---

[501] 26 U.S.C. § 7408(b).

[502] S. Rep. No. 97-494, Vol. 1 at 266 (1982), reprinted in 1982 U.S.C.C.A.N. 781, 1014.

[503] 26 U.S.C. § 6700(a)(2)(A).

[504] *United States v. Raymond*, 228 F.3d 804, 811 (7th Cir. 2000), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n. 1 (7th Cir. 2013); see also *United States v. Stover*, 650 F.3d 1099, 1107-08 (8th Cir. 2011) (The organizing, promoting, or selling element of § 6700 "should be defined broadly, and is satisfied simply by selling an illegal method by which to avoid paying taxes." (quotations omitted).); *United States v. Benson*, 561 F.3d 718, 722 (7th Cir. 2009); *United States v. United Energy Corp.*, No. C-85-3655-RFP (CW), 1987 WL 4787, at *8-9 (N.D. Cal. Feb. 25, 1987).

(continued...)

All Defendants organized, or assisted in organizing the scheme, and sold the scheme to customers either directly or through other people.[505] Johnson created the solar energy scheme and organized other people, including Shepard and Freeborn, to sell lenses pursuant to the scheme. Johnson directed IAS, and now, RaPower-3, to market the lenses in ways that would maximize sales. Johnson also established the contracts and infrastructure through which customers buy lenses. In an effort to increase sales, Johnson has spoken to countless customers and prospective customers about his purported solar energy technology and the tax benefits he promotes, including on radio broadcasts twice per month since March 2017. Johnson directed both IAS and RaPower-3 to pay commissions to people who sell solar lenses. He also gave Shepard and Freeborn information about the purported technology, the transactions underlying the solar energy scheme, and the purported tax benefits to publicize and, thereby, increase sales of solar lenses. Johnson is paying for customers' representation in Tax Court, and Shepard's and Freeborn's representation in this case.

Shepard takes all Johnson's information about the solar energy scheme, adds his own observations, and then spreads the scheme as widely as he can, especially through the internet and social media. Shepard has created and managed a website, newsletter, and email distribution list solely devoted to selling solar lenses through RaPower-3; supported and encouraged RaPower-3 "distributors" to increase their downline sales; convened and hosted events like the 2012 RaPower-3 National Convention and other tours of Defendants' facilities. When distributors or other customers have questions, they look to Shepard (as "Chief Director of Operations for RaPower-3") to answer them, or to get the answer from Johnson. Shepard also

---

[505] *See* § 6700(a); *Stover, 650 F.3d at 110*7-08; *United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1104 (9th Cir. 2000); *United Energy Corp.*, 187 WL 4787, at *8-9.

provides arguments and materials for customers to submit to the IRS that mirror Defendants'
promotional materials.

Freeborn was a prolific salesman for RaPower-3. As the self-titled "National Director for
RaPower-3," he took information from Johnson and Shepard about the purported technology, the
transactions, and the purportedly related tax benefits, and presented it to people in-person or by
phone or email. His work resulted in more than $300,000 in commissions; it follows from IAS's
and RaPower-3's commission structure, that either Freeborn or those in his downline have
generated well over $3 million in actual revenue to IAS or RaPower-3.

> **B.  While promoting the solar energy scheme, Defendants made or furnished (or
> caused others to make or furnish) statements about the allowability of a
> depreciation deduction and a solar energy tax credit as a result of buying
> solar lenses, which statements Defendants knew or had reason to know were
> false or fraudulent.**

Defendants told customers they could claim a tax deduction for depreciation on the lens
and the solar energy tax credit on their individual income tax returns if they purchased a lens.
Defendants constantly made statements to customers, over years and years, in support of these
assertions while promoting the solar energy scheme. Defendants' statements were false or
fraudulent as to material matters, and Defendants knew or had reason to know it.

Statements about "material matters" include those that "directly address[]" the tax
benefits purportedly available to a participant in a tax scheme and those that "concern[] factual
matters that are relevant to the availability of tax benefits."[506] "Material matters are those which
would have a substantial impact on the decision-making process of a reasonably prudent investor

---

[506] *United States v. Campbell*, 897 F.2d 1317, 1320 (5th Cir. 1990); *Benson*, 561 F.3d at 724; *United Energy Corp.*,
1987 WL 4787, at *9.

(continued...)

and include matters relevant to the availability of a tax benefit."[507] "There is no matter more material to the sale of a tax avoidance package than whether the package effectively allows customers to avoid taxes."[508]

A statement about a material matter is false in the tax law context if "untrue and known to be untrue when made."[509] A statement about a material matter can also be false because of what a plan promoter fails to say.[510] Promoters are charged with knowledge of the law governing the tax benefits they promote.[511] A promoter who does not tell customers all of the requirements

---

[507] *Campbell*, 897 F.2d at 1320; *United States v. Buttorff*, 761 F.2d 1056, 1062 (5th Cir. 1985).

[508] *Benson*, 561 F.3d at 724; see *Stover*, 650 F.3d at 1111 (affirming district court's finding that a promoter's promises of numerous tax advantages induced customers to purchase his tax arrangements).

[509] *Stover*, 650 F.3d at 1108.

[510] 26 U.S.C. § 7408(c) (conduct subject to injunction is "any action, *or failure to take action*" which is subject to certain penalty provisions or the regulations governing practice before the IRS (emphasis added)); *Stover*, 650 F.3d at 1109 (8th Cir. 2011) ("Stover's statements regarding all three schemes were also false because of what he failed to convey: that deductions taken under 26 U.S.C. § 162(a) must be 'ordinary and necessary' for the deducting business. The district court found that Stover 'advised his clients to set up these entities in order to save taxes without also advising them of the potential pitfalls and the actions necessary to guard against the obvious conclusion that the transaction was a sham and bore no relation to reality.' . . . [C]ourts have repeatedly held that a tax promoter's failure to advise his clients of the requirements for a proper deduction qualifies as a false statement."); *United States v. Gleason*, 432 F.3d 678, 682-683 (6th Cir. 2005) (affirming district court's finding that a defendant "made false statements about the purported home-based business deductions" that the defendant claimed could be derived from using his abusive tax scheme because the defendant "did not properly qualify his assertions about the deductibility of weddings, college, travel, meals, golf, cars, and everyday household expenses by stating that business expenses must be 'ordinary and necessary' to the business, and that personal consumption expenditures must be 'inextricably linked to the production of income[.]'" (internal citations omitted)); *United States v. Elsass*, 978 F. Supp. 2d 901, 935 (S.D. Ohio 2013) (listing "examples of false statements made by [the defendants], keeping in mind that statements can be false based on what they fail to convey").

[511] *See, e.g., United States v. Campbell*, 704 F. Supp. 715, 725 (N.D. Tex. 1988) ("The Coral program was based on the deduction for research and experimental expenditures allowed by [I.R.C. § 174]. That section permits an electing taxpayer to currently deduct from gross income (rather than to amortize) the amount of expenditures 'paid or incurred' for research and experimental activities. Acquiring a project completed before the date of acquisition would not constitute an expenditure for research and experimentation under Section 174." (citation omitted)); *United States v. Music Masters, Ltd.*, 621 F. Supp. 1046, 1055 (W.D.N.C. 1985) ("Under Section 46(c) of the Code, property must be placed in service in the year for which an investment tax credit is claimed. Music Masters represented to investors that these masters were purchased in 1982 and that the investors could deduct the investment tax credits for that year. These were material false statements, since the availability of credits for the 1982 year would have a substantial impact on a reasonably prudent investor in the investment program." (citations omitted)).

(continued...)

to lawfully claim a deduction or credit has made a false statement.[512] A promoter who does not tell customers all of the facts relevant to whether the customers may lawfully claim a deduction or credit has made a false statement.[513]

A court may conclude that a promoter had *reason to know* his statements are false or fraudulent based on "what a reasonable person in the defendant's subjective position would have discovered."[514] The trier of fact may impute knowledge to a promoter, "so long as it is commensurate with the level of comprehension required by [his] role in the transaction."[515] A person selling a plan "would ordinarily be deemed to have knowledge of the facts revealed in the sales materials furnished to him by the promoter."[516] A person who holds himself out as an authority on a tax topic has reason to know whether his statements about that topic are true or false.[517] "The test for injunctive relief under § 7408 is satisfied if the defendant had reason to know his statements were false or fraudulent, regardless of what he actually knew or believed."[518]

---

[512] *E.g.*, *Stover*, 650 F.3d at 1109 ("When Stover's client Donald Clark questioned whether it was a 'legal and standard practice' to create sham management companies solely for tax savings purposes, Stover replied that it was. Stover's statements were false because they untruthfully conveyed that his clients' tax arrangements did not need to have economic substance.").

[513] *United Energy Corp.*, 1987 WL 4787, at *9 (among the false statements that the defendants made were "representations that [solar energy equipment] modules would be installed by the end of the year of purchase and that the solar farms were operational, letters stating that modules were installed and available for service, and statements reflecting payments for power that was never produced. The income projections also constituted false statements, as did, in some instances, the statement that a module existed at all.").

[514] *Campbell*, 897 F.2d at 1321-22 (quotation and alteration omitted); *accord United States v. Hartshorn*, 751 F.3d 1194, 1202 (10th Cir. 2014).

[515] *Campbell*, 897 F.2d at 1322; *Estate Pres. Servs.*, 202 F.3d at 1103; *United States v. Davison*, No. 08-0120-CV-W-GAF, 2010 WL 286419, at *1 (W.D. Mo. Jan. 19, 2010).

[516] *United States v. Harkins*, 355 F. Supp. 2d 1175, 1180 (D. Or. 2004) (quotation omitted).

[517] *United States v. Poseley*, No. CV 06–2335–PHX–EHC, 2008 WL 4811174, at *2 (D. Ariz. Nov. 4, 2008) ("Although the Defendants attempted to disclaim liability as tax or legal experts in their marketing materials, Defendants held themselves out as tax experts to their customers and at promotional seminars. Defendants knew or had reason to know that their tax evasion schemes, including the creation of Pure Trusts, were unlawful and fraudulent." (fact citations omitted)).

[518] *United States v. Hartshorn*, 751 F.3d 1194, 1202 (10th Cir. 2014).

Here, Defendants' statements about "material matters" go to the law and facts applicable to 1) whether their customers were in a "trade or business" related to leasing out solar lenses, or were holding the lenses "for the production of income," such that their customers were allowed a depreciation deduction related to the solar lenses and the solar energy credit in § 48; 2) whether, even if their customers were in a "trade or business" or other "activity" with respect to the solar lenses, customers were allowed to deduct expenses against active income and use the solar energy credit to offset tax on active income; and 3) whether Defendants' customers were "at risk" for the full purchase price of each lens.

> **1.    Defendants knew, or had reason to know, that their customers were not allowed a depreciation deduction or the solar energy credit because customers were not in a "trade or business" related to the solar lenses and did not hold the lenses for the production of income.**

Under the proper circumstances, the Internal Revenue Code allows a taxpayer engaged in a trade or business certain tax deductions for expenses the taxpayer incurs while generating income, and certain credits against tax liability. At issue here are the business deduction for depreciation and the solar energy credit.

> **a.    Defendants knew, or had reason to know, that their customers were not in a "trade or business" related to the solar lenses and did not buy lenses for the production of income.**

The typical first step in the analysis of whether a taxpayer is in a "trade or business" (such that depreciation and/or the solar energy credit may be allowed) is to determine whether the taxpayer has undertaken activity for that purported "trade or business" in good faith, with the primary purpose of the activity to make a profit – or, instead, has bought into an abusive tax scheme designed to create tax losses.[519] Here, the focus is on *Defendants' statements* to their

---

[519] 26 U.S.C. §§ 162(a), 183, 7701(o)(1)(A) (for a transaction to be recognized for tax purposes, the transaction must "change[] in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position"); *Nickeson*

(continued...)

customers that their customers were in the trade or business of holding out solar lenses for lease, and what Defendants knew or had reason to know about whether those statements were false or fraudulent.

At minimum, Defendants had "reason to know" that their solar energy scheme is an abusive tax scheme rather than a bona fide trade or business for their customers, and that their statements about tax benefits were false or fraudulent. Common red flags that courts have identified as showing an abusive tax scheme include: 1) continued failure of a purported "business" to earn income; 2) control of the purported business remaining with the promoter, rather than the customer; 3) illusory contract documents with little cash outlay by the customer and substantial debt or obligation that the customer is unlikely to pay; and 4) a promoter's heavy emphasis on greatly reducing or eliminating a customer's tax liability by buying in to the plan.[520] Courts have rejected abusive tax schemes with these features.[521] All of these red flags are present here and, for the reasons that follow, Defendants engaged in conduct subject to penalty under § 6700(a)(2)(A) each time they stated that a solar lens purchaser was in a "trade or business" with respect to any solar lens.

---

[footnote continued] _v. Comm'r_, 962 F.2d 973, 976-77 (10th Cir. 1992). Often, this question is before a court when an individual taxpayer claims to have a "trade or business" and therefore seeks business-related tax deductions and/or credits. _E.g._, _Sala v. United States_, 613 F.3d 1249 (10th Cir. 2010), _as amended on reh'g in part_ (Nov. 19, 2010); _Nickeson_, 962 F.2d at 976-77; _Keeler v. Comm'r_, 243 F.3d 1212, 1218-20 (10th Cir. 2001); _Jackson v. Comm'r_, 966 F.2d 598, 601 (10th Cir. 1992).

[520] _E.g._, _Nickeson_, 962 F.2d at 976-77; _Music Masters, Ltd._, 621 F. Supp. at 1049-50.

[521] _See_ _Rose v. Comm'r_, 88 T.C. 386, 413 (1987) (collecting cases), _aff'd_ 868 F.2d 851 (6th Cir. 1989), _not followed on other grounds as stated in Bank of New York Mellon Corp. v. Comm'r_, 106 T.C.M. (CCH) 367 (T.C. 2013); _United States v. Philatelic Leasing_, 794 F.2d 781, 782-85 (2d Cir. 1986); _United States v. Petrelli_, 704 F. Supp. 122, 124 (N.D. Ohio 1986) (concluding that defendants violated § 6700 when they "entered into lease agreements with investors who leased master photographs and plates from the defendants. Defendants advised the lessees of the master photographs and plates to claim investment tax credits and deductions for the leased art work and plates allegedly made therefrom, some of which never existed.").

i.     **Defendants knew, or had reason to know, that no customer earned or would earn income from buying solar lenses.**

When the activity underlying a tax plan fails to perform as promised, the plan's

promoters know, or have reason to know, that the plan is an abusive tax shelter and not a trade or

business.[522]  For example, in *United States v. United Energy Corporation*, from 1982 through

1984, four defendants "sold 'solar power modules' which, according to advertising literature,

would simultaneously produce electricity and thermal energy (hot water) from the sun's rays."[523]

None of the modules actually worked as promised, however, and no module purchaser was ever

paid by a third party for energy produced by a module.[524]  For this and other reasons, the district

court concluded that the defendants made false or fraudulent statements in their "representations

designed to mislead purchasers into believing that the solar farms were operational, that uses for

hot water existed . . . and that their modules could and would be fully installed."[525] These false

statements were contributing factors to the defendants' "income projections based upon

---

[522] *Blum v. Comm'r*, 737 F.3d 1303, 1312 (10th Cir. 2013) ("The probability of earning a profit must be reasonable, not a mere possibility."); *see Sala*, 613 F.3d at 1254 ("The existence of some potential profit is 'insufficient to impute substance into an otherwise sham transaction' where a 'common-sense examination of the evidence as a whole' indicates the transaction lacked economic substance.")*; Keeler*, 243 F.3d at 1218 ("While it is true that investors routinely make decisions with an eye to decreasing tax liability, the deliberate incurrence of first-year losses may be an indication that a transaction lacks economic substance."); *Jackson v. Comm'r*, 864 F.2d 1521, 1526 (10th Cir. 1989) ("Although the failure to make sales in a given period does not per se prevent a taxpayer from carrying on a business, the tax court's finding that taxpayers 'made [no] legitimate efforts to locate potential buyers for the [player/recorders]' during 1978 is fatal to taxpayers' case. Merely possessing the legal capability to sell player/recorders by obtaining a license from the inventor, without actual efforts to sell the products, is insufficient to constitute carrying on a trade or business for purposes of section 162." (citations and footnote omitted)); *see generally Apperson v. Comm'r*, 908 F.2d 975, 1990 WL 100774 at *1-2 (7th Cir. 1990) (unpublished); *Music Masters, Ltd.*, 621 F. Supp. at 1056. *See also Gregg v. Dep't of Revenue*, No. TC-MD 140043C, 2014 WL 5112762, at *4 (Or. T.C. Oct. 13, 2014) (concluding that Defendants' customer Peter Gregg did not have a trade or business related to his solar lens purchase).

[523]  1987 WL 4787, at *1.

[524] *United Energy Corp.*, 1987 WL 4787, *2-5.

[525] *United Energy Corp.*, 1987 WL 4787, *5.

(continued...)

completely unsupportable energy production estimates."[526]  Such false statements were "material to the issue of whether [that solar energy] enterprise is entered into with a profit-making motive."[527]

It is no excuse for making such false or fraudulent statements that a promoter-defendant "had intended to accomplish" things like installing and starting up solar energy equipment, "but had been thwarted."[528] "[A] statement that something non-existent currently exists is false irrespective of the most reasonable, good faith intentions that it will exist in the future. Even a statement that something will exist in the future, such as an income projection, can be false if there is no reasonable basis for the prediction." [529]

> **(a)      Defendants knew, or had reason to know, that customers would not earn income from "leasing out" his lenses to LTB.**

Johnson and Shepard have been promoting the solar energy scheme for more than *ten years*, and Freeborn promoted the scheme for at least four years. During that time, all repeatedly made statements to customers creating the expectation that customers would earn income from "leasing out" their lenses to LTB according to Johnson's 2006 vision[530]:

---

[526] *United Energy Corp.*, 1987 WL 4787, *4.

[527] *United Energy Corp.*, 1987 WL 4787, *9.

[528] *United Energy Corp.*, 1987 WL 4787, *9.

[529] *United Energy Corp.*, 1987 WL 4787, at *9.

[530] IAS Dep. 162:1-163:22; Pl. Ex. 532 at 6; *see also* Pl. Ex. 531 at 1-3.



But as of April 2018, no third-party power purchaser has ever paid LTB (or any other entity) for energy. LTB has never paid a customer for use of his lens.

Defendants have known that no customer was paid rental income generated by payments from a third-party purchaser throughout the entire time they have been promoting the solar energy scheme. Johnson, as the manager and director of all entities at issue in this case knew that no money was coming in from a third-party power purchaser. Shepard knew as early as 2006, and Freeborn knew as early as 2009 (and continuously through the years thereafter), that IAS had missed its target installation dates in their own contracts and their own lenses were not producing rental income. They knew that other customers were not being paid either. Tellingly, Shepard has never even bothered to ask Johnson why. Payments were irrelevant because the principal benefit was tax advantages.

Not only have Defendants known that no customer has ever been paid rental income generated by payments from a third-party purchaser, they knew or had reason to know that such rental income would not be paid. Defendants knew, or had reason to know, that Johnson's purported solar energy technology had not resulted, and would not result, in sales of energy to a third-party purchaser. Johnson knew that neither he, nor anyone affiliated with him, had ever installed, operated or maintained a solar energy production plant before. Running a solar energy

power plant is not an endeavor for the inexperienced. Johnson also knew, all along, that LTB existed only on paper. He also knew that neither Shepard nor Freeborn ever asked any questions about LTB or its experience in operating or maintaining solar energy equipment: not when they first signed an agreement purportedly to lease their lenses to LTB, and not in the intervening years.

Defendants' solar energy scheme is clearly a complete sham. Defendants knew it was not generating income for customers for more than *ten years*. Yet, despite their clear knowledge that the system did not produce energy or income to customers, they continued to sell lenses, encourage customers to take purportedly related tax deductions and credits, and deplete the United States Treasury. Defendants have given self-serving and conflicting reasons for the lengthy delay in bringing Johnson's ideas to fruition, all of which show that they knew or had reason to know that their customers were not earning income from leasing their lenses, and would not be earning such income in the near future. Johnson claims to have been able to put electricity on the grid since 2005. He has just made the "business decision" not to do it. But Johnson has also claimed, as have Shepard and Freeborn, that his process toward generating energy has taken more than ten years because his work is so cutting-edge. Every time he thinks he is finished and ready to connect to a third-party purchaser, he finds a problem, needs to create some new invention, or otherwise needs to make an improvement to his system. For example, Shepard testified that he told a customer in November 2012 that there were "150 towers ready to install" because (at that time) he thought that it "wouldn't take too long to put up 150 towers."[531] But because Defendants were using "brand new technology," various components of the

---

[531] Shepard Dep. 172:9-173:15; Pl. Ex. 141 at 1.

(continued...)

purported technology did not work.[532] So the towers were not erected at that time.[533] Now, more than five years later, all those new towers with lens arrays are *still* not up.

Even if such towers had been constructed, they would not work as Defendants claim they will. The United States' expert witness on concentrating solar power, Dr. Thomas Mancini, credibly testified that Defendants' purported technology comprises separate component parts that do not work together in an operational solar energy system to produce electricity or other useable energy from the sun. Dr. Mancini also credibly testified that Defendants' purported technology is not now, and will never be, a commercial-grade dish solar system converting sunlight into electrical power or other useful energy. Defendants do not have the expertise, the experience, the research, or the data to build a system that converts solar radiation into electrical power or other useful energy.

But one need not have Dr. Mancini's extensive expertise to see that Defendants' purported technology is a sham. As Freeborn (a high school teacher and coach who did not have any special expertise in solar energy technology) testified, getting the "individual parts" of Johnson's purported technology to "work in concert . . . seems to be the hurdle."[534] Yet Defendants have continued to sell the scheme.

For these reasons, Defendants knew or had reason to know that any "construction updates" they gave customers, suggesting that rental income was soon to arrive, were false or fraudulent. Shepard and Freeborn knew that each time they visited Millard County, Utah, because the only towers they ever saw were the 19 that went up in 2006. To date, those towers are *still* the only towers built with lens arrays installed. Defendants knew, or had reason to know,

---

[532] Shepard Dep. 172:9-179:17.

[533] Shepard Dep. 172:9-179:17.

[534] Freeborn Dep. 95:3-13.

that the bulk of customers' "lenses" are shrouded in plastic wrap on pallets in a warehouse, uncut, unframed, and not installed on any tower such that they could even have the possibility of providing heat to generate electricity. The Court gives no credence to Defendants' claims that they have made "progress" on any site, either in manufacturing or construction. Assembling components for a system that has not been shown to work is not progress. Rather, it is a convenient façade for Defendants' ongoing fraud. They are savvy enough to inject just enough purported reality into the solar energy scheme to convince willing believers.

Further, the requirements for interconnecting to the electrical grid are extensive, expensive, and time-consuming. Defendants have no expertise or experience in this technical and specialized process, or in obtaining a power purchase agreement to sell electricity to a commercial third-party purchaser. Defendants knew, or had reason to know, that there has never been an interconnection agreement. Johnson and Shepard know, or have reason to know, that there is no current, concrete plan to obtain either an interconnection agreement, yet their statements to customers suggested that they would have one soon. But PacifiCorp, the entity responsible for maintaining the electrical grid near Defendants' property, and through which Defendants would interconnect to the grid if they could, has not received an interconnection application, nor has it ever heard of Defendants.

Defendants also knew, or had reason to know, that there has never been a contract for any third party to buy power generated through any system using the solar lenses. Johnson and Shepard know, or have reason to know, that there is no current, concrete plan to obtain a power purchase agreement. As Shepard said, when discussing his efforts to enter a power purchase agreement *since 2010*: "Every time I got close, they wanted to see a power project up and

running. . . . And we didn't have that running yet."[535] Yet they told their customers that such an agreement was imminent.

In short, Defendants knew, or had reason to know, that their statements to customers that they would earn rental income from leasing out their solar lenses to LTB for the production of electricity were false or fraudulent.[536]

> **(b)     Defendants knew, or had reason to know, that no customer would earn a bonus payment.**

Defendants told customers that, if they bought lenses and signed a "bonus contract," they would earn a payout based on certain gross sales benchmarks for IAS. The bonus payouts (of either $6,000 or $2,000 per lens) were keyed to IAS's first and second billion dollars in gross sales revenue. On their face, those sales numbers are astronomical to reach, based on what Shepard and Freeborn knew about the state of the purported solar lens technology. Shepard and Freeborn knew that since 2010, RaPower-3, *not IAS*, had been selling lenses – both Shepard and Freeborn were part of the transition from IAS to RaPower-3. Because IAS was not selling, both had reason to question why a customer should expect any payout on a bonus contract, much less "soon" as they both told customers. Shepard admitted that he would not know how to begin evaluating whether IAS was anywhere near its first (or second) billion dollars. Either Shepard or Freeborn could have asked Johnson about this at any time to learn exactly how far away customers (including Shepard and Freeborn themselves) are from receiving a bonus payment. Instead, Shepard was willfully ignorant.

---

[535] Shepard Dep. 205:21-206:12.

[536] *See United Energy Corp.*, 1987 WL 4787, at *9.

In fact, Johnson testified that to date IAS has produced *no* sales revenue. Nonetheless, Defendants told customers about how important the bonus contract was for obtaining tax benefits (when Johnson was offering bonus contracts) and why they should expect revenue from it.

But like the other transaction documents in the solar energy scheme, the promises in the "bonus contracts" are illusory. Johnson used the bonus contracts to increase lens sales, knowing that RaPower-3 was the entity that generated sales and not IAS. His promise to pay will never come due as long as he directs that entities other than IAS make sales (which is what he has done so far). The "bonus contract" is just one more façade for Defendants' ongoing fraud.

Defendants knew, or had reason to know, that no customer was paid a bonus, or would be paid a bonus.

ii.     **Defendants knew, or had reason to know, that customers had no control over their purported "lens leasing" businesses.**

When a promoter sells a plan in which the promoter, and not the customer, retains control over the customer's purported trade or business, the promoter knows or has reason to know that he is selling an abusive tax scheme.[537] Defendants know, or have reason to know, that Johnson

---

[537] *Blum*, 737 F.3d at 1314-15 (indicia of tax-avoidance motive are when a taxpayer fails to investigate a deal before signing up and does not understand the details of the plan); *Nickeson*, 962 F.2d at 977 ("failure of taxpayers to inquire into the potential profitability of the program" and "taxpayers' lack of control over activities" are hallmarks of an abusive tax shelter); *Rose v. Comm'r*, 868 F.2d 851, 854 (6th Cir. 1989); *United Energy Corp.*, 1987 WL 4787,. at *1-3; *Music Masters, Ltd.*, 621 F. Supp. at 1056 ("The investors were each told they were to be in the business of manufacturing and distributing records based on the partial interest(s) they leased in the masters, and that they would not have to pay more than the start-up distribution expenses, which could be as little as $200." But in fact "[t]he evidence [was] clear that *Defendants* [and not their customers] carried on the business of manufacturing and distributing the masters. The Defendants' representations to the contrary are false and/or fraudulent." (emphasis added)); *see also Van Scoten v. Comm'r*, 439 F.3d 1243, 1253 (10th Cir. 2006) (a taxpayer did not reasonably rely on a promoter's assurances about purported tax benefits from entering a cattle partnership, in part because the taxpayer had no experience in the cattle industry); *see also Arevalo v. Comm'r*, 469 F.3d 436, 439 (5th Cir. 2006) ("where the transferor continues to retain significant control over the property transferred, the transfer of formal legal title will not operate to shift the incidence of taxation attributable to ownership of the property" (quoting Upham v. Comm'r, 923 F.2d 1328, 1334 (8th Cir.1991)).

(continued...)

controls the entire process, from start to finish, of their customers' purported foray into the "solar lens leasing business." Johnson controls all terms of the transaction. He decides whether and when to install a customer's lens in a tower, which (according to Defendants' transaction documents) is a prerequisite to the lens generating any income. Defendants tell customers how little effort they will be required to expend in their "solar lens leasing business."

Customers do not negotiate terms, including price. Defendants know, or have reason to know that customers have no reason to negotiate price because customers pay a mere $105 per lens to claim tax benefits calculated on the $3,500 "purchase price" of a lens.[538] Customers simply write a check to RaPower-3. Customers have not asked about LTB's experience operating and maintaining solar energy equipment before signing the O&M. Customers do not take possession of their lenses. No customer has ever chosen to buy a lens, then lease it to an entity other than LTB.[539] Defendants do not even have a way to track which lens belongs to which customer. It follows that there is no way for a customer to identify which lenses (whether among the many stacks of uncut plastic inside a warehouse or framed on one of the towers erected in 2006) belong to him. Defendants know, or have reason to know, that their customers are typically wage-earners in other full-time professions who lack the time and experience to meaningfully engage in a solar lens leasing business, and are not experienced in "leasing out" solar lenses.[540]

---

[538] *See Keeler*, 243 F.3d at 1219 ("The Tax Court also found that the prices of the items traded were not set by market forces, but by [the promoter]. Contrary to taxpayer's assertion, any alleged negotiation between [the promoter] and its customers as to the prices of the legs falls short of demonstrating economic substance, because the importance of the instruments' prices was dwarfed by their tax advantages.").

[539] *See Jackson*, 864 F.2d at 1526.

[540] *See Apperson*, 1990 WL 100774, at *1-2.

(continued...)

iii.    **Defendants knew, or had reason to know, that the transaction documents were meaningless.**

When transactions feature substantial deferred debt, backed by non-recourse promissory notes, which will purportedly be paid out of proceeds from the plan itself, a promoter knows or has reason to know that he is selling an abusive tax scheme.[541] The form of Defendants' lens sale-lease transactions that Defendants use in the solar energy scheme have similar features.

Defendants tell their customers the "full purchase price" of each lens that the customer purportedly buys, but allow them to make a much smaller "down payment." From 2006 through 2009, the full purchase price was $30,000 but the down payment was only $9,000. Currently, the full purchase price is $3,500 and the down payment is $1,050.[542] From the beginning, Johnson conditioned the customer's obligation to pay the difference between the initial "down payment" and the "full purchase price" of a lens on that very lens being installed and producing revenue. No lenses are installed and producing revenue. And Johnson's transaction terms mean that no customer actually owes the difference between the down payment and the full purchase price until five years *after* his lenses are "installed and producing revenue." Payments continue for 30 years thereafter. These facts show that any purported obligation to pay is substantial – and perhaps indefinitely – deferred debt.

Johnson does not charge interest on these "financed amounts." Customers borrow for free. According to the plain terms of the contracts, the only security for the customers' promise to pay these outstanding amounts is the lens itself. Customers are not required to fill out any type

---

[541] *See Nickeson*, 962 F.2d at 977 (one hallmark of an abusive tax scheme is nonrecourse indebtedness); *Philatelic Leasing*, 794 F.2d at 786; *United States v. Stover*, 731 F. Supp. 2d 887, 911-12 (W.D. Mo. 2010); *see Music Masters, Ltd.,*, 621 F. Supp. at 1054.

[542] As explained in the facts, this is a simplified statement of Defendants' "down payment" structure. Typically, customers do not even pay $1,050 in the tax year for which they claim depreciation and a credit for any lens; they pay $105 in that tax year and then pay the remaining $945 per lens once they receive the tax benefits Defendants promote.

of credit application, pledge any collateral or otherwise demonstrate their ability to pay the outstanding obligation on the "full purchase price" of the lens.

As described above, all Defendants know, or have reason to know, that that promise to pay is illusory (or at least is within Johnson' entire control). If Johnson has never installed a customer's lenses on towers that Johnson has, to date, failed to build, the customer will never be required to pay IAS or RaPower-3 the full purchase price of any lens. All Defendants know this, or have reason to know it, based on the plain terms of the contracts they signed or sold and their knowledge of the conditions at Defendants' facility in Delta, Utah.

Further, Defendants also know, or have reason to know, that Johnson does not actually enforce the full down payment amount of $1,050. Johnson will refund a customer's money if they simply no longer wish to own lenses, or if the IRS has disallowed the customer's depreciation or solar energy tax credit. Refunding money paid to "buy" lenses on the basis of a change in tax treatment shows that customers never had a bona fide "lens leasing" business or income producing activity. As a result, Defendants knew, or had reason to know, that the contracts contain illusory promises from all parties. They are designed to create the appearance of substance where there is none. And Defendants knew, or had reason to know, that their statements to customers, relying on the form of these documents to assert that a customer was in a substantive trade or business were false or fraudulent.[543]

---

[543] *See Twenty Mile Joint Venture, PND, Ltd. v. Comm'r*, 200 F.3d 1268, 1277 (10th Cir. 1999) ("the form chosen by the parties will be respected only if it comports with the reality of the transaction").

### iv. Defendants knew that they promoted the solar energy scheme based on the tax benefits it would provide.

When a promoter sells a plan by focusing on the plan's ability to greatly reduce or eliminate a customer's income tax liability, the promoter knows or has reason to know that he is selling an abusive tax scheme, and the customer is not in a trade or business.[544] As they sold the solar energy scheme to customers, Defendants made it very clear that the goal of buying solar lenses was to eliminate a customer's tax liability. They told people to calculate the number of lenses to buy based on their anticipated tax liability. According to Shepard's sample Form 1040, a customer should end up buying enough lenses so that the amount of their depreciation deduction would "get [their adjusted gross income] low enough for zero taxes."[545] If that was not enough, Shepard told customers to claim solar energy tax credits "if needed" to reach the goal of "zero" taxable income.[546] Freeborn explicitly coached his downline to sell lenses by waiting for people to complain about paying taxes and then telling them that, with RaPower-3, they could stop paying taxes.

The system by which customers made payments (which all Defendants knew about) also shows that the purpose of the solar energy scheme was to reduce or eliminate a customer's tax

---

[544] *Blum*, 737 F.3d at 1311 ("Evidence that a transaction was designed to 'produce a massive tax loss' indicates the transaction lacks economic substance."); *Stover*, 650 F.3d at 1110 (that money would "forever escape taxation" was a "key selling point" and an indicator of an abusive tax scheme). *See also Hartshorn*, 751 F.3d at 1204 ("Paying income taxes is a statutory duty; some also consider it a civic duty. Few gladly pay, but most faithfully do. Faithful compliance is tested, sometimes beyond elastic limits, by the siren's song of the unscrupulous — pay 10% of your income to the 'church' and completely avoid the much higher extractions demanded by the taxman AND do so without changing your life circumstances in any significant manner. Sounds great! To the unprincipled or the naïve, it is precisely what the doctor ordered. It is also illegal.") (O'Brien, J., concurring); *Nickeson*, 962 F.2d at 977 (one hallmark of an abusive tax scheme is "marketing on the basis of projected tax benefits"); *Keeler*, 243 F.3d at 1220 ("the fact that taxpayer's losses offset almost all of his income--100% and 97%, respectively, in 1981 and 1982-- indicates his primary motivation was tax avoidance and not profit potential").

[545] Pl. Ex. 40 at 13; Pl. Ex. 490 at 9-10.

[546] Pl. Ex. 40 at 13; Shepard Dep. 240:4-11. *See also* Pl. Ex. 158 at 15; Shepard Dep. 243:3-9; Pl. Ex. 490 at 9-10.

(continued...)

liability, while enriching Defendants with funds rightfully owed the Treasury.[547] Johnson's system since 2010 allowed customers to pay RaPower-3 only $105 of the $3,500 purchase price per lens in the year they wish to "buy" the lenses and claim the associated tax benefits. Johnson allows customers to pay RaPower-3 the remaining down payment amount of $945 in the *following year*, only *after* a customer has claimed depreciation and the solar energy tax credit for the year of purchase. The customer has the cash-in-hand to pay RaPower-3 because he "zero[ed] out" his taxes.[548] Instead of paying the United States Treasury his rightful tax liability, the customer pays RaPower-3 for "buying lenses."

Defendants knew, or had reason to know, that the full purchase price stated for each lens (whether $9,000, $3,000, or $3,500) nearly equals the amount of tax benefits Defendants tell customers they are allowed. The amount of the down payment Johnson states is identical to the amount Defendants tell customers they may claim as a solar energy tax credit. From 2006 through 2009, both the down payment and the promoted credit were $9,000. Since 2010, the total down payment and the promoted credit were $1,050. The difference between the down payment and the "full" purchase price of a lens is almost exactly the same amount that Defendants claim customers may deduct in depreciation. In this way, a customer never has to spend "his own money" to buy a lens. The United States Treasury pays for it, just as Johnson promised in 2006[549]:

---

[547] *See* Pl. Exs. 496-97, 777.

[548] Pl. Ex. 48.

[549] Pl. Ex. 532 at 12.

Earn $$ From Your Federal Income Tax
0% of Your Own $$ Invested

Because of the way Defendants marketed the solar energy scheme, it is clear: Defendants knew, or had reason to know, that the "solar lens sales" were not bona fide transactions. Defendants knew, or had reason to know, that the solar lenses were a smokescreen for their unlawful "sales" of tax deductions and credits to customers.

            **b.**      **Defendants knew, or had reason to know, that their customers were not allowed a depreciation deduction.**

One "business" deduction is for depreciation, the "wear and tear" on property either used in the taxpayer's "trade or business" or held by the taxpayer "for the production of income."[550] If a taxpayer is *not* in a trade or business, or is *not* holding property for the production of income, then the taxpayer is *not* eligible for a deduction for depreciation on that property.[551] "Depreciation . . . [is] not allowed on assets acquired for a business that has not begun operations."[552] The period for depreciation in an ongoing business begins when property is "placed in service."[553] "Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function."[554]

---

[550] 26 U.S.C. § 167(a). Depreciation is not the only business expense deduction Defendants promoted to their customers, but it is the one with the greatest impact on the Treasury.

[551] § 167(a).

[552] *Piggly Wiggly S., Inc. v. Comm'r of Internal Revenue*, 84 T.C. 739, 745 (1985); *United Energy Corp.*, 1987 WL 4787, at *11 ("[T]he term 'placed in service' refers to an asset that is 'available for service' but not yet actually in use only if the taxpayer is engaged in an ongoing trade or business and the asset is not yet in service for reasons beyond the taxpayers control."); *see also id.* at *10.

[553] 26 C.F.R. § 1.167(a)-10(b).

[554] 26 C.F.R. § 1.167(a)-(11)(e)(1)(i) (26 C.F.R. § 1.46-3(d)(1)(ii) and (d)(2) "shall apply for the purpose of determining the date on which property is placed in service").

(continued...)

105

In furtherance of the solar energy scheme, Defendants told customers that their lenses were "placed in service" in the tax year in which the customer bought the lens.[555] Defendants asserted that customers' solar lenses are placed in service once they are "available for ANY income producing activity, including leasing [them] out."[556] To Defendants, the fact that customers signed a contract to "lease" their lenses to LTB was sufficient to show that their lenses were in a "state of readiness" to be leased, and therefore were placed in service. These assertions are false. For all of the reasons described above, Defendants knew or had reason to know that their customers' "lens leasing" businesses were not bona fide and ongoing businesses. Defendants knew, or had reason to know, that LTB existed only on paper. Defendants knew, or had reason to know, that their customers' purported "leasing businesses" existed only on paper and would never produce income. Defendants knew, or had reason to know, that their customers were not engaged in any business activity with a true profit motive.[557]

Defendants have also argued that customers' solar lenses are "placed in service" because as soon as the plastic rectangles "[come] off the production line" at the manufacturer, the

---

[555] Pl. Ex. 25 at 1.

[556] Pl. Ex. 1 at 3; Pl. Ex. 10 at 3; Pl. Ex. 29; Pl. Ex. 231 at 4; Pl. Ex. 547. Defendants have claimed, at times, that customers "leased out" their lenses to advertise for IAS and/or RaPower-3 in some fashion. The analysis that follows applies regardless of the purported purpose for which the lenses were "leased out."

[557] The facts of this case, which Defendants knew or had reason to know, distinguish it from cases Defendants have cited to support their idea that a tangible piece of property is "placed in service" as soon as someone "holds it out for lease." In those cases, the Tax Court first found that the taxpayers entered into leasing activities with a bona fide profit objective – meaning that the taxpayers actually had a business, unlike Defendants' customers here. *Cooper v. Comm'r*, 88 T.C. 84, 109 (1987) ("we believe that petitioners entered into their leasing activities with a bona fide objective to make a profit"); *Waddell v. Comm'r*, 86 T.C. 848, 849 (1986) ("Ps' computerized ECG terminal franchise venture was an activity engaged in for profit."). Because of the lack of substance to the purported leasing transactions (including the critical fact that the entity to which customers purportedly lease their lenses does not exist except on paper, this case is closer akin to the cases concluding that property that does not exist cannot be depreciated. *Hudson v. Comm'r*, 71 F.3d 877, 1995 WL 725812, at *5 (5th Cir. 1995). *See also Gregg v. Dep't of Revenue*, No. TC-MD 160068R, 2017 WL 5900999, at *5-6 (Or. T.C. Nov. 30, 2017); *United Energy Corp.*, 1987 WL 4787, at *2-4, 11.

(continued...)

"lenses" are "in a state of readiness" to "provide[] solar process heat."[558] While the solar lenses may be able to concentrate solar radiation sufficient to set wood or shoes smoldering, blacken a rabbit, or burn an IRS agent,[559] that alone is not sufficient to generate "solar process heat." "Solar process heat" is taking heat from the sun and using it to accomplish function or application, like heating potash to speed the process of turning it into fertilizer.[560] There is no evidence that Defendants' solar lenses have ever, by themselves, used heat from the sun to accomplish any kind of useful function or application.

There is also no evidence that Defendants' solar lenses have ever been used as an individual component within a system to concentrate solar radiation to accomplish any kind of useful function or application – or to generate electricity. "[A]n individual component, incapable of contributing to the system in isolation, is not regarded as placed in service until the entire system reaches a condition of readiness and availability for its specifically assigned function."[561] Defendants' purported system as a whole has not been placed in service. For facilities that are intended to generate power, factors that go to whether the system as a whole is placed in service (such that any individual component could be placed in service) are: "1) whether the necessary permits and licenses for operation have been obtained; 2) whether critical preoperational testing has been completed; 3) whether the taxpayer has control of the facility; 4) whether the unit has been synchronized with the transmission grid; and 5) whether daily or regular operation has

---

[558] Pl. Ex. 9 at 1-2; *see also* Pl. Ex. 32 at ¶ 2; Pl. Ex. 73 at 1; Pl. Ex. 185 at 1-2; Pl. Ex. 472 at 1.

[559] T. 1666:14-24; T. 1737:2-9.

[560] T. 105:13-106:6.

[561] *Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 390 (5th Cir. 1995).

(continued...)

begun."[562] The evidence here shows that Defendants' purported solar energy technology does not work, nor will it ever. Accordingly, there is no "daily or regular operation" of the system; it has not been "synchronized with the transmission grid"; "critical preoperational testing" has not yet been completed, and there is no evidence that it has even begun.[563] Defendants themselves continually assert the need for additional research and development before they will be "operational." Because the system in which the solar lenses would purportedly be used is not placed in service, the lenses themselves – component parts of that system, even lenses that have been installed on towers – are not placed in service.

Further, the bulk of customers' "lenses" are not installed on towers. They currently exist as rectangular sheets of plastic, shrouded in plastic wrap on pallets in a warehouse, uncut, unframed. According to Defendants, a lens must be installed in a tower before it even has a chance of producing revenue from the production of electricity. Even if Defendants' purported technology did work and was in operation, the rectangular plastic sheets would still have to be modified (cut into triangles and framed) before they can be installed. Thus, in their rectangular state, the sheets of plastic are not ready and available for any income-producing activity.

Ken Oveson, a CPA, told Shepard in August 2009 that customers' lenses were not "placed in service" such that customers could lawfully claim a depreciation deduction or solar

---

[562] *Sealy Power, Ltd.*, 46 F.3d at 395. "The most important of the . . .  factor appears to be . . . that the unit has gone into ordinary daily operation." *In re Mitchell*, 109 B.R. 434, 438 (Bankr. W.D. Wash. 1989), *aff'd*, No. C90-484M, 1990 WL 142016 (W.D. Wash. Aug. 31, 1990), *judgment rev'd on other grounds*, 977 F.2d 1318 (9th Cir. 1992).

[563] This is not a situation that has presented in other cases, when a nearly operational power plant was seeking "placed in service" status for certain property in a particular tax year. *E.g.*, *Sealy Power, Ltd.* 46 F.3d at 395; *Consumers Power Co. v. Comm'r*, 89 T.C. 710, 725-26 (1987). Further, "[m]aterials and parts acquired to be used in the construction of an item of equipment shall not be considered in a condition or state of readiness and availability for a specifically assigned function." 26 C.F.R. § 1.46-3(d)(2)(iv).

(continued...)

energy tax credit. For all of these reasons, Defendants engaged in conduct subject to penalty under § 6700(a)(2)(A) each time they stated that a solar lens was "placed in service."

### c.   Defendants knew, or had reason to know, that their customers were not allowed the solar energy credit.

Under § 48, a taxpayer may be allowed an "energy credit" that reduces his income tax liability in a given year[564] for certain "energy property" he "placed in service" during the tax year for which the taxpayer claims the credit.[565] "[E]nergy property" means equipment with respect to which depreciation is allowed, and "which uses solar energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, or to provide solar process heat."[566]

Defendants told their customers that they were allowed to claim an energy credit under § 48 for their lenses. But as described *supra*, their customers are not allowed a depreciation deduction for their solar lenses because they were not in a trade or business or holding the lenses for the production of income and their lenses were not "placed in service." These two factors disqualify their customers from the solar energy credit, and Defendants knew or had reason to know it based on the plain text of § 48.

Further, Defendants knew or had reason to know that customers' solar lenses did not "use[] solar energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, or to provide solar process heat"[567] in the years in which the taxpayers bought the lenses and claimed credits. The preponderance of the credible evidence already described shows that customers' lenses have never been used in a system that generates electricity, that heats or

---

[564] §§ 48(a), 46(2), 38(a) & (b)(1).

[565] § 48(a)(1); 26 C.F.R. § 1.46-3(d)(1) & (2).

[566] § 48(a)(3)(A)(i) & (C); see also 26 C.F.R. § 1.48-9(d)(1).

[567] *See* § 48(a)(3)(A)(i) & (C); see also 26 C.F.R. § 1.48-9(d)(1).

cools a structure or provides hot water for use in a structure. Nearly all customer "lenses" are actually rectangular sheets of plastic sitting in a warehouse, uncut, unframed, and not yet installed on towers. Further, the preponderance of credible evidence shows that even the lenses installed on towers do not "provide solar process heat."

For these reasons, Defendants engaged in conduct subject to penalty under § 6700(a)(2)(A) each time they stated that a solar lens qualified for a solar energy credit under 26 U.S.C. § 48.

> **2.      Defendants knew, or had reason to know, that their customers were not allowed to deduct their purported expenses related to the solar lenses against their active income or use the credit to reduce their tax liability on active income.**

As just described, Defendants knew or had reason to know that their customers did not operate a trade or business as a result of purportedly buying the solar lenses, or hold the lenses to produce income. Their customers were not allowed the business expense deduction for depreciation or the solar energy credit. But even assuming that they were allowed the depreciation deduction and the solar energy tax credit, the next question to ask is whether (as Defendants have repeatedly asserted) their customers could use these tax benefits to offset their wages, or other "active" income.

Under 26 U.S.C. § 469, deductions and credits accrued in a passive activity, for individuals,[568] are only allowable to offset passive activity income.[569] They are *not* allowed to

---

[568] The overwhelming majority of Defendants' customers purchased the solar lenses in their individual capacity, but some purchased the solar lenses under the guise of a limited liability company ("LLC"). For tax purposes, these types of LLCs are "disregarded," and the tax consequences are treated as being incurred directly by the individual and reported directly on that individual's federal income tax return *See, generally*, 26 C.F.R. §§ 301.7701-1 through 301.7701-3.

[569] § 469(a), (d).

(continued...)

offset non-passive activity income like wages earned from an employer.[570] "Section 469 was intended to limit the financial incentive to structure traditional tax shelters. Prior to this enactment, taxpayers could use passive activity losses to offset non-passive activity income, thereby sheltering active income from taxation. Now, however, § 469 generally prohibits the deduction of passive activity losses, except insofar as the losses are used to offset passive activity income."[571]

Activity that involves the rental of tangible property is *per se* a passive activity.[572] Jessica Anderson expressly told Johnson this in October 2010.[573] Defendants knew or had reason to know the black letter law that any business involving leasing out tangible property like a "solar lens" was a *per se* passive activity, and that deductions and credits from purportedly leasing out solar lenses are not allowed to offset active income or tax on active income.

Yet Defendants repeatedly told customers they could lawfully claim deductions and credits from their "solar lens leasing business" to offset their active income and tax accruing from active income. They did so by telling customers that the customers "materially participated" in their "solar lens leasing business."[574] This is a false or fraudulent statement, about which Defendants knew or had reason to know, because the plain text of § 469 states that a rental activity is a passive activity "without regard to whether or not the taxpayer materially

---

[570] § 469(a), (d); *Senra v. Comm'r*, 97 T.C.M. (CCH) 1386, 2009 WL 1010855 at *4 (T.C. 2009).

[571] *Van Scoten*, 439 F.3d at 1249 n.4 .

[572] 26 U.S.C. § 469(c)(2), (c)(4), (c)(7), & (j)(8); *Williams v. Comm'r*, 108 T.C.M. (CCH) 128, 2014 WL 3843838, at *8 (T.C. 2014) ("Rental activities are generally considered to be passive regardless of material participation."); *Senra*, 97 T.C.M. (CCH) 1386, 2009 WL 1010855 at *3 ("Any activity where payments are principally for the use of tangible property is a rental activity.").

[573] Pl. Ex. 570 at 2.

[574] *E.g.*, Pl. Ex. 25 at 1.

(continued...)

participates in the activity."[575] Jessica Anderson expressly told Johnson this in October 2010.[576] There are very limited exceptions to this rule, all of which apply to bona fide businesses and not the bogus transactions Defendants sold.[577]

Because Defendants made statements about "material participation," the Court will analyze those statements even though the standard does not apply here. If a taxpayer "materially participates" in an activity, losses and credits from that activity may be allowed to offset active income and tax on active income.[578] A taxpayer "materially participates" in an activity only if the taxpayer's involvement in the activity is regular, continuous, and substantial.[579] A Temporary Treasury Regulation identifies a number of fact-specific tests to determine whether a taxpayer has "materially participated" in any trade or business.[580] They include the number of hours the taxpayer has participated in the activity during the tax year and the kinds of activities the taxpayer performed for the business.[581] Defendants point to these tests to argue that their customers meet the standard for having "materially participated" in their lens leasing businesses.

But once again, Defendants ignore a critical provision of the regulation – which Jessica Anderson expressly told Johnson in 2010. Work done by a taxpayer as an *investor* in an activity (such as "[m]onitoring the finances or operations of the activity in a non-managerial capacity" or "[s]tudying and reviewing financial statements or reports on operations of the activity") is not

---

[575] 26 U.S.C. § 469(c)(2), (c)(4).

[576] Pl. Ex. 570 at 2.

[577] 26 C.F.R. § 1.469-1T(e)(1)(ii), (e)(3); *see also* Pl. Ex. 570 at 2-4.

[578] 26 U.S.C. § 469(a), (c)(1), (c)(2), (j)(8).

[579] 26 U.S.C. § 469(h).

[580] *See generally* 26 C.F.R. § 1.469-5T.

[581] *See* 26 C.F.R. § 1.469-5T(a), (b), (f).

(continued...)

"participation" in the activity, "unless the individual is directly involved in the day-to-day management or operations of the activity."[582] These are exactly the kinds of activities Defendants claim their customers do with respect to their "lens leasing businesses." But performing these activities does not mean that a person has "materially participated" in a business.

Therefore (even assuming that the material participation standard applied here, which it does not), Defendants knew or had reason to know that their customers were not engaged in day-to-day management of a lens leasing business. Defendants promoted the solar energy scheme to wage-earning taxpayers with other investments, activities, hobbies, and personal commitments that absorbed their time, leaving no time that the customers could devote to materially participating in a purported "solar lens leasing business." One of Defendants' key selling points was telling customers how *little* they would have to do with respect to the lenses: "Since LTB installs, operates and maintains your lenses for you, having your own solar business couldn't be simpler or easier."[583] Under the solar energy scheme as Defendants operated it, customers did not materially participate in any activity related to the solar lenses.

For these reasons, Defendants engaged in conduct subject to penalty under § 6700(a)(2)(A) each time they stated that a solar lens purchaser could lawfully claim deductions and credits related to solar lenses to offset the purchaser's active income and tax accruing from active income.

---

[582] 26 C.F.R. § 1.469-5T(f)(2)(ii)(A) & (B).

[583] Pl. Ex. 19 at 1.

3.      **Defendants knew, or had reason to know, that that the full "purchase" price of the lenses was not at risk in the year a customer signed transaction documents.**

As is clear from the above, Defendants' customers were not in a trade or business, and were not allowed deductions like depreciation. And even if they were allowed such tax treatment (which they are not), they would be allowed to use those deductions and credits only to offset passive income. Assuming that Defendants' customers would be allowed some passive deductions, the next step in the analysis is to determine what amount they could be allowed.

The allowable amount of any deduction with respect to any activity is limited to the amount that the taxpayer has "at risk" in the activity.[584] "Section 465 was enacted because of the proliferation of tax shelters in the 1970's. Before the enactment of section 465, investors could take advantage of quick depreciation rules plus the deductibility of interest on nonrecourse debt to generate large "losses" in order to offset personal income. Section 465 attacks these practices directly."[585] A taxpayer is considered "at risk" with respect to money and property that the taxpayer contributed to the activity (so, amounts that the taxpayer pays to the activity out-of-pocket) and certain limited amounts that the taxpayer borrows.[586]

There are numerous caveats and exceptions to the general idea that a taxpayer is at risk for amounts that the taxpayer borrows to participate in the activity.[587] A taxpayer is *not* "at risk" to the extent the taxpayer is not personally liable to repay the borrowed funds or has secured repayment of the debt with property used in the activity at issue.[588] A taxpayer is not "at risk

---

[584] § 465(a).

[585] *Nicholson v. Comm'r*, 60 F.3d 1020, 1026 (3d Cir. 1995) (footnote omitted) (Alito, J.).

[586] § 465(b)(1).

[587] *E.g.*, § 465(b)(2), (3), (4),

[588] § 465(b)(2).

(continued...)

with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements."[589] "We look to the economic reality of the situation to determine whether there was a realistic chance that [the taxpayer] might lose the money [he borrowed], or, rather, whether the funds were protected from loss by the arrangement of the transactions."[590]

Here, Defendants tell their customers that they may claim federal tax deductions based on the "full purchase price" (currently $3,500, but $9,000 or $3,000 in prior years) of each lens that the customer purportedly buys. But Defendants' customers are not "at risk" with respect to the full $3,500 in the year they purportedly purchase their lenses and claim the purportedly related tax benefits. Instead, the customers typically make a down payment of $1,050 (at most) of the $3,500 purchase price. The contract documents state that the customer does not incur an obligation to pay the remaining $2,450 of the $3,500 purchase price until the customer's lens is installed and producing revenue. Defendants knew, or had reason to know, that no customer's lens was installed and producing revenue at any time, so they knew or had reason to know that no customer had any obligation to pay the remaining $2,450 for any lens. Therefore, no customer was "at risk" for that amount in the tax year the customer purportedly purchased a lens.

And even if a customer were ever to incur the obligation to pay the $2,450, that amount is "financed" by RaPower-3 at zero percent interest.[591] The customer is not personally liable to pay

---

[589] § 465(b)(4).

[590] *Oren v. Comm'r*, 357 F.3d 854, 860 (8th Cir. 2004); *Brifman v. Comm'r*, 64 T.C.M. (CCH) 3 (T.C. 1992) ("The 'economic reality' of the situation is the key factor in determining who is ultimately liable for a debt.").

[591] Defendants' customers never executed any notes or entered into any borrowing transaction. However, to the extent that the transaction could be viewed as the customers borrowing funds – they are borrowing the funds from RaPower-3 by deferring payment and/or from LTB, who will take its payment from revenue generated from the lens. Under 26 U.S.C. § 465(d)(3), a taxpayer is not considered "at risk" for funds borrowed from any person who has an interest in such activity or from a person who is related to a person (other than the taxpayer) having such an interest in the activity. Here, both LTB and RaPower-3 have an interest in the "activity" and therefore Defendants' customers are not at risk for the remaining purchase price if that amount is considered borrowed.

any of the "financed" amount; all payments will come from LTB from revenue the lens generates and the only collateral for the "financed" amount is the lens itself. There is no provision for payment in the event the lens does not generate revenue. There is no remedy in case a customer defaults, other than "repossession" of the lens by RaPower-3. These features make any potential obligation to pay the $2,450 a nonrecourse debt, for which no customer would be "at risk."

Further, customers' down-payments (currently $1,050 per lens) also do not appear to have been "at risk." IAS and RaPower-3 contracts contained an explicit statement that a customer could get a refund of all amounts paid in, without penalty, if either IAS or RaPower-3 did not perform on the contract. Johnson has offered refunds of all funds used to purportedly buy solar lenses to anyone being audited by the IRS.

The facts show that Defendants' customers funds are not "at risk" with respect to *any* amount they have paid in to the solar energy scheme or purportedly borrowed to participate. Defendants, who structured and sold these transactions, knew or had reason to know that their customers were not at risk for the full purchase price of any lens and therefore were not allowed to claim a depreciation deduction for the full purchase price or any related amount. For these reasons, Defendants engaged in conduct subject to penalty under § 6700(a)(2)(A) each time they stated that the full purchase price of a lens (whether $9,000, $3,000, or $3,500) was "at risk" for federal income tax purposes.

> ## 4. Defendants knew, or had reason to know, that all of their statements were false or fraudulent in spite of the legal advice upon which they claim reliance.

Defendants claim that they relied on the Andersons' writings and the Kirton McConkie memorandum while they were promoting the solar energy scheme, to support their assertions that customers could lawfully claim a depreciation deduction and a solar energy tax credit from

buying solar lenses and signing the transaction documents that Defendants provided. But these writings, and the facts and circumstances surrounding them, cannot support the heavy weight of Defendants' purported reliance on advice of counsel – especially because Defendants knew facts about the solar energy scheme that the attorneys did not know.[592]

When an advisor's opinion depends on facts that do not match the reality of a transaction, a promoter's claimed reliance is not in good faith.[593] The Anderson writings offer no genuine basis for Defendants' purported reliance because they are general summaries of the law, unconnected to the specific facts and circumstances of the transactions Defendants promoted. The October 2010 letter and the November 2010 draft say as much: they withhold any decisive opinion on the lawfulness of any tax treatment because they do not have specific facts and circumstances about the transactions. They each state that the availability of the tax benefits summarized will depend on facts and circumstances that do not appear in either document.

The Kirton McConkie memorandum is factually inapposite to RaPower-3 customers. On its face, the memorandum applies only to lens buyers that are C corporations (among other factual assumptions and preconditions stated in the memorandum). Birrell was careful to repeat this because of the differences in tax treatment for C corporations versus individuals and pass-through entities. Johnson and Shepard knew that RaPower-3 sold solar lenses to individuals or pass-through entities, not to C corporations. The memorandum assumes that Defendants' purported solar energy technology works and that the sale and lease transactions are completed using forms Birrell prepared. Neither of these assumptions match the facts of the solar energy

---

[592] _United Energy Corp._, 1987 WL 4787, at *11 ("The important point here, however, is not what defendants or their tax attorney believed the law to be. The point is that the module purchasers were entitled to truthful information on which to base their own decisions, regardless of defendants' interpretation of the law. Thus, even if defendants, knowing all the facts, reasonably believed their legal interpretation was correct, still their misstatements of the underlying material facts to purchasers are actionable.").

[593] _United States v. Zanfei_, No. 04 C 2703, 2006 WL 2861051, at *3, 13 (N.D. Ill. Sept. 29, 2006).

scheme as Defendants know them. The memorandum provides them no basis for their purported reliance.

Shepard's purported reliance on these writings was also unreasonable because he did not personally consult with or receive advice from the Anderson Law Center or Kirton McConkie. He got the November 2010 Anderson draft and the Kirton McConkie memorandum from Johnson. Shepard knows that Johnson is the originator of the solar energy scheme and Johnson's entity collects all the money from the solar energy scheme. It is not reasonable for a person to rely on opinion letters delivered to him by a financially conflicted promoter.[594] Shepard was also on notice from discussions with Ken Oveson about the true limitations on tax treatment of lenses.

While the text of the attorneys' materials shows their limitations, the attorneys also made clear that the use of the materials by Defendants was improper. A promoter's claimed reliance on advice of counsel is "disingenuous" when the promoter ignores warnings from independent attorneys that his interpretation of the internal revenue code is wrong.[595] Here, Jessica Anderson told Neldon Johnson, no later than January 2011, that he was wrong about the tax benefits solar lens purchasers could claim. Both the Andersons and Birrell sent Johnson cease-and-desist letters, which told him in no uncertain terms exactly why their writings did not support his solar energy scheme. Shepard knew, too, that Birrell said that the memorandum could not be used as RaPower-3 was using it. Shepard's visit to Kirton McConkie to complain about this did nothing to change Birrell's mind.

In short, the Anderson and Kirton McConkie writings do not negate Defendants' reason to know that they made false or fraudulent statements to customers. If anything, the

---

[594] *Van Scoten*, 439 F.3d at 1253 ; *Anderson v. IRS*, 442 F. Supp. 2d 365, 372 (E.D. Tex. 2006).

[595] *Campbell*, 704 F. Supp. at 730-31; *see also Estate Pres. Servs.*, 202 F.3d at 1103 .

circumstances surrounding the writings, and the attorneys' outraged response to learning that Defendants were using their writings to promote the solar energy scheme, bolster Defendants' reason to know that their statements were false or fraudulent.

> ### C. While promoting the solar energy scheme, Defendants made or furnished (or caused others to make or furnish) gross valuation overstatements as to the value of the solar lenses.

A defendant may also be enjoined under § 7408 for making or furnishing, or causing another to make or furnish, "gross valuation overstatement[s]" as to a material matter while organizing or selling a plan related to taxes.[596] A gross valuation overstatement is "any statement as to the value of any property or services" if the value of the property or services is directly related to the amount of any tax deduction or credit and the stated value is more than 200 percent of the correct value of the property or services.[597] A defendant "who stated [a] price to any person as part of an effort to induce them to invest . . . [has] furnished a 'gross valuation

---

[596] 26 U.S.C. § 6700(a)(2)(B), § 7408; _United States v. Alexander_, 2010 WL 1643425, at *5 (D.S.C. 2010) ("Regardless of whether he created the statements or merely re-circulated others' work, the Defendant cannot dispute that he furnished materials to his customers through the Aware Group and the Freedom Trust Group."); _Mattingly v. United States_, 722 F. Supp. 586, 571(E.D. Mo. 1989) ("Clearly whether property exists or whether a valuation can actually be rendered at the time the representation is made is inconsequential. The fact that the statement was made and that it exceeds the correct value by 200 percent is all that is relevant under § 6700(b)(1)(A).").

[597] 26 U.S.C. § 6700(b)(1).

(continued...)

overstatement' within the meaning of § 6700(a)(2)(B)."[598] There is no scienter element in proving penalty conduct under this provision of § 6700; it is a strict liability standard.[599]

Defendants sell a single solar lens for a total purported price of $3,500. But the evidence shows that that number far exceeds 200 percent of the correct price for a "lens." The record evidence showed that Plaskolite charged IAS between $52 and $70 dollars for a rectangular sheet of plastic. Each rectangle could be cut into two triangular "lenses," making the raw cost of each "lens" very low. Defendants' technology does not work, and is not likely to work to produce commercially viable electricity or solar process heat. Therefore, each "lens" is just one component of an inoperable system. It is not a piece of sophisticated technology such that premium pricing is appropriate for it.

Defendants have attempted to argue that "research and development" costs should be attributed to the costs of the lens, but there is no credible evidence about the amount of those costs. The concept of the Fresnel lens itself is not new. If Defendants have incurred "research and development" costs associated with their purported technology, such costs are in their yet-unsuccessful attempts to get the entire system working. The Court does not credit any such costs

---

[598] _United States v. Turner_, 601 F. Supp. 757,767 (E.D. Wis. 1985); accord _Gates v. United States_, 874 F.2d 584, 586 (8th Cir. 1989) ("[The defendant] admitted that in responding to questions about the valuation, he would refer individuals to the valuation statements contained in the promotional offering materials. This conduct is sufficient to satisfy the requirements of section 6700."); _Reno v. United States_, 717 F. Supp. 1198, 1202 (S.D. Miss. 1989); _Mattingly_, 722 F. Supp. at 572 (distributing brochures listing inflated purchase prices in connection with the sale of an abusive tax shelter constituted making or furnishing a gross valuation overstatement); _Campbell_, 704 F. Supp. at 726 ("Statements of the . . . contract price were statements of value. To offer an object or service at a specified price is to implicitly represent that the object is worth the price."), _aff'd Campbell_, 897 F.2d at 1322-23 (rejecting the defendant's argument that a quoted price for a purported investment was not a representation of value directly related to a tax deduction).

[599] _Autrey v. United States_, 889 F.2d 973, 981 (11th Cir. 1989); _United States v. Hand-Bostick_, 816 F. Supp. 2d 343, 352 (N.D. Tex. 2011); _Campbell_, 704 F. Supp. at 726 ("Scienter need not be shown to hold a person liable for gross valuation overstatements . . . . This 200 percent overvaluation is to be a bright line test."); _Turner_, 601 F. Supp. at 767 ("scienter is not required" to establish a violation of § 6700(a)(2)(B)); see also _Gates_, 874 F.2d at 586 (rejecting a defendant's attempt to avoid liability for making or furnishing a gross valuation overstatement because he did not know that the valuations were overstatements).

(continued...)

to the price of the lens alone. Based on the available and credible evidence, the Court concludes that the correct valuation of any "lens" is close to its raw cost, and does not exceed $100.[600] The most expensive parts of the purported solar energy production system are other components, such as collectors, towers, frames, distribution pipes and fluids, turbines, and generators. And those components consume the most testing and development resources.

It follows that Defendants engaged in conduct subject to penalty under § 6700(a)(2)(B) and made or furnished a gross valuation overstatement each time they told someone the price of a lens (whether $9,000, $3,000, or $3,500). They caused others to make or furnish gross valuation overstatements when those people told *others* the price of a lens – for example, when a RaPower-3 team member told someone the price of a lens while attempting to recruit that person into his downline.

### D. An injunction and other equitable relief are necessary and appropriate to enforce the internal revenue laws of the United States.

Because § 7408 sets forth specific criteria for injunctive relief, namely that injunctive relief is appropriate to prevent recurrence of penalty conduct, the United States need only show that that criteria is met; it need not show that the traditional equitable factors are satisfied before an injunction may issue.[601] The foregoing facts show that an injunction is appropriate here. But

---

[600] *C.f. United Energy Corp.*, 1987 WL 4787, at *5 ("A buyer with reasonable knowledge of the relevant facts would not have purchased a UEC module at any price. Such a buyer would have realized that UEC's modules had no chance of producing any significant income and that tax credits would never become available because the modules would never be placed in service and because defendants' operation was a sham. The people who actually purchased modules did not have a reasonable knowledge of the relevant facts because of the false statements made in UEC's advertising literature.")

[601] *Buttorff*, 761 F.2d at 1063; *United States v. Buttorff*, 563 F. Supp. 450, 454 (N.D. Tex. 1983) ("The legislative process has already taken these [equitable] factors into consideration in its decision to address the promotion of abusive tax shelters . . . ."); *accord Stover*, 650 F.3d at 1106 (traditional equitable factors need not be discussed when an injunction is authorized by statute like § 7408 and the statutory elements have been satisfied); *Estate Pres. Servs.*, 202 F.3d at 1098; *see also Hartshorn*, 751 F.3d at 1198.

(continued...)

121

the Court will also address other factors that courts have weighed to issue an injunction under § 7408(b), which are: (1) the extent of each Defendant's participation; (2) the isolated or recurrent nature of each Defendant's abusive conduct; (3) the Defendants' degree of scienter; (4) the Defendants' recognition (or non-recognition) of culpability; and (5) the likelihood that any Defendant's occupation would put him "in a position where future violations could be anticipated;" and (6) the gravity of the harm caused by Defendants' abusive conduct.[602]

Injunctive relief is appropriate to prevent recurrence of penalty conduct because of the multi-level marketing used by RaPower-3. The high economic incentives for network participation are illustrated by the testimony of Robert Aulds. In his downline a total of 2,468 lenses have been purchased.[603] His sales pitch was simple. Aulds answered the question as to whether RaPower-3 worked by telling potential buyers that he got a check from the federal government.[604]

The incentive for evangelizing the misleading scheme is high. Under the RaPower-3 commission structure, 10% of the purchase price paid by people directly sponsored by a purchaser was paid to the sponsor, and 1% of the purchase price paid by people sponsored by a purchaser in up to five lower levels was paid to the sponsor.[605] Multi-level marketing is pernicious due to the propagation of misinformation. For example, Aulds testified that his understanding was that "according to the definition of 'placed in service' that the government uses, they didn't actually have to be on a lens to be placed in service. They had to be on site

---

[602] *Gleason*, 432 F.3d at 683 (quoting *Estate Pres. Servs.*, 202 F.3d at 1105).

[603] Aulds Dep. 69:15-24, Pl. Ex. 394 at 2.

[604] Aulds Dep. 59:17-60:11.

[605] Aulds Dep. 79:7-16.

(continued...)

available to be on the lens, and so we met that qualification from the moment they were

purchased."[606] He also said that he and "99.9%" of the RaPower-3 purchasers "didn't understand

tax law and all that stuff," but that they had to help other purchases "understand this is not a

scam.  We're actually taking tax law and applying it . . . ."[607] The toxic combination of multi-

level marketing and misleading information creates an urgent need an injunction.

 The facts and legal analysis already recited show that Defendants Neldon Johnson, IAS,

RaPower-3, LTB1, and R. Gregory Shepard ("Defendants" hereafter, in light of Roger

Freeborn's death and dismissal from this case) fully, actively, and consistently, for more than ten

years, participated in promoting and selling the solar energy scheme. They each knew, or had

reason to know, that their statements about the tax benefits purportedly related to buying solar

lenses were false or fraudulent. Johnson, IAS, RaPower-3, and Shepard made or furnished gross

valuation overstatements while promoting the scheme. Defendants show no remorse, recognition

of culpability, or likelihood of stopping this abusive conduct without a Court order.

 Johnson, Johnson's entities, and Shepard have made the solar energy scheme a primary

focus of their time, energy, and efforts for the past ten years. They did not stop promoting the

scheme after investigation by the IRS, multitudes of customer audits by the IRS, and adverse

rulings in the Oregon Tax Court, Magistrate Division. According to Shepard, the only change in

his behavior since the United States filed this case is that he "bowed [his] back and [is] fighting

harder."[608] This shows that, without an injunction, Defendants' occupations put them in a

position where future violations of the internal revenue laws are likely. Defendants' efforts to

---

[606] Aulds Dep. 107:13-17.

[607] Aulds Dep. 119:16-23.

[608] Shepard Dep. 314:1-5.

promote the depreciation deduction and the solar energy tax credit have been so robust, that although Defendants stopped promoting depreciation as a benefit in 2016, their customers continued to claim it.

Further, the harm caused by Defendants' abusive conduct is extensive. The United States showed that its direct financial harm due to the deductions and credits claimed on a subset of Defendants' customers' tax returns for tax years 2013-2016 is at least $14,207,517.[609] Critically, these numbers do not include the still-unknown harm to the Treasury from Defendants' misconduct. It does not include tax returns for tax years 2008 (or prior) through 2012, although Defendants' customers bought lenses and claimed purportedly related tax benefits during those years. This snapshot does not include tax returns for tax year 2017, although Defendants sold lenses in 2017 and it is reasonable to conclude that the people who "bought" lenses in 2017 claimed the tax benefits Defendants' promoted for tax year 2017. The United States' numbers also do not include, for example, customers' tax returns that claimed the tax benefits Defendants promoted, but which the IRS has not yet identified.

All of Defendants' conduct that warrants an injunction under § 7408 also warrants an injunction and disgorgement under § 7402(a). Under § 7402(a), "[t]he district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions . . . orders of injunction, . . . and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws." An injunction under § 7402 may be issued "in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to

---

[609] Pl. Ex. 752 at 3.

(continued...)

enforce such laws."[610] "It would be difficult to find language more clearly manifesting a congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the internal revenue laws" than the language in § 7402(a).[611]

There is no need show that a Defendant "has violated a particular Internal Revenue Code section in order for an injunction to issue" under § 7402(a).[612] All the United States must show is that an injunction (or other order, such as one for disgorgement and other equitable relief) "may be necessary or appropriate for the enforcement of the internal revenue laws."[613] An order for disgorgement, in this case, is "appropriate" for the enforcement of the internal revenue laws.[614]

To show entitlement to disgorgement, the United States has the burden of "producing evidence permitting at least a reasonable approximation of the amount of [Defendants'] wrongful gain."[615] Defendants bear the "risk of uncertainty in calculating net profit."[616] "'Reasonable approximation' will suffice to establish the disgorgement liability of a conscious wrongdoer, when the evidence allows no greater precision, because the conscious wrongdoer bears the risk

---

[610] 26 U.S.C. § 7402(a).

[611] *Brody v. United States*, 243 F.2d 378, 384 (1st Cir. 1957).

[612] *E.g.*, *United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984); *Elsass*, 978 F. Supp. 2d at 941 ("[E]ven if the Defendants' business structure somehow left them outside the legal definition of tax return preparers, broad relief would still be appropriate, as § 7402(a) is undoubtedly designed to prevent individuals from undermining the Nation's tax laws through exploiting loopholes in the [Internal Revenue Code]'s overall regulatory scheme.").

[613] 26 U.S.C. § 7402(a); *accord*, *e.g.*, *United States v. ITS Financial, LLC*, 592 F. App'x 387, 394 (6th Cir. 2014) ("The fact that no other court has ever granted the precise injunction granted in this case does not mean [§ 7402(a)] does not authorize it.").

[614] *United States v. Stinson*, 239 F. Supp. 3d 1299, 1326 (M.D. Fla. 2017) ("Because § 7402(a) encompasses a broad range of powers necessary to compel compliance with the tax laws, the Court has determined that disgorgement is an available remedy in this case." (quotation omitted)).

[615] Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d) & cmt. i.; *Stinson*, 239 F. Supp. 3d at 1329; *United States v. Mesadieu*, 180 F. Supp. 3d 1113, 1120-23 (M.D. Fla. 2016).

[616] Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d) & cmt. i. ; *Stinson*, 239 F. Supp. 3d at 1329; *Mesadieu*, 180 F. Supp. 3d at 1120-23.

(continued...)

of uncertainty arising from the wrong. The allocation of risk of uncertainty to the wrongdoer

yields the rule that 'when damages are at some unascertainable amount below an upper limit and

when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the

proper amount.'"[617] In other words, if "the true measure of unjust enrichment is an

indeterminable amount not less than 50 and not more than 100, liability in disgorgement will be

fixed at 100."[618]

      Defendants obstructed discovery about their gross receipts and other topics involving

their finances. They did not produce relevant documents and information to the United States on

these issues. Nonetheless, the United States showed that Defendants "sold" at least 49,415

lenses.[619] If all customers paid the $1,050 down payment required under the terms of

Defendants' own transaction documents, Defendants' gross receipts were $51,885,750.[620] There

was testimony that not all of Defendants' customers have paid the down payment amount for all

of the lenses they purportedly bought, but Defendants offered no credible evidence of the amount

of any missing down payments. But this is the likely explanation for why Defendants' own

customer database shows that (even if Defendants "sold" 82,365 lenses) customers actually paid

in $50,025,480 as of February 28, 2018.[621] It is reasonable, based on the facts of this case and

Defendants' extensive promotion of the solar energy scheme, to conclude that customers have

---

[617] *Gratz v. Claughton*, 187 F.2d 46, 51-52 (2d Cir. 1951) *quoted in* Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. i.

[618] Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. i.

[619] Pl. Ex. 742B.

[620] Pl. Ex. 742B, Pl. Ex. 749.

[621] T. 758:10-777:10; Pl. Ex. 749. *See also supra* ¶ 79, noting likely ranges of revenue based on Pl. Exs. 742A and 742B. It appears that data from sales by IAS and RaPower-3, and perhaps also XSun Energy and SOLCO I, are in Defendants' customer database. The United States' bank deposit analysis, which contained data only through 2016, also supports this number.

(continued...)

used their "purchases" of all, or nearly all, of those lenses to claim a depreciation deduction and a solar energy credit. Because of the manner in which Defendants promoted the scheme, the Court concludes that $50,025,480 in gross receipts from the solar energy scheme came from money that rightfully belonged to the U.S. Treasury.[622] Defendants – who are the ones in possession of the best evidence of a reasonable approximation of their gross receipts – failed to rebut the United States' evidence of this reasonable approximation, and introduced no credible evidence of their own on the point.[623]

On the facts of this case, it is appropriate to hold Johnson liable for the gross receipts shown in the RaPower-3 database. An individual may be held liable for what is, on its face, an entity's debt, when 1) there was "such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct" and 2) "adherence to the corporate fiction [would] sanction a fraud, promote injustice, or lead to an evasion of legal obligations." [624]

---

[622] *E.g.* Freeborn Dep. 48:2-51:18; Pl. Ex. 496, Pl. Ex. 497; Pl. Ex. 777 at 1-2; Pl. Ex. 40 at 13.

[623] *See Esgar Corp. v. Comm'r.,* 744 F.3d 648, 656 (10th Cir. 2014) ("It is the function of the Tax Court to draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. The Tax Court may draw these inferences from the whole record, including the Commissioner's evidence on a given fact and the taxpayer's lack thereof." (quotations and alterations omitted)); *Wardrip v. Hart*, 949 F. Supp. 801, 804 (D. Kan. 1996).

[624] *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993); *United States v. Van Diviner*, 822 F.2d 960, 965 (10th Cir. 1987) (identifying factors to determine whether to pierce the corporate veil, including "whether a corporation is operated as a separate entity"; "commingling of funds and other assets"; "the nature of the corporation's ownership and control"; "use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation"; "disregard of legal formalities and the failure to maintain an arms-length relationship among related entities"; and "diversion of the corporation's funds or assets to noncorporate uses."); *see also United States v. Badger*, 818 F.3d 563, 572 (10th Cir. 2016) ("One can attempt to improperly escape a payment responsibility using any manner of entity, regardless of the formal connection between the two alter egos.").

(continued...)

127

Here, the whole purpose of RaPower-3 was to perpetrate a fraud to enable funding of the unsubstantiated, irrational dream of Nelson Johnson.[625] The same is true for the other entities Johnson established and used including IAS, SOLCO I, XSun Energy, Cobblestone, and the LTB entities. He created the solar energy scheme and directed all of these entities' actions to sell it. Johnson owns RaPower-3, SOLCO I, and XSun Energy directly or indirectly and exercises exclusive control over their actions. Johnson commingled funds between his entities and frequently used the entities' bank accounts to pay his personal expenses and his family.[626] The funds were disbursed from the entities' bank accounts either with Johnson's knowledge or at his direction. Johnson was personally enriched from the gross receipts received by IAS ($5,438,089[627]), RaPower-3 ($25,874,066[628]), SOLCO I ($3,434,992[629]) and XSun Energy ($1,126,888[630]) even if he did not go through the process of formally moving money into his own personal account before spending it.

---

[625] *Boilermaker-Blacksmith Nat. Pension Fund v. Gendron*, 96 F. Supp. 2d 1202, 1218 (D. Kan. 2000) ("[P]laintiffs must show that defendants acted with intent to avoid payment to plaintiffs, or that their disregard of corporate formalities caused the companies to be less able to pay plaintiffs or otherwise caused injustice.").

[626] *See S.E.C .v. World Capital Mkt., Inc.*, 864 F.3d 996, 1007 (9th Cir. 2017) ("ongoing possession of the funds is not required for disgorgement"); *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010) ("A person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained."); *S.E.C. v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014) ("Given the close relationship between Monterosso and Vargas, and their collaboration in the fraudulent scheme, we find it was appropriate to hold them jointly and severally liable.").

[627] Pl. Ex. 738; T. 869:1-25; Pl. Ex. 852, at 59; T. 257:7-258:20, 271:9-272:12, 293:1-294:11, 312:5-15; Pl. Ex. 371; Pl. Ex. 507, at 20, 35; T. 1812:4-12.

[628] Pl. Ex. 735; T. 863:18-868:24; *see also* Pl. Exs. 742B, 749.

[629] Pl. Ex. 739; T. 863:18-866:18; 870:3-872:14; Johnson Dep., vol. 1, 82:8-85:2; IAS Dep. 38:10-40:6; 45:4-21; LTB1 Dep. 78:22-79:5; 79:12-80:9;81:12-21; Pl. Exs. 38, 325, 495, 545..

[630] Pl. Ex 740; T. 871:9-872:14; Johnson Dep., vol. 1, 79:8-81:7; 82:8-10; IAS Dep. 47:2-19; Pl. Exs. 208, 355, 356, 510, 743 at 11.

(continued...)

The United States has shown that a reasonable approximation for Shepard's gross receipts from the solar energy scheme was at least $702,001.[631] Any amounts that went through an entity that Shepard owns and operates are attributable to him, personally, for the same reasons that Johnson is personally liable for the gross receipts of his entities.

Disgorgement will be ordered, pursuant to § 7402(a), in these amounts. Defendants will not be allowed any credit of operating expenses to "carry[] on the business that is the source of the profit subject to disgorgement."[632] When a defendant defrauds the claimant, as the United States has shown Defendants have done, such credits are not consistent with principles of equitable disgorgement.[633]

In addition to this direct harm to the Treasury, Defendants' misconduct has caused the government to devote substantial resources to investigating the solar energy scheme, which Defendants promoted widely; investigating Defendants' conduct in particular; examining the tax returns of Defendants' customers; litigating nearly 200 petitions filed by Defendants' customers

---

[631] Pl. Ex. 411 at 16-17; Pl. Ex. 445; T. 1296:14-1301:3, 1596:5-1598:21.

[632] Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(c) & cmt. h; *see also id.* at cmt. i. ("[T]he claimant has the burden of producing evidence from which the court may make at least a reasonable approximation of the defendant's unjust enrichment. If the claimant has done this much, the defendant is then free (there is no need to speak of 'burden shifting') to introduce evidence tending to show that the true extent of unjust enrichment is something less."); *id.* at cmt. k. ("[T]he wrongdoer who is deprived of an illicit gain is ideally left in the position he would have occupied had there been no misconduct.").

[633] Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(c) & cmt. h ("The defendant will not be allowed a credit for the direct expenses of an attempt to defraud the claimant, even if these expenses produce some benefit to the claimant."). *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1114 (9th Cir. 2006) ("[I]t would be unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place."); *SEC v. Veros Farm Holding LLC*, No. 1:15-cv-00659-JMS-MJD, 2018 WL 731955, at *4 (S.D. Ind. Feb. 6, 2018); *SEC v. Art Intellect, Inc.*, No. 2:11-CV-357, 2013 WL 840048 at *23 (D. Utah, Mar. 6, 2013) ("The amount of disgorgement should not include any offset for the operating expenses of [the defendant company, which was run as a Ponzi scheme].") (Campbell, J.); *SEC v. Smart*, No. 2:09cv00224, 2011 WL 2297659 at *21 (D. Utah June 8, 2011) (the purpose of "depriving a wrongdoer of unjust enrichment" would not be served if defendants "who defrauded investors" were allowed a credit against disgorgement of the "expenses associated with this fraud.") (quoting *JT Wallenbrock*, 440 F.3d at 1115)) (Kimball, J.).

(continued...)

in Tax Court; and litigating this case for nearly three years.[634] Further, the government has suffered irreparable harm from Defendants' misconduct, which "undermine[d] public confidence in the administration of the federal tax system and encourage[d] noncompliance with the internal revenue laws."[635]

For these reasons, the United States has shown that it is entitled to the following relief.

## ORDER AND INJUNCTION

**IT IS HEREBY ORDERED** pursuant to 26 U.S.C. §§ 7402 and 7408 that Defendants and their officers, agents, servants and employees, and anyone acting in active concert or participation with them are **HEREBY PERMANENTLY ENJOINED** from directly or indirectly, by use of any means or instrumentalities:

1.    **Solar Energy Business Limited without Disclosures.**  Organizing (or assisting in the organization of), promoting, or selling any entity, plan, or arrangement or participating (directly or indirectly) in the sale of any interest in an entity, plan, or arrangement involving a solar lens and/or any solar energy system or component without the following affirmative disclosure printed on every document; included on every webpage and sub-page that comprises

---

[634] *See United States v. Anderson*, 3:10-510-JFA, 2010 WL 1988100, at *3 (D.S.C. May 5, 2010) ("The United States is also harmed because the IRS is forced to devote substantial resources to identifying whether the taxpayers for whom Anderson filed returns were actually owed refunds and recovering any erroneous refunds that are issued."); *United States v. Casternovia*, 08-426-CL, 2011 WL 4625638, at *7 (D. Or. August 23, 2011) ("Pendell's conduct has resulted in serious harm to the United States, not only in the form of understatements of liability but also the administrative burden on the IRS of auditing, investigating, and collecting taxes from SORCE and ERS customers."); *United States v. Grider*, 3:10-CV-0582-D, 2010 WL 4514623, at *4 (N.D. Tex. November 2, 2010) ("There is a broad public interest in maintaining a sound tax system and defendants' failure to pay employment and other taxes causes harm by divesting funding from other government objectives." (quotations and alteration omitted); *United States v. Ferrand*, 05-0069, 2006 WL 598212, at *5 (W.D. La. February 7, 2006) ("Not to be forgotten is the administrative cost the IRS and, in turn, the general public, will suffer from having to audit each return the Defendants prepared.").

[635] *Anderson*, 2010 WL 1988100, at *3; *accord HedgeLender*, 2011 WL 2686279, at *10 (Promoting an abusive tax shelter that caused millions of lost tax revenue "is a significant harm to society because it promotes noncompliance with federal tax laws and is a great cost to the public."); As the Senate Report regarding the enactment of § 6700 observed, "[t]he widespread marketing and use of tax shelters undermines public confidence in the fairness of the tax system and in the effectiveness of existing enforcement provisions." S. Rep. No. 97- 494, Vol I at 266.

rapower3.com, iaus.com, rapower3.net, the IAUS & RaPower3 Forum, and any other website

controlled by any Defendant and used in relation to marketing lenses; and included in any other

written communication: "THE UNITED STATES DISTRICT COURT FOR THE DISTRICT

OF UTAH in *U.S. v. RaPower-3, LLC., et al.*, Case No., 2:15 cv 828, has determined that the

solar energy technology of RaPower-3 in place from 2005 to 2018 is without scientific validation

or substance and ineligible for tax credits or depreciation by individual purchasers of lenses.";

      2.    **False and Fraudulent Statements Prohibited in Solar Energy Business.**

Making or furnishing, or causing another to make or furnish, in connection with organizing

promoting, or selling any entity, plan, or arrangement involving a solar lens and/or any solar

energy system or component any false and fraudulent statements including, without limitation,

the following:

      a.    That a purchaser of a solar lens is in a "trade or business" of "leasing out" the solar lens, or is in any other "trade or business" with respect to a solar lens;

      b.    That a purchaser of a solar lens may lawfully claim on a federal tax return a depreciation deduction related to a solar lens;

      c.    That a purchaser of a solar lens may lawfully claim on a federal tax return any other business expense deduction related to a solar lens; or

      d.    That a purchaser of a solar lens may lawfully claim on a federal tax return a solar energy credit related to a solar lens.

      3.    **Limitation on Statements Regarding Tax Benefits**. Making or furnishing, or

causing another to make or furnish, in connection with organizing or selling any plan or

arrangement, a statement with respect to the allowability of any deduction or credit or the

securing of any other tax benefit by reason of holding an interest in the entity or participating in

the plan or arrangement which Defendants know or have reason to know is false or fraudulent as

to any material matter;

       4.      **Gross Overvaluation Statements Prohibited – Solar Energy**. Making or

furnishing, or causing another to make or furnish, a statement of the value of a solar lens and/or

any solar energy system or component that exceeds 200 percent of the correct valuation of the

lens, system, and/or component, when the value of the lens, system, and/or component is directly

related to the amount of a federal tax deduction, credit, or other benefit;

       5.      **Gross Overvaluation Statements Prohibited – Property or Service**. Making or

furnishing, or causing another to make or furnish, a statement of the value of any property or

service that exceeds 200 percent of the correct valuation of the property or service, when the

value of the property or service is directly related to the amount of a federal tax deduction, credit,

or other benefit;

       6.      **Recommending Tax Advisors Prohibited.** Recommending a tax return preparer

or other tax professional to any person with whom a Defendant has a financial or contractual

relationship;

       7.      **Prohibition Against Tax Document Activities – Solar Energy.** Preparing or

filing, or assisting or advising in the preparation or filing of, any federal tax return or amended

return, or claim for refund, other related documents or forms (including but not limited to

Internal Revenue Service ("IRS") Form 3800, IRS Form 4368, IRS Form 4562, and IRS

Schedule C), or any other document filed with the IRS, that claims federal tax benefits as a result

of using, purchasing, or otherwise acquiring a solar lens and/or any solar energy system or

component;

8.      **Prohibition Against Tax Document Activities for Others.** Preparing or filing, or assisting or advising in the preparation or filing of, any federal tax return or amended return, or claim for refund, other related document or form (including but not limited to IRS Form 3800, IRS Form 4368, IRS Form 4562, and IRS Schedule C), or any other document filed with the IRS, for any person or entity other than himself or an entity in which he owns an interest;

9.      **Prohibition Against Advocacy to Federal Taxation Authorities.** Making arguments or submitting documents or other materials to the IRS or to the United States Tax Court that claim or support the claim that federal tax benefits are available to a taxpayer as a result of using, purchasing, or otherwise acquiring a solar lens and/or any solar energy system or component; and

## COMPLIANCE VERIFICATIONS

**IT IS FURTHER ORDERED THAT** in aid of this order, the following compliance verifications must be made. Wherever possible, these materials must be delivered in native format (electronic, machine readable, searchable) with cover explanatory information disclosing any proprietary programs needed to read the data**:**

10.      **Identification of Entities.** Each Defendant must deliver to counsel for the United States, no later than 28 days from the date this Injunction is entered, a list identifying any entity in which they own an interest, either directly or indirectly through another entity, or through which they sold a solar lens and/or any solar energy system or component. The list must include the name of any other person or entity who owns an interest in an identified entity (with the address, telephone number, taxpayer identification number, and email address of that person or entity); the identified entity's taxpayer or employer identification number; and the registered agent for the identified entity, including the registered agent's address and telephone number.

Each Defendant must also file with the Court, no later than 28 days from the date this Injunction is entered, a certification signed under penalty of perjury that they complied with this paragraph and that the information provided to counsel for the United States under this paragraph is true and correct.

11.     **Identification of Purchasers.** Each Defendant must deliver to counsel for the United States, no later than 56 days from the date this Injunction is entered, a list of all persons or entities who, on or since January 1, 2005, have purchased any solar lens and/or any solar energy system or component, including each person's or entity's mailing address, e-mail address, telephone number, and taxpayer identification number. Each Defendant must also file with the Court, no later than 56 days from the date this Injunction is entered, a certification signed under penalty of perjury that they complied with this paragraph and that the information provided to counsel for the United States under this paragraph is true and correct.

12.     **Identification of Sellers, Marketers, MLM Participants.** Each Defendant must deliver to counsel for the United States, no later than 56 days from the date this Injunction is entered, a list of all persons or entities who have sold a solar lens and/or any solar energy system or component on behalf of a Defendant, including each person's or entity's mailing address, e-mail address, telephone number, taxpayer identification number, item sold, and quantity sold. Each Defendant must also file with the Court, no later than 56 days from the date this Injunction is entered, a certification signed under penalty of perjury that they complied with this paragraph and that the information provided to counsel for the United States under this paragraph is true and correct.

13.     **Identification of Tax Preparers.** Each Defendant must to deliver to counsel for the United States, no later than 56 days from the date this Injunction is entered, a list of all

persons or entities to whom they referred customers for the preparation of federal tax returns related to a solar lens and/or any solar energy system or component, including each tax preparer's or entity's mailing address, e-mail address, and telephone number. Each Defendant must also file with the Court, no later than 56 days from the date this Injunction is entered, a certification signed under penalty of perjury that they complied with this paragraph and that the information provided to counsel for the United States under this paragraph is true and correct.

14.     **Distribution of Complaint and Injunction.** Each Defendant must, no later than 56 days from the date this Injunction is entered and at their own expense, (a) contact by first-class mail (and also by e-mail, if an address is known) all persons or entities who have purchased any solar lens and/or any solar energy system or component, since 2005 stating that (1) a copy of the United States' complaint, and (2) a copy of this signed document is available for download at a specified web site; and (b) email a copy of those documents to every purchaser for whom an email address is available. There must not be any other document enclosed with the email. Each Defendant must file with the Court, no later than 56 days from the date this Injunction is entered, a certification signed under penalty of perjury that they complied with this paragraph; a copy of the standard letter and email sent; a listing of the persons who received a letter and those who also received an email; that the mailing and emailing complied with this paragraph; and attaching any agreements between Defendants as permitted in this paragraph. A Defendant may, in a signed writing, agree with a Defendant who has entirely completed a timely and compliant distribution , that the distribution was made in behalf of the Defendant making the agreement provided that the letter and email so state, and provide email, phone and mail contact information for each Defendant on whose behalf the mailing and emailing was made. Such Defendants are jointly and severally responsible for deficiencies in the mailing and emailing.

15.    **Warning; Removal of Tax Information from Websites.** Each Defendant, their officers, agents, employees, servants and persons acting in active concert or participation with them must, no later than 28 days from the date this Injunction is entered, remove all tax related content from www.rapower3.com and www.rapower3.net and www.iaus.com and the IAUS & RaPower3 Forum and any other site controlled by any Defendant. At the top of each page of each such web site the following notice must appear, which must include a link to this document which must be posted on that website:

> THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH in *U.S. v. RaPower-3, LLC.*, et al., Case No., 2:15 cv 828, has determined that the solar energy technology of RaPower-3 in place from 2005 to 2018 is without scientific validation or substance and ineligible for tax credits or depreciation by individual purchasers of lenses. The tax information provided by Neldon Johnson, RaPower-3, International Automated Systems (IAUS), XSun Solar, SOLCO I LLC, Greg Shepard, and others associated with them is misleading. Tax information related to solar energy systems or components must not appear on this site until further order of the court.

This notice must appear at in text that is at least as large as the largest text on the rest of the page, and in a color that distinguishes it from any background color and other text color on the page. Each Defendant must also file with the Court, no later than 28 days from the date this Injunction is entered, a certification signed under penalty of perjury that they complied with this paragraph.

16.    **Removal of Other Tax Related Information.** Each Defendant must, no later than 28 days from the date this Injunction is entered, remove all tax related content regarding Defendants' purported solar energy technology system from any website and/or social media account he owns or maintains, or is owned or maintained on his behalf. Each Defendant must also file with the Court, no later than 28 days from the date this Injunction is entered, a certification signed under penalty of perjury that they complied with this paragraph.

17.    **Reporting Customer Information to IRS and Notice to Customers.** For the duration of the time between the date of this Injunction and ten years from the date of this

Injunction, no later than January 15 each year, Defendants must report to the IRS the following information about their customers for any solar lens or other product relating to solar energy technology: name; taxpayer identification number; address; phone number; product purchased; quantity of product purchased; date of purchase; total sales price; amount actually paid; date(s) of payment; and Defendants' account in which payment was deposited. Defendants must report this information to the IRS through its designee, Revenue Agent Kevin Matteson, at Internal Revenue Service, 178 S. Rio Grande, M/S 4218, Salt Lake City, UT, 84101. Defendants must notify customers, at the time this information is collected: "This information will be provided to the IRS. You may be subject to audit, interest on any unpaid taxes, and penalties if you claim tax benefits connected with your purchase."

18. **Notice of Future Entities**. For the duration of the time between the date of this Injunction and ten years from the date of this Injunction, each Defendant must advise the IRS through its designee, Revenue Agent Kevin Matteson, of any entity formed by him or it or at his or its direction after the entry of this Injunction, no later than 28 days from the date of the entity's formation. Notice to the IRS must be sent to Revenue Agent Matteson at Internal Revenue Service, 178 S. Rio Grande, M/S 4218, Salt Lake City, UT, 84101 (or any other designee the IRS appoints), and must include: 1) copies of the documents as filed with the appropriate authorities to form the entity (e.g., Articles of Incorporation); 2) the entity's taxpayer identification number and/or employer identification number; 3) the location and identifying number for all of the entity's bank accounts (whether domestic or foreign). Each Defendant must advise all principals of any such entity of these requirements.

19. **Misrepresentations Prohibited.** Each Defendant must not make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that misrepresent any of the terms of this Injunction.

20. **Persons Bound.** Pursuant to Fed. R. Civ. P. 65(d)(2), this Injunction binds the following who receive actual notice of it by personal service or otherwise:

      a.      each Defendant, Neldon Johnson, International Automated Systems, Inc., RaPower-3, LLC, LTB1, LLC, and R. Gregory Shepard;

      b.      each Defendant's officers, agents, servants, employees, and attorneys; and

      c.      other persons or entities who are in active concert or participation with anyone identified in paragraphs (a) or (b) above.

21. **Discovery Permitted.** The United States may propound post-judgment discovery to monitor compliance with this Injunction.

22. **Costs and Expenses.** The United States is awarded its costs and expenses incurred in this suit with respect to its claims against Defendants. The United States may file a Bill of Costs pursuant to 28 U.S.C. § 1920 and the Local Rules of the District of Utah, which shall be subject to objection as the statute and rules provide.

23. **Jurisdiction Retained.** This Court will retain jurisdiction over this action for purpose of implementing and enforcing this Injunction and issuing any additional orders necessary or appropriate for the enforcement of the internal revenue laws.

**IT IS FURTHER ORDERED THAT:**

24.      **Equitable Disgorgement.** Judgment shall be entered in favor of the United States and against Neldon Johnson, International Automated Systems, Inc., RaPower-3, LLC, and R. Gregory Shepard, jointly and severally, in the amount of $50,025,480 as equitable monetary relief, up to and including the amount of gross receipts each received from the solar energy scheme as follows:

        a.      Neldon Johnson: $50,025,480 ;

        b.      International Automated Systems, Inc.: $5,438,089;

        c.      RaPower-3, LLC: $25,874,066; and

        d.      R. Gregory Shepard: $702,001.

Signed October 4, 2018.

BY THE COURT:

David Nuffer
United States District Judge