UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAPOWER-3, LLC; INTERNATIONAL AUTOMATED SYSTEMS, INC.; LTB1, LLC; R. GREGORY SHEPARD; NELDON JOHNSON; and ROGER FREEBORN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO INTERVENE (DOC. NO. 1143)**<br><br>Case No. 2:15-cv-00828-DN-DAO<br><br>Judge David Nuffer<br><br>Magistrate Judge Daphne A. Oberg |

Preston and Elizabeth Olsen, and other similarly situated taxpayers (all of whom were represented by Paul Jones before the United States Tax Court) (collectively, the "Prospective Intervenors"), move for leave to intervene. (*See* Mot. to Intervene ("Mot.") 1, Doc. No. 1143.) Prospective Intervenors were customers of the defendants who purchased purported solar energy technology in what ultimately amounted to an abusive tax scheme. They seek to intervene in this case, arguing the United States will otherwise receive a double recovery, to their detriment.

Specifically, Prospective Intervenors argue a recent tax court decision requires them to pay the same amounts to the Internal Revenue Service ("IRS") which were previously withheld through deductions and tax credits on the purported solar lenses. Because Prospective Intervenors paid money to the defendants to obtain these improper tax credits—and the defendants have been ordered to pay over the same amount to the United States—Prospective Intervenors assert their payment of the tax assessment will lead to a double recovery for the United States and, as to them, a double tax. They do not dispute the amount owed. Instead, they

1

contend the amount received by the United States as second-priority claimant, pursuant to this court's receivership order, should be credited to their tax liability.

The undersigned held a hearing on the motion to intervene on November 15, 2021 and permitted the parties to submit supplemental briefing regarding whether Prospective Intervenors must (and can), establish independent jurisdiction for permissive intervention. (Min. Entry, Doc. No. 1176.) As addressed in more detail below, the motion is denied.[1] Where Prospective Intervenors have failed to establish their injury will likely be redressed by a favorable decision, they lack standing to intervene of right. For the same reason, Prospective Intervenors lack standing for permissive intervention. Moreover, this court lacks subject matter jurisdiction over their claim, barring permissive intervention.

## BACKGROUND

The United States brought this case against Defendants Neldon Johnson, RaPower-3, LLC, International Automated Systems, Inc., LTB1, LLC, R. Gregory Shepard, and Roger Freeborn ("Defendants"), seeking to enjoin them from continuing an abusive tax scheme. (Compl., Doc. No. 2.) After a twelve-day trial, the court issued a judgment in favor of the United States. *See United States v. RaPower-3, LLC*, 343 F. Supp. 3d 1115 (D. Utah 2018), *aff'd*, 960 F.3d 1240 (10th Cir. 2020). The court found Defendants promoted an abusive tax

---

[1] Although motions to intervene are not expressly excepted from a magistrate judge's authority in 28 U.S.C. § 636(b)(1)(A), "[a]n order denying intervention is final and subject to immediate review if it prevents the applicant from becoming a party to an action." *Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 839 (10th Cir. 1996). This denial of Prospective Intervenors' motion does not have any dispositive effect on the existing parties or claims. However, because such an order is dispositive of Prospective Intervenors' right to join the action, if any litigant objects, the district judge may decide to construe this order under the standards of a Report and Recommendation, which provides for de novo review. *See Auto-Owners Ins. Co. v. Clayton*, No. 2:21-cv-92, 2021 U.S. Dist. LEXIS 199201, at *10 n. 2 (D. Utah Oct. 13, 2021) (unpublished) (citing 28 U.S.C. § 636(b)(1)(B)).

2

scheme for more than ten years, which centered on selling customers "purported solar energy technology featuring 'solar lenses.'" *Id.* at 1123. However, these solar lenses "were only the cover story for what Defendants were actually selling: unlawful tax deductions and credits." *Id.*

Specifically, Mr. Johnson claimed to have invented solar energy technology utilizing solar thermal lenses which were placed in arrays on towers. *Id.* at 1123–24. But the court found the system never produced any energy, and never proceeded past the research and development stage. *Id.* at 1126, 1153, 1176. In fact, the court concluded that even if Mr. Johnson had constructed all the necessary towers and equipment, they "would not [have] work[ed] as Defendants claim" because the purported technology would "never be[] a commercial-grade dish solar system converting sunlight into electrical power or other useful energy." *Id.* at 1177. Defendants conceded they never sold, or had a contract to sell, energy generated from using the solar lenses to an outside purchaser. *Id.* at 1156–57, 1178.

Despite this, Mr. Johnson sold the solar lenses to customers. *Id.* at 1126. Even though the system did not produce energy, or income to customers, Defendants told customers "they could claim a tax deduction for depreciation on the lens and the solar energy tax credit on their individual income tax returns if they purchased a lens." *Id.* at 1171, 1176. But Defendants knew or had reason to know these statements were false or fraudulent. *Id.*

Starting in 2010, Defendants required a customer to pay $1,050 on a lens with a purchase price of $3,500. *Id.* at 1180–82; *see also id.* at 1138. But only $105 of the $1,050 down payment was due in the year the customer bought the lens. *Id.* at 1181. This strategy permitted the customer to claim tax benefits based on the $3,500 purchase price, while only paying $105. *Id.* at 1179. The remaining $945 of the down payment was due the following year, "only *after* a customer ha[d] claimed depreciation and the solar energy tax credit for the year of purchase.

3

The customer ha[d] the cash-in-hand to pay RaPower-3 because he 'zero[ed] out' his taxes." *Id.* at 1181. That is, the amount of the down payment was "identical to the amount Defendants t[old] customers they [could] claim as a solar energy tax credit." *Id.* at 1182. "In this way, a customer never ha[d] to spend 'his own money' to buy a lens," as the United States Treasury effectively paid for it. *Id.* Stated another way, "[i]nstead of paying the United States Treasury his rightful tax liability, the customer pa[id] RaPower-3 for 'buying lenses.'" *Id.* at 1181–82.

In selling this solar energy scheme to customers, Defendants noted "the goal of buying solar lenses was to eliminate a customer's tax liability." *Id.* at 1181. Defendants advised customers "to calculate the number of lenses to buy based on their anticipated tax liability," because if they bought enough lenses, "the amount of their depreciation deduction would 'get [their adjusted gross income] low enough for zero taxes.'" *Id.* If the depreciation was not sufficient to meet this goal, Defendants told customers to "claim solar energy tax credits 'if needed' to reach the goal of 'zero' taxable income." *Id.* Thus, Mr. Johnson attempted "to generate tax benefits" for customers "before his purposed solar energy equipment ever produced energy." *Id.* at 1164.

The court found this caused extensive harm to the United States Treasury. *Id.* at 1193. The United States established "its direct financial harm due to the deductions and credits claimed on a subset of Defendants' customers' tax returns for tax years 2013–2016 is at least $14,207,517." [2] *Id.* at 1193. This total did not include an undetermined amount from "tax years 2008 (or prior) through 2012, although Defendants' customers bought lenses and claimed purportedly related tax benefits during those years." *Id.* Nor did it include returns "for tax year

---

[2] *See also id.* at 1169 ("A reasonable approximation of the harm to the Treasury, from depreciation and tax credits claimed, from this sample is at least $14,207,517.").

2017, although Defendants sold lenses in 2017 and it [was] reasonable to conclude that the people who 'bought' lenses in 2017 claimed the tax benefits Defendants' promoted for tax year 2017." *Id.* Lastly, it did not include any totals from the tax returns of customers who claimed these tax benefits but have not yet been audited by the IRS. *Id.* The court found the Defendants' conduct warranted disgorgement of Defendants' gross receipts in the amount of $50,025,480. *Id.* at 1193–95.

To effectuate the judgment, the court granted the United States' motion for injunctive relief and issued an order freezing Defendants' assets and authorizing appointment of a receiver. (Mem. Dec. and Order Freezing Assets and to Appoint a Receiver ("Asset Freeze Order"), Doc. No. 444.) In connection with the Asset Freeze Order, the court issued a Corrected Receivership Order, ("CRO," Doc. No. 491). The CRO establishes, among other things, the priority in which the receiver shall distribute proceeds from the liquidation of the receivership estate. (CRO ¶ 89, Doc. No. 491.) All payments must be made in full at each priority level before moving to the next priority level. (*Id.*)

The United States Department of Justice has first priority—to recover its costs. (*Id.*) In second priority, the United States is to be paid $14,207,517. (*Id.*) Some of Defendants' customers fall into the third-priority group. To fit into this category, customers must establish they have resolved all issues with the IRS regarding tax deductions or credits relating to the solar lenses. (*Id.*) Customers who do not have tax assessments relating to the solar lenses or who were not required to pay back taxes due to related deductions or credits do not qualify as third-priority claimants. (*Id.*) The United States is, again, in fourth priority—to be paid any remaining assets or funds, until the total payments made to the first, second, third, and fourth priority claimants reaches $50,025,480. (*Id.*) As a fifth priority, the receiver is authorized to solicit

claims from "other persons who may be owed money" by the receivership defendants,[3] including customers who do not qualify as third-priority claimants. (*Id.*) Lastly, to the extent any funds remain, they revert to the receivership defendants. (*Id.*) The receiver represented that as of September 2021, the receiver distributed $8,500,000 to the United States per the second-priority claims. (Receiver's Resp. to Olsen Mot. to Intervene ("Receiver Opp'n"), 5 n.11, Doc. No. 1153.) Assessing available funds, the receiver did not expect to be able to satisfy the full $14,207,517 owing to the United States as second-priority claimant. (*Id.*)

Separately from the federal case, the IRS audited the tax returns of many of Defendants' customers, disallowing the deductions and tax credits claimed for the solar lenses. (Mot. 5, Doc. No. 1143.) Some of the audited customers appealed the IRS' decision, and the tax court heard a test case (the Olsen's case) to aid in resolving approximately 200 similar cases. (*Id.*) On April 6, 2021, the tax court upheld the IRS' decision to disallow depreciation deductions and energy tax credits related to the solar lenses. (*Id.*)

Prospective Intervenors argue that, due to this tax court decision, the United States will be unjustly enriched to the detriment of Prospective Intervenors. The United States will, in theory, receive approximately fourteen million dollars as second-priority claimant in this case, due to the harm it suffered as a result of the improper energy deductions and credits. (*Id.* at 3, 5.) And now, because of the tax court decision, the United States will also receive that amount from Prospective Intervenors for the same deductions and tax credits claimed. (*Id.* at 5.) Prospective Intervenors argue this constitutes double taxation because the fourteen million dollars the United States will receive for the second priority claims reflects the same money Prospective

---

[3] Defendants RaPower-3, LLC; Neldon Johnson; International Automated Systems Inc.; LTB1 LLC; and R. Gregory Shepard. (*Id.* ¶ 2.)

Intervenors paid to Defendants; thus, by paying their tax liability, they will effectively be paying the United States twice.[4] (*Id.*) Accordingly, Prospective Intervenors seek to intervene in this action for purposes of obtaining a declaratory judgment or equitable relief against the United States, requiring it "to allocate payments made by the [r]eceiver to the [Treasury] . . . among the Intervenors' tax liabilities as deposits on their income tax accounts in order to ensure the Treasury is not unjustly enriched at the expense of Intervenors." (*Id.* at 2.)

## LEGAL STANDARDS

A party may intervene of right or permissively. Fed. R. Civ. P. 24. Rule 24(a) of the Federal Rules of Civil Procedure governs intervention of right and states:

> On a timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

Rule 24(b) governs permissive intervention and provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The Tenth Circuit "has historically taken a 'liberal' approach to intervention." *W. Energy All. v. Zinke*, 877 F.3d 1157, 1164 (10th Cir. 2017).

## ANALYSIS

As a threshold matter, Prospective Intervenors must establish they have standing to

---

[4] Both the United States and Prospective Intervenors argue the other will end up with a windfall if the court rules against them. The United States asserts Prospective Intervenors are seeking to avoid paying taxes due and owing, and Prospective Intervenors assert they have already paid the money to Defendants who have been ordered to pay it to the United States, leading to unjust enrichment.

intervene.  "[A]n intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests."  *Town of Chester v. Laroe Estates, Inc.*, ___ U.S. ___, 137 S. Ct. 1645, 1651 (2017).  Article III standing requires a litigant to show "(1) that he has suffered an injury in fact; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely that the injury will be redressed by a favorable decision."  *Am. Humanist Ass'n v. Douglas Cnty. Sch. Dist. Re-1*, 859 F.3d 1243, 1250 (10th Cir. 2017) (internal quotation marks omitted).  Because Prospective Intervenors failed to show it is likely their injury will be redressed by a favorable decision, they lack standing to intervene of right.

Neither the parties nor Prospective Intervenors addressed standing as it relates to permissive intervention, but the court must.  *See Colo. Springs v. Climax Molybdenum Co.*, 587 F.3d 1071, 1078–79 (10th Cir. 2009) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.").  Legal authority supports the idea that those asking leave to permissively intervene must establish Article III standing when they seek relief different from any party.  For instance, in *Town of Chester*, the Supreme Court noted that "[f]or all relief sought, there must be a litigant with standing."  ___ U.S.___, 137 S. Ct. at 1651.  This principle applies "whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right."  *Id.*; *see also Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) ("[A]ny person invoking the power of a federal court must demonstrate standing to do so.").

Relying on *Town of Chester*, the Eastern District of New York recently concluded that a permissive intervenor who sought "different relief must demonstrate independent standing." *Cross Sound Cable Co., LLC v. Long Island Lighting Co.*, No. 21-cv-2771, 2022 U.S. Dist.

LEXIS 15084, at *23–24 (E.D.N.Y. Jan. 27, 2022) (unpublished); *see also Cirba Inc. v. VMware, Inc.*, No. 19-742-LPS, 2020 U.S. Dist. LEXIS 239744, at *9–10 (D. Del. Dec. 21, 2020) (unpublished) (finding "permissive intervention (without independent Article III standing) would not be appropriate" when intervention would broaden relief sought); *United States v. Bayer CropScience LP*, No. 2:15-cv-13331, 2018 U.S. Dist. LEXIS 123239, at *26–27 (S.D. W. Va. July 24, 2018) (unpublished) ("In view of . . . *Town of Chester*, this court is confident that the same [standing] principle extends to a permissive intervenor."). Courts within the Tenth Circuit have also required permissive intervenors to establish standing. *See, e.g.*, *Parson v. Farley*, 352 F. Supp. 3d 1141, 1148 (N.D. Okla. 2018) ("[T]he [c]ourt inquires as to whether [prospective intervenor] can demonstrate standing to intervene, in addition to satisfying Rule 24(b)'s requirement."). Accordingly, Prospective Intervenors must also establish Article III standing to intervene permissively.

I. <u>Injury in Fact</u>

There is no doubt Prospective Intervenors have been injured by Defendants generally. Based on Defendants' false and fraudulent statements, Prospective Intervenors purchased solar lenses which ended up being worthless. But the injuries Prospective Intervenors claim here relate to the litigation itself. They complain: (1) the lenses they purchased are now controlled by the receiver, and (2) they are being double-taxed because they were ordered to pay the IRS taxes owing even though the receiver will pay the IRS essentially the same amount for the same harm.[5] (Mot. 8, Doc. No. 1143.)

At the hearing, Prospective Intervenors further outlined their injuries. They argued that if

---

[5] Prospective Intervenors do not explain how these two injuries differ in light of the court's ruling that all "gross receipts from the solar energy scheme came from money that rightfully belonged to the U.S. Treasury." *RaPower-3, LLC*, 343 F. Supp. 3d at 1195. They explain they

the money they paid Defendants for the purported solar lenses ends up in the hands of the United States (as second-priority claimant), they will essentially have paid the United States once. When they pay taxes owed due to the improper deductions and credits, pursuant to the IRS audit and tax court decision, they will pay those same amounts again. As a result, the United States would potentially receive twenty-eight million dollars (fourteen from the receiver and fourteen from the taxpayers) to satisfy the approximately fourteen million dollars in damages. Prospective Intervenors argue a declaratory judgment would prevent this double tax while ensuring the United States still receives the fourteen million dollars to which it is entitled under the CRO.

The United States argues Prospective Intervenors are simply faced with "the direct consequences of [their] choice to shelter [their] taxable wage income by claiming artificial losses."[6] (United States' Br. in Opp'n to the Mot. to Intervene ("U.S. Opp'n") 4, Doc. No. 1152.) The United States contends Prospective Intervenors' claim of injury stems from a misunderstanding of the court's ruling and the harm caused. (*Id.* at 5–6.) Prospective Intervenors argue the entirety of the harm to the U.S. Treasury that the United States proved from deductions and tax credits amounted to approximately fourteen million dollars. (Reply to Resps. to Intervenors Mot. to Intervene ("Reply") 5, Doc. No. 1165.) The United States, on the other hand, argues this amount reflects a sample or snapshot of the harm. The much greater total

---

are not seeking to receive any funds, but are instead "seeking to ensure that the funds turned over are actually applied to the injury that United States represented to this [c]ourt to have incurred"—the depreciation deductions and energy credits. (Reply to Resps. to Intervenors Mot. to Intervene 4, Doc. No. 1165.) In this sense, Prospective Intervenors appear to concede the money spent to purchase the lenses and the taxes owing represent the same funds.

[6] The receiver concedes Prospective Intervenors established an injury as to the amounts they paid to purchase the lenses but argues the CRO provides the avenue for their recovery. (Receiver Opp'n 3, Doc. No. 1153.)

harm is reflected in the sum of approximately fifty million dollars which the court ordered Defendants to disgorge. (U.S. Opp'n 5–6, Doc. No. 1152.) The United States highlights the court's finding that Defendants' gross receipts of approximately fifty million dollars "came from money that rightfully belonged to the U.S. Treasury." (*Id.* at 5.)

Neither party's position is exactly on point. The United States is correct that the court found the fourteen million dollars was a snapshot of the harm to the U.S. Treasury, and it did not include several years of tax returns. *RaPower-3, LLC*, 343 F. Supp. 3d at 1193. The court also ordered the disgorgement of Defendants' fifty million dollars in gross receipts, noting it "came from money that rightfully belonged to the U.S. Treasury." *Id.* at 1195. However, the CRO does not award the entire fifty-million-dollar disgorgement to the United States. (CRO ¶ 89, Doc. No. 491.) The United States is to receive approximately fourteen million dollars as the second-priority claimant. Then, as the fourth-priority claimant, it receives the remainder of funds "until the total payments made to the first, second, third, and fourth priority claimants reaches [approximately fifty million]." (*Id.*) To the extent the United States believes it is entitled to funds for damages not fully assessed, or which fall outside the relevant statute of limitations, (*see* U.S. Opp'n 5–6, Doc. No. 1152), these remainder funds are its only recourse against Defendants. The third-priority group includes customers, such as Prospective Intervenors. (*Id.*) In other words, under the CRO, the United States is not entitled to the full fifty-million-dollar disgorgement.

Prospective Intervenors' argument about the overlap between their tax liability and the money owed to the United States pursuant to the CRO reflects an oversimplification. The tax liability pursuant to the tax court's order and the fourteen million dollars owed to the United States as a second-priority claimant are not entirely duplicative because the tax court's findings

pertain to a number of different years than those accounted for in CRO's snapshot of damages.[7] In addition, the damages relate to a broader base of customers; Prospective Intervenors account for only a portion of the third-priority claimants (customers who have had their taxes audited by the IRS, who owe money for the impermissible deductions and tax credits, and who are represented by Paul Jones).[8] (Nov. 15, 2021 Hr'g at 6:25–6:30.) Even assuming this overlap is sufficient for Prospective Intervenors to establish an injury in fact, they fail to establish standing when considering the factors below.

II.    <u>Fairly Traceable to Challenged Action of Defendants</u>

Possibly because the United States and the receiver both dispute the double taxation injury, neither party addressed whether any such injury is fairly traceable to the conduct of Defendants. The injury claimed may be remotely traceable to Defendants' conduct in the sense that if Defendants had never promoted the abusive tax scheme, their customers would not now be facing unfavorable tax court findings. But the injury complained of is more directly traceable to the finding of the tax court regarding Prospective Intervenors' taxes owing—and its interplay with the receivership order in this case. In a very real sense, the injury Prospective Intervenors complain of, and seek relief for, are disconnected from Defendants' actions. Instead, both the injury and the relief sought are tied to the rulings of this court and the tax court. Accordingly, it is not clear Prospective Intervenors have established their alleged injury is fairly traceable to Defendants' actions. However, even assuming it is, their injury is not likely redressed by a

---

[7] For example, the Olsen's tax court order covers 2010 to 2014, (Ex. D to Mot., Doc. No. 1143-4), and the snapshot covers tax returns for 2013 to 2016, *RaPower-3, LLC*, 343 F. Supp. 3d at 1193.

[8] Prospective Intervenors conceded at the hearing that some apportionment may be necessary.

favorable decision.

    III.    <u>Likelihood the Injury will be Redressed by a Favorable Decision</u>

Prospective Intervenors' weakest argument regarding standing is that their injury will likely be redressed by a favorable decision. The relief Prospective Intervenors claim will redress their injury, is "an order that the distributions from the [r]eceiver to the Treasury are to be allocated to the Intervenors' income tax accounts at [the] IRS as deposits to apply against assessments made against them related to this case and/or their Tax Court case." (Mot. 14, Doc. No. 1143.) Because the requested relief is prohibited by the Declaratory Judgment Act and the Anti-Injunction Act, Prospective Intervenors' injury is not likely to be redressed by a favorable decision.

The Declaratory Judgment Act permits a court "[i]n a case of actual controversy within its jurisdiction . . . [to] declare the rights and other legal relations of any interested party seeking such declaration" "except with respect to Federal taxes." 28 U.S.C. § 2201(a). The Anti-Injunction Act provides (with exceptions inapplicable here) that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). As outlined below, the District of Wyoming analyzed both acts in some depth, and the Tenth Circuit adopted the district court's analysis and ordered that the opinion be published. *See Wyo. Trucking Ass'n, Inc. v. Bentsen*, No. 94-cv-0107, 1995 U.S. Dist. LEXIS 2357 (D. Wyo. Feb. 7, 1995) (unpublished), *aff'd and analysis adopted*, 82 F.3d 930 (10th Cir. 1996).

As the District of Wyoming noted "[t]he reach of these two statutes is coextensive, with the Declaratory Judgment Act 'reaffirming the restrictions set out in the Anti–Injunction Act.'"

13

*Id.* at *5 (quoting *Bob Jones Univ. v. Simon,* 416 U.S. 725, 733 n.7 (1974)). The Declaratory Judgment Act "is at least as broad as the Anti–Injunction Act," and the same reasoning applies to both. *Id.* (internal quotation marks omitted). The "principal purpose of the Anti–Injunction Act is to permit the government to assess and collect taxes expeditiously without judicial intervention, and to require that the legal right to taxes withheld be determined in a suit for a refund." *Id.* at *5–6. Taxpayers' rights to file a claim for a refund with the IRS and to commence a suit for a refund constrains the government's ability to assess taxes "*carte blanche*." *Id.* at *6; *see also* 26 U.S.C. § 7422. Additionally, there is a "two-tiered exception" to the Anti-Injunction Act known as the *Williams Packing* test. *Bentsen*, 1995 U.S. Dist. LEXIS 2357, at *6–7 (citing *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1 (1961)). "The *Williams Packing* test allows an injunction of a tax where (1) it is clear that under no circumstances could the government ultimately prevail, and (2), equity jurisdiction would otherwise exist." *Id.*; *see also Bob Jones Univ.*, 416 U.S. at 737 (holding injunction can only issue upon proof of "irreparable injury" and "certainty of success on the merits"); *Wade v. Reg'l Dir.*, 504 F. App'x 748, 752 (10th Cir. 2012) (unpublished) (noting it must be "clear that *under no circumstances* could the Government ultimately prevail").

Prospective Intervenors claim neither the Declaratory Judgment Act nor the Anti-Injunction Act bars their claim because they do not seek to restrain the assessment or collection of taxes. They concede they owe the taxes assessed and do not seek a ruling altering their tax liability. (Reply 8–9, Doc. No. 1165.) Instead, they seek a declaratory order requiring the United States to apply funds received as a second-priority claimant to their tax liabilities. (*Id.* at 9.) The United States contends this would have the effect of moving Prospective Intervenors up on the priority list (to the detriment of others on the list, including those customers/taxpayers not

included in the group of Prospective Intervenors), giving them second priority—and would turn the CRO on its head. (U.S. Opp'n 10–11, Doc. No. 1152.) The United States also argues that ordering the United States to apply money to an individual tax liability would amount to improper judicial interference in the collection of taxes. (*Id.* at 8.)

In *Schon v. United States*, 759 F.2d 614 (7th Cir. 1985), the Seventh Circuit concluded the district court lacked jurisdiction to order funds paid by taxpayers, as representatives of a company, to be allocated to trust fund taxes owed by the company. Specifically, a co-assignee (of an assignment the company entered for the benefit of creditors) sent a check to the IRS without specifying whether the check applied to trust fund or non-trust-fund taxes owed by the company. *Id.* at 616. Although a company lawyer later asked that the money be applied to trust fund taxes, the IRS applied it to non-trust-fund taxes, leaving the company with an unpaid liability. *Id.* The district court granted summary judgment against the company on the grounds that the funds had not been properly designated to trust fund taxes. *Id.* On appeal, the United States argued the company essentially sought a declaratory judgment that the IRS should have applied the money to trust fund taxes. *Id.* at 617. The Seventh Circuit agreed that the action really asked for a declaratory judgment regarding federal taxes. *Id.* at 618. Ultimately, the circuit court vacated the judgment and remanded the case back to the district court with instructions to dismiss the case for lack of jurisdiction. *Id.*

Similar to *Schon*, Prospective Intervenors intend to ask the court to allocate money to specific tax liabilities of particular people. The allocation sought would violate the Anti-Injunction Act and Declaratory Judgment Act because it would restrain the collection of taxes from Prospective Intervenors and relieve them of their tax obligations. Prospective Intervenors' requested "application of tax payments," (*see* Reply 9, Doc. No. 1165), would also interject the

judiciary into the tax assessment and collection process, declaring the rights of parties with respect to federal taxes in violation of the Declaratory Judgment Act.  The problems inherent in Prospective Intervenor's request for judicial intervention are manifold.  Some of the problems are illustrated by the facts that (1) the tax court assessed tax liabilities for a different timeframe than that used to calculate the fourteen million dollars in damages; (2) Prospective Intervenors do not represent the interests of all similarly situated customers/taxpayers because the group consists only of taxpayers represented by Paul Jones; and (3) the United States has not yet recovered the full fourteen million dollars (and may never do so).

The cases cited by Prospective Intervenors do not change this analysis.  In *Sorenson v. Secretary of the Treasury*, 752 F.2d 1433 (9th Cir. 1985), the court concluded the suit was a "tax refund suit," noting the taxes had been both assessed and collected.  *Id.* at 1438.  There is no way to reasonably characterize the case at hand as a tax refund suit, where Prospective Intervenors have yet to pay the taxes assessed by the tax court.  In *Caine v. United States*, No. 91-C-0286-S, 1992 U.S. Dist. LEXIS 15412 (D. Utah Sep. 4, 1992) (unpublished), the plaintiff sought to clear a property he bought at a trustee's sale of a federal tax lien previously imposed on the property. *Id.* at *3.  The court concluded a third-party suit to quiet title was not barred by the Declaratory Judgment Act or the Anti-Injunction Act.  *Id.* at *9–10.  No similarities exist between *Caine* and the instant case.  Finally, *East Kentucky Welfare Rights Organization v. Simon*, 506 F.2d 1278 (D.C. Cir. 1974), *vacated*, 426 U.S. 26 (1976), provides no help to Prospective Intervenors.  Not only was the case later vacated, the facts differ greatly.  In the underlying case upon which Prospective Intervenors rely, the D.C. Circuit found "merit in the claim that there [was] no other adequate legal remedy." *Id.* at 1284.  But even more critical was the fact that the plaintiffs sought to force the government to impose a tax on contributions to certain hospitals, rather than

to negate the levy of a tax.  *Id.*  The case at hand does not involve any of these issues.

Finally, Prospective Intervenors have not established this case qualifies as an exception to the Anti-Injunction Act under the *Williams Packing* test.  First, it is far from certain that Prospective Intervenors would prevail, and the test requires certainty of success on the merits.  *See Bob Jones Univ.*, 416 U.S. at 737.  Indeed, Prospective Intervenors have not even argued there are no circumstances under which the government could prevail.  Second, Prospective Intervenors have failed to show irreparable injury.  An "inadequacy of available remedies" constitutes an irreparable injury.  *See United States v. Am. Friends Serv. Comm.*, 419 U.S. 7, 11 (1974).

At the hearing, Prospective Intervenors argued it is because they have no alternative remedy that they seek to intervene.  But the United States asserts there are two alternative remedies.  First, as provided for in the CRO, any customer who has fully paid her tax obligations resulting from the scheme can apply for payment from the receivership, if it appears the receiver will collect more than fourteen million dollars. (U.S. Opp'n 8–9, Doc. No. 1152 (citing CRO ¶ 89(c), Doc. No. 491).)  Second, the United States noted at the hearing that, in the event of a double recovery, Prospective Intervenors could file a tax refund suit.  *See also Bentsen*, 1995 U.S. Dist. LEXIS 2357, at *6.  Prospective Intervenors' claim that such a remedy is unavailable because they do not know how the United States will apportion the fourteen million dollars is unavailing.  Upon filing suit, Prospective Intervenors could request specific, relevant information to that effect.  Looking, for example, at the Olsens, who have been assessed additional taxes for 2010 to 2014, the only risk of a double recovery relates to 2013 and 2014.  The Olsens could file a refund suit relevant to those two years and request information as to the apportionment of any amount of the fourteen million dollars the United States actually receives.  Where there are

alternative means for relief, Prospective Intervenors do not have an irreparable injury warranting exception from the Anti-Injunction Act.

Because the relief Prospective Intervenors seek is barred by the Declaratory Judgment Act and the Anti-Injunction Act, their injury is not likely to be redressed by a favorable decision. Accordingly, they lack standing to intervene.

IV.    <u>Subject-Matter Jurisdiction</u>

Although it appears clear, as outlined above, that Prospective Intervenors must establish standing for permissive intervention, subject-matter jurisdiction is addressed for completeness. To litigate a claim on the merits, a prospective permissive intervenor must establish "an independent ground for subject matter jurisdiction." *Equal Emp't Oppor'y Comm'n v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998) (citing *Beckman Indus. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992)); *see also Hunnicutt v. Smith*, No. 18-619, 2021 U.S. Dist. LEXIS 155664, at *2–3 (D.N.M. Aug. 18, 2021) (unpublished) ("[P]ermissive intervention . . . requires . . . an independent basis of subject matter jurisdiction.").

As explained above, Prospective Intervenors' action is barred by the Declaratory Judgment Act and the Anti-Injunction Act. In these circumstances, the court lacks subject-matter jurisdiction over Prospective Intervenors' claim. *See Green Sol. Retail, Inc. v. United States*, 855 F.3d 1111, 1112 (10th Cir. 2017) (affirming the district court's order dismissing the action for lack of subject-matter jurisdiction because it was barred by the Anti-Injunction Act and the Declaratory Judgment Act); *Fostvedt v. United States*, 978 F.2d 1201, 1204 n.4 (10th Cir. 1992) ("The district court must dismiss, for lack of subject matter jurisdiction, any suit that does not fall within one of the exceptions [to the Anti-Injunction Act and Declaratory Judgment Act.]"). Accordingly, even if Article III standing were not required for permissive intervention,

where Prospective Intervenors' claims are barred by the Declaratory Judgment Act and the Anti-Injunction Act, the court lacks subject-matter jurisdiction over their claims.

## CONCLUSION

Where Prospective Intervenors failed to establish they have standing to intervene, their motion to intervene, (Doc. No. 1143), is DENIED.

DATED this 2nd day of February, 2022.

BY THE COURT:

Daphne A. Oberg
United States Magistrate Judge